UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

Ernie Haire Ford, Inc., d/b/a Big Dog                    Case No. 8:08-bk-18672-MGW
Motorcycles of Tampa, d/b/a Ernie                        Chapter 11
Haire MegaVolume Superstore, d/b/a
Quicklane Tire & Auto Center, d/b/a
Ernie Haire Used Car Auto Mall, d/b/a
Indian Motorcycle of Tampa, d/b/a Ernie
Haire Used Car Supercenter of Tampa

          Debtor.
_____/

## AMENDED[1] ORDER APPROVING SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES AND SHORTENING NOTICE PURSUANT TO BANKRUPTCY RULE 2002(a)(2)

THIS CASE having come before the Court for hearings on August 17, 2009, at 9:30 a.m.

(the "**Sale Hearing**") upon the *Debtor's Motion to Authorize Sale of Assets Free and Clear of*

*Liens, Claims, Interests, and Encumbrances and to Shorten Notice Pursuant to Bankruptcy Rule*

*2002(a) and Request for Expedited Hearing* filed on July 17, 2009 (Doc. No. 533) (the "**Sale**

**Motion**"). At the Sale Hearing, the Debtor was represented by Herbert R. Donica and Geoffrey

Todd Hodges; the Elder Automotive Group of Tampa Bay, Inc. ("**Elder**") was represented by

Michael V. Hargett; Northgate Lincoln-Mercury, Inc. ("**Northgate**") was represented by Andrew

M. Brumby; and Crown Automotive Group, Inc. ("**Crown**") was represented by Charles A.

Postler.

Elder delivered to the Debtor a signed Asset Purchase Agreement dated as of June 29,

2009 (the "**Purchase Agreement**") providing for the sale, conveyance, and transfer by the

---

[1] This Order amends the Court's Order dated September 8, 2009 [Dkt. 669] only to attach Exhibit "A," which was omitted from the original Order, and to correct the scrivener's error in the sequence of the lettered paragraphs in the Findings of Fact and Conclusions of Law.

Debtor and the purchase and acceptance by Elder of substantially all of the assets of the Debtor as defined in the Purchase Agreement (the "**Assets**"), free and clear of any and all claims (including "claims" as defined in Section 101(5) of the Bankruptcy Code), mortgages, pledges, liens, security interests, interests, charges, encumbrances, setoffs, recoupments, liabilities, debts, indebtedness, costs, damages, judgments, or obligations of any character whatsoever, wherever and whenever arising (collectively, the "**Encumbrances**"), in consideration for the payment in cash, as provided for by the Purchase Agreement. The Purchase Agreement was filed on June 29, 2009 concurrently with the *Debtor's Emergency Motion to Approve Bid Procedures for Auction and Sale of Assets* and has been on file with the Court and available for inspection and review by creditors and parties in interest.

In connection with the proposed sale by the Debtor of the Assets, after notice and hearing on July 1, 2009 upon the *Debtor's Emergency Motion to Approve Bid Procedures for Auction and Sale of Assets* (Doc. No. 493), this Court entered its *Order Granting Debtor's Emergency Motion to Approve Bid Procedures for Auction and Sale of Assets* (Doc. No. 532), which, after further notice and hearing on July 27, 2009, was supplemented by the *Order Supplementing Order Granting Debtor's Emergency Motion to Approve Bid Procedures for Auction and Sale of Asset*s (Doc. No. 601) entered August 13, 2009 (collectively, the "**Bid Procedures Orders**").

In the Bid Procedures Orders, the Court (1) established a deadline of 12:00 noon (Eastern Daylight Time) on August 14, 2009 for the submission of any competing bids for the Assets, (2) approved procedures for submission of competing bids and (3) approved a break-up fee to be paid to Elder in the event a competing bid was accepted as a higher and better offer.

The Bid Procedures Orders were served on all parties listed on the Local Rule 1007-2 parties in interest list. The Court finds that the Bid Procedures Orders were served on all

potential bidders in order to achieve selection of the highest and best offer for the sale of the Assets. The Court further finds that, on August 14, 2009, Northgate and Crown timely submitted competing bids in the form of an executed asset purchase agreement, and Elder timely submitted a qualifying bid in the form of an executed amended and restated asset purchase agreement.

Pursuant to Orders of this Court, an auction was conducted in open court on August 17, 2009 9:30 a.m. (Eastern Daylight Time) in Courtroom 8A, Sam M. Gibbons United States Courthouse, 801 North Florida Avenue, Tampa, Florida (the "**Auction**"), before the undersigned judge of this Court.

At the Auction, Elder, Crown and Northgate appeared, participated and submitted bids. After a succession of bids at the Auction, Crown made a bid providing an estimated benefit to the unsecured creditors of $2,825,000 (the "**Backup Backup Bid**"), Northgate made a bid providing an estimated benefit to the unsecured creditors of $3,400,000 (the "**Backup Bid**"), and Elder made a bid providing an estimated benefit to the unsecured creditors of $3,500,000 (the "**Final Bid**"). The terms and conditions of the Final Bid are set forth in the executed asset purchase agreement attached hereto as **"Exhibit A"** and incorporated herein by reference (the "**Final Purchase Agreement**").

At the Sale Hearing, the Debtor advised the Court that the Final Bid submitted by Elder at the Auction was the highest and best offer for the Assets and recommended that the Final Bid be approved by the Court. As set forth in this Order, the Court found at the hearing, and in this Order further finds, that the Final Bid of Elder (in such capacity, together with such affiliates of Elder to whom Elder may assign its rights and privileges under the Final Purchase Agreement, the "**Buyer**") was the highest and best offer for the Assets and approved the sale, as reflected hereinbelow, of the Assets to the Buyer. The Court further found it appropriate to approve the

Backup Bid as the second highest and best bid and to approve the Backup Backup Bid as the third highest and best bid.

The Court finds that the notice to creditors and other parties in interest, including potential bidders, contained within the Sale Motion, the Bid Procedures Orders, and of the Sale Hearing, was adequate, sufficient, and appropriate under the circumstances of this Chapter 11 Case and constitutes due, adequate, and timely notice in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the Local Rules of this Court, and otherwise satisfies the procedural requirements of due process. Any requirements for other notice are hereby waived and dispensed with pursuant to Bankruptcy Rules 2002, 6006, 9006 and 9007, Rule 2002-1 of the Local Rules and Section 105 (a) of the Bankruptcy Code. The Court further finds that appropriate certificates of mailing and service have been filed in the record regarding such notice.

The Court finds that the bid procedures set forth in the Bid Procedures Orders have been duly complied with in all respects by the Debtor, the Buyer, Crown, and Northgate. The Court further finds that the implementation and conduct of the bid procedures were fair and reasonable under the circumstances and reasonably calculated to achieve the highest and best price for the Assets for the benefit of the Debtor's estate and their creditors.

Based upon the entire record, the Court finds and concludes as follows:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW:[2]

A.     The Debtor has advanced sound and sufficient business reasons, and it is a reasonable exercise of the Debtor's business judgment pursuant to Section 363 of the Bankruptcy Code, to sell the Assets to the Buyer, in accordance with the terms of the Final Purchase

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed.R.Bankr.P. 7052. Decretal provisions of this Final Order shall have the same effect

Agreement. The Final Purchase Agreement is further justified by the compelling circumstances described in the Sale Motion and the representations and proffers offered in support of the Sale Motion at the Bid Procedures Hearing, the Auction, and the Sale Hearing.

B. The Assets are property of the Debtor's estate, and title thereto is vested in the Debtor's estate, subject to consummation of the Final Purchase Agreement.

C. The Final Purchase Agreement is a result of an extensive search and marketing process conducted by the Debtor. As demonstrated by the pleadings, certain testimony, and other evidence proffered or adduced at the hearings, the Debtor has adequately marketed the Assets and conducted the sale process in compliance with the Bid Procedures Orders and applicable law.

D. The Debtor and the Buyer have acted in good faith in connection with the preparation, negotiation, and execution of the Final Purchase Agreement; the subject matter of the Sale Motion and this Order; and the implementation of the Bid Procedures Orders, and the conduct of the Auction. Without limiting the foregoing, the Final Purchase Agreement has been negotiated in good faith, at arm's length, and not by any means forbidden by law. The Court specifically finds that the Buyer has acted in good faith in pursuing the transactions contemplated in the Final Purchase Agreement for purposes of Section 363(m) of the Bankruptcy Code and is therefore entitled to the protection of that provision.

E. The Purchase Price was not controlled by an agreement among potential bidders, and, therefore, the sale of the Assets is not subject to avoidance under Section 363(n) of the Bankruptcy Code.

---

whether they are included in the Findings of Fact and Conclusions of Law or elsewhere in this Final Order.

F.      The consideration provided by the Buyer for the purchase of the Assets pursuant to the Final Purchase Agreement (the "**Purchase Price**") substantially exceeds all projections for the likely proceeds the Debtor would have realized from a liquidation of the Assets.

G.      The Debtor has articulated good and sufficient business justifications for the sale of the Assets, pursuant to Sections 363(b) and 363(f) of the Bankruptcy Code, upon the expedited time schedule approved by the Court.

H.      The Buyer would not have entered into the Final Purchase Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtor, its estate, and their creditors, if the sale, conveyance, and transfer of the Assets to the Buyer were not free and clear of all Encumbrances of any kind or nature whatsoever, or if the Buyer would, or in the future could, be liable for any such Encumbrances.

I.      The offer evidenced by the Final Purchase Agreement constitutes the highest and best offer for the Assets.

J.      The sale of the Assets to the Buyer constitutes a sale of property of the Debtor outside the ordinary course of business within the meaning of Section 363(b) of the Bankruptcy Code and is fair, reasonable, and in the best interests of the Debtor, its creditors, the estate, and all parties in interest.

K.      The requirements for a sale under Section 363(f) of the Bankruptcy Code have been satisfied and the Assets may be sold under that subsection of the Bankruptcy Code.

L.      The Buyer does not constitute a successor to the Debtor or its estate, and the transactions contemplated in the Final Purchase Agreement do not amount to a consolidation, merger, or *de facto* merger of the Buyer and the Debtor or its estate.

M.     To the extent that any objecting party's respective objection has not been withdrawn or specifically addressed by this Order, such objection is **overruled** by this Order.

N.     The statutory predicates for the relief sought in the Sale Motion are Sections 105, 363, 1107, and 1108 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9006, and 9014.

O.     This Court has jurisdiction to hear and determine the Sale Motion and to grant the relief requested in the Sale Motion pursuant to 28 U.S.C. §§157(b)(l) and 1334(b). Venue of these cases and the Sale Motion in this district is proper under 28 U.S.C. §§1408 and 1409. This proceeding is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A), (N) and (0).

P.     The Court, having considered the Sale Motion and the record, and having heard argument of counsel and testimony proffered by counsel at the Sale Hearing, and being fully advised in the premises, for the reasons announced on the record at the Auction and the Sale Hearing and stated in open court, which, together with this Order, shall constitute the findings of fact, conclusions of law, and decision of the Court, finds that the relief requested in the Sale Motion is necessary and appropriate and in the best interests of the Debtor, its creditors, and the estate, and that the Sale Motion is well taken and should be granted in accordance with the terms and conditions set forth in this Order.

**NOW THEREFORE, BASED UPON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.     The Sale Motion is granted as set forth in this Order.

2.     The motion to shorten notice filed in relation to the Sale Motion is hereby granted.

3.     Any objection to the entry of this Order, to the extent not resolved or withdrawn, is hereby **overruled**.

4.     The findings of fact set forth above or stated in open court are ratified and adopted as findings of this Court and are incorporated in this Order. To the extent that any of the findings of fact set forth in this Order are deemed to be conclusions of law, then such findings are confirmed as conclusions of law, and vice versa.

5.     The Final Bid by the Buyer is determined to be the highest and best offer for the purchase of the Assets.

6.     The form and substance of the Final Purchase Agreement and the transactions contemplated by it are approved in all respects, except as otherwise provided in Paragraph 30. Following the entry of this Order, the Debtor and the Buyer are authorized to enter into any nonmaterial amendment or modification to the Final Purchase Agreement that is not adverse to the Debtor's estate without the need of further notice and hearing or order but notice of all such modification shall be provided to counsel for the Official Committee of Unsecured Creditors in this Case.

7.     The execution, delivery, performance, and implementation of the Final Purchase Agreement by the Debtor is ratified, authorized, and approved in all respects.

8.     Subject to the terms and conditions of the Final Purchase Agreement and this Order, the Debtor is authorized and directed to sell, transfer, assign, and deliver the Assets to the Buyer free and clear of any and all Encumbrances, subject to the payment by the Buyer of the Purchase Price in accordance with the Final Purchase Agreement.

9.     The Debtor shall sell the Assets to the Buyer on an "as is, where is" basis meaning that the Buyer shall take such assets in their condition as of the Closing Date, as defined

below, and without warranty or representations of any kind from the Debtor except as set forth in the Final Purchase Agreement.

10.     If the Debtor does not consummate the transactions contemplated in the Final Purchase Agreement with the Buyer and the Final Purchase Agreement is terminated according to its terms, the Debtor shall proceed to close on the sale of the Assets with Northgate as the backup bidder pursuant to the terms of the Backup Bid. If Northgate is unable to consummate the transactions on such terms, then the Debtor shall proceed to close on the sale of the Assets with Crown pursuant to the terms of the Backup Backup Bid. In each of the foregoing scenarios, the closing would be subject to the terms of a definitive purchase agreement to be entered into subsequently, if necessary, and in accordance with the Bid Procedures Orders and subject to all other terms, findings, conclusions, protections and other provisions of this Order, with the Backup Bidder or the Backup Backup Bidder, as applicable, substituted as the Buyer for purposes of this Order and the respective definitive purchase agreement of the Backup Bidder or the Backup Backup Bidder, as applicable, substituted as the Final Purchase Agreement for purposes of this Order.

11.     The Debtor is authorized and directed to take any and all actions necessary or appropriate to (a) consummate the transactions contemplated in the Final Purchase Agreement including, but not limited to, the sale of the Assets (including, without limitation, to convey to the Buyer any and all of the Assets intended to be conveyed free and clear from any and all Encumbrances) and the closing in accordance with the Sale Motion, the Final Purchase Agreement, and this Order (the "**Closing**"); the date upon which the Closing shall occur is referred to herein as the "**Closing Date**") and (b) execute and deliver all documents and to perform, consummate, implement, and close fully the transactions contemplated in the Final

Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Final Purchase Agreement, the sale, conveyance, and transfer of the Assets free and clear from any and all Encumbrances.

12.     Ten (10) days following the Closing Date, the Debtor shall promptly refund the bid deposit of Northgate, as the backup bidder, and Crown, as the backup backup bidder, pursuant to the Bid Procedures Orders.

13.     In the event the Closing does not occur, the Debtor shall be required to disburse Elder's bid deposit only in accordance with the Final Purchase Agreement and the Bid Procedures Orders.

14.     The provisions of this Order authorizing the sale of the Assets free and clear of Encumbrances shall be self-executing and neither the Debtor nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate, and implement the provisions of this Order. However, the Debtor and the Buyer are authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtor or the Buyer deem necessary and appropriate to implement and effectuate the terms of the Final Purchase Agreement and this Order. If any person or entity that has filed a financing statement, mortgage, or other document or agreement evidencing Encumbrances on or in any of the Assets (including Encumbrances noted on certificates of title as to any vehicles or equipment owned by the Debtor) has not delivered to the Debtor at or prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of Encumbrances and any other documents necessary for the purpose of documenting the release of all Encumbrances that the person or entity has with respect to any of the Assets, then without

further order of the Court the Buyer is authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Assets.

15.     Any and all Assets in the possession or control of any person or entity, including, without limitation, any auction house, former vendor, supplier, or employee of the Debtor, shall be transferred to the Buyer free and clear of the Encumbrances pursuant to the Final Purchase Agreement.

16.     Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of any security, or the making, delivery, filing, or recording of an instrument of transfer pursuant to the Sale shall not be taxed under any law imposing a stamp tax, or similar tax. The future sales of real property pursuant to the Dealership Facility Leases attached to the Final Purchase Agreement as Exhibits J, K and L shall be instruments of transfer within the meaning of, and subject to the terms of, this paragraph 16. All filing or recording officers, wherever located and by whomever appointed, are hereby directed to accept for filing or recording, and to file or record immediately upon presentation thereof, all such deeds, bills of sale, mortgages, leasehold mortgages, deeds of trust, leasehold deeds of trust, memoranda of lease, notices of lease, assignments, leasehold assignments, security agreements, financing statements, and other instruments of absolute or collateral transfer without the payment of any stamp tax, or similar tax imposed by federal, state, or local law.

17.     In the absence of a stay pending appeal, if the Buyer closes under the Final Purchase Agreement at any time on or after the entry of this Order, then, with respect to the Final Purchase Agreement, the Buyer shall be entitled to the protection of Section 363(m) of the Bankruptcy Code if this Order or any authorization contained herein is reversed or modified on

appeal. The purchase by the Buyer is a purchase in good faith for fair value within the meaning of Section 363(m) of the Bankruptcy Code and Buyer is granted the maximum protections of Section 363(m) of the Bankruptcy Code.

18.     The sale, conveyance, and transfer of the Assets approved by this Order is not subject to avoidance pursuant to Section 363(n) of the Bankruptcy Code.

19.     On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general sale, conveyance, and transfer of the Assets and a bill of sale transferring good and marketable title in the Assets to the Buyer free and clear from any and all Encumbrances. Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated in the Final Purchase Agreement.

20.     Neither the Debtor nor the Buyer shall be liable for any brokerage commission or finder's fee with respect to the transactions contemplated in the Final Purchase Agreement, and no portion of the Purchase Price shall be disbursed for such expenses.

21.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated in the Final Purchase Agreement.

22.     The notice and service given by the Debtor with respect to the Sale Motion, the Auction, and the Bid Procedures Orders complied with the Bankruptcy Code, the Bankruptcy Rules, the Bid Procedures Orders, and the Local Rules of this Court.

23.     Any creditor, prospective purchaser, lessor, or other party in interest that did not file and serve, on or before the Sale Hearing, a written objection to the Sale Motion or the sale, conveyance and transfer contemplated by the Final Purchase Agreement is conclusively deemed to have waived any objection it may have to the Sale Motion, the Auction, or the sale of the

Assets to the Buyer and shall be, and hereby is, permanently barred and restrained from objecting to the sale and conveyance to the Buyer of the Assets.

24.     Without limiting the effect or scope of the foregoing, the sale, transfer, and conveyance of the Assets from the Debtor to the Buyer does not and will not subject the Buyer or its affiliates, successors, or assigns or their respective properties (including the Assets) to any liability for claims against the Debtor or the Assets by reason of such transfer under the laws of the United States or any state, territory, or possession of the United States applicable to such transactions.

25.     The Buyer shall not be deemed to have acquired, assumed, or agreed to perform or pay any liability, claim, warranty, debt, or obligation of the Debtor, including, without limitation, any federal, state or local tax (including, without limitation, any tax, fine, or penalty relating to a tax or addition to tax, whether or not previously assessed, fixed, or audited) incurred but unpaid by the Debtor prior to the Closing Date, except as expressly provided in the Final Purchase Agreement or in this Order. The Buyer shall not be deemed (a) to be a successor or successor in interest to the Debtor by reason of any theory of law or equity and shall not have any successor or transferee liability of any kind or character; (b) to have merged, *de facto* or otherwise, with or into the Debtor; or (c) to be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor. Pursuant to sections 105(a) and 363 of the Bankruptcy Code, all persons are hereby enjoined from taking action against the Buyer to recover any claim (as defined in section 101(5) of the Bankruptcy Code) which such person has against the Debtor or otherwise in connection with the Assets. The Debtor is not a small business debtor as defined in 11 U.S.C. § 101 (51D).

26.     Without limitation of the foregoing, Buyer shall have no obligation to pay wages, bonuses, severance pay, vacation pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans) or any other payment with respect to employees or former employees of the Debtor or its affiliated companies, specifically including any its employee leasing companies, if any. Buyer shall have no liability with respect to any collective bargaining agreement, employee pension plan, employee welfare or retention, benefit and/or incentive plan to which the Debtor is a party and relating to the Assets, and Buyer shall in no way be deemed to be a party to or an assignee of any such agreement, and all parties to any such agreement are hereby enjoined from asserting against Buyer any and all claims, as defined in Section 101(5) of the Bankruptcy Code, or Encumbrances of any kind or nature whatsoever arising from or relating to such agreement.

27.     Without limitation of the foregoing, Debtor shall retain the responsibility for providing its employees notice as required by the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101, et seq. (the "**WARN Act**").   Debtor shall be solely responsible for any and all liabilities, losses, claims, damages, causes of action, lawsuits, administrative proceedings (including informal proceedings), judgments, settlement payments, costs, and expenses (including without limitation reasonable attorneys' fees and disbursements of every kind, nature and description) with respect to any obligations under the WARN Act, including but not limited to, any and all such liabilities, losses, claims, damages, causes of action, lawsuits, administrative proceedings (including informal proceedings), judgments, settlement payments, costs and expenses (including without limitation reasonable attorneys' fees and disbursements of every kind, nature and description) arising out of a failure to give the required notice under the WARN Act and/or giving the required notice in less than the time

required by the WARN Act.  Buyer shall have no responsibility to Debtor or any employees of Debtor under the WARN Act.

28.     Without limitation of the foregoing, Buyer shall not be responsible for any environmental liabilities that existed as of the Closing Date or arise after the Closing Date due to activities conducted prior to the Closing Date. Nothing in this Sale Order shall be interpreted to deem Buyer as the successor to the Debtor under any state law successor liability doctrine with respect to any liabilities under environmental statutes or regulations for penalties for days of violation prior to the Closing or for liabilities relating to off-site disposal of waste by the Debtor prior to the Closing. Nothing in this paragraph shall be construed to create for any governmental unit any substantive right that does not already exist under law.

29.     Without limitation of the foregoing, Buyer shall have no obligation to withhold any portion of the Purchase Price to safely cover the account of any taxes, interest or penalties levied by the State of Florida against the Debtor and shall not be liable for any such taxes, interest or penalties in respect of the Debtor's business operations prior to the Closing Date.

30.     The terms and provisions of this Order and the Final Purchase Agreement shall be binding in all respects upon the Buyer and upon the Debtor and its affiliates and subsidiaries; their estates; and all creditors, equity interest holders, and other parties in interest in the Debtor's Chapter 11 cases (whether known or unknown); all parties to executory contracts and leases to be rejected or otherwise not assumed by the Debtor; any parties filing objections to the Sale Motion; all other parties in interest and the respective successors and assigns of each of the foregoing, and any subsequent trustees or examiners appointed in the Debtor's Chapter 11 case or upon a conversion to Chapter 7 under the Bankruptcy Code. The Final Purchase Agreement shall not be subject to rejection and, in the event that the Debtor's Chapter 11 case is converted

to Chapter 7 under the Bankruptcy Code, the Final Purchase Agreement shall not be subject to rejection in such Chapter 7 case. Nothing herein shall be construed to bind Wachovia to take any action, perform any function or deliver any document related solely to its perfected mortgage lien interests in the real estate covered by the Dealership Facility Lease (New Vehicle Sales Parcel) attached to the Final Purchase Agreement as Exhibit K (the "**New Vehicle Sales Parcel Lease**"), including, but not limited to, any provisions in the New Vehicle Sales Parcel Lease purporting to require Wachovia to deliver a Subordination, Non-Disturbance and Attornment Agreement or release its mortgage lien interests for less than the outstanding balance directly or indirectly secured thereby from time to time. Provided, however, the foregoing provision shall in no way diminish the Debtor's duty, pursuant to Paragraph 11(A)(13) of the Final Purchase Agreement, to deliver at closing the New Vehicle Sales Parcel Lease and a Subordination, Non-Disturbance and Attornment Agreement from such lender(s), including but not limited to, Wachovia, in favor of Elder, the terms of which shall be satisfactory to Elder in its reasonable discretion. Wachovia will provide at Closing, a Subordination, Non-Disturbance and Attornment Agreement regarding the Dealership Facility Lease (Used Vehicle Sales Parcel) attached to the Final Purchase Agreement as Exhibit J, in favor of Elder, the terms of which shall be satisfactory to both Wachovia and Elder, in their respective reasonable discretion, subject only to the confirmation of Debtors Amended and Restated Chapter 11 Plan, dated August 31, 2009, as supplemented and the funding by Debtor at closing of the 9560 Principal Reserve Account, as defined therein.

31.     The Debtor shall not be required to file the statement with the United States Trustee as described in Bankruptcy Rule 6004(f)(1).

32.     To the extent that any inconsistency between the provisions of this Order and the terms of the Final Purchase Agreement or the Sale Motion or any other order entered in these cases arises, the provisions of this Order shall control.

33.     The provisions of this Order are nonseverable and mutually dependent.

34.     This Court retains jurisdiction (a) to interpret and enforce the provisions of the Final Purchase Agreement and the documents executed pursuant to the Final Purchase Agreement; (b) to interpret and enforce the provisions of this Order; and (c) to enter and provide any appropriate relief in connection with the full performance under the Final Purchase Agreement, including but not limited to the obligations with respect to third party liens.

35.     The proceeds of the sale shall be paid to the Debtor at the closing subject only to the payment of the closing costs, prorations, and other sums required by the Final Purchase Agreement.

36.     The Debtor is granted authority to enter into a lease (the "**Lease**"), as landlord, with Elder, as tenant, for the Used Vehicle Sales Parcel, as that term is defined in and subject to the terms and conditions contained in the Final Purchase Agreement.  The Debtor is granted `authority to reject its leasehold interests in the New Vehicle Sales Parcel and the Vacant Lot, excluding the southern sixty (60) feet thereof, as those terms are defined in the Final Purchase Agreement (the "**Rejection**"). The effective date of the Lease and the effective date of the Rejection shall be the Closing Date. Upon the Rejection, the leasehold interest of the Debtor to the New Vehicle Sales Parcel and the Vacant Lot, excluding the southern sixty (60) feet thereof, shall cease to be property of the estate.

37.     If the Closing does not occur due to the Debtor's failure to deliver one or more of the closing deliverables required in Paragraph 11(A) of the Final Purchase Agreement, then

Elder shall have an allowed super-priority administrative expense claim for the break-up fee in the amount of $150,000 (the "**Break-Up Fee**") approved in the Bid Procedures Orders. The Debtor is authorized and directed to pay the Breakup Fee at the closing of a transaction with either Northgate or Crown. The Break-Up Fee shall be paid out of the first proceeds of the sale prior to the satisfaction of any of the Debtor's other claims or indebtedness. The Break-Up Fee shall be paid only from such proceeds.

38.     This Order <u>shall be immediately effective</u> and is not subject to the 10 day stays contemplated under Fed.R.Bankr.P. 6004(h) and 6006(d), and the Debtor and other parties are authorized and directed to consummate the transfer of the Assets to Elder.

**DONE** and **ORDERED** in Chambers at Tampa, Florida on September 17, 2009 _____.

_____
Michael G. Williamson
United States Bankruptcy Judge

Copies to:

Ernie Haire Ford, Inc., 9545 N. Florida Ave., Tampa, FL 33612
Herbert R. Donica, Esq., 106 S. Tampania Ave., Suite 250, Tampa, FL 33609
Geoffrey Todd Hodges, Esq., 905 Shaded Water Way, Lutz, FL 33549
Alberto F. Gomez, Jr., Esq., 119 S. Dakota Avenue, Tampa, FL 33606
Michael V. Hargett, Esq., 601 Bayshore Blvd., Suite 700, Tampa, FL 33606
Roy S. Kobert, Esq., 390 N. Orange Ave., Ste. 1400, Orlando, FL 32801
Richard H. Malchon, Jr., Esq., 401 E. Jackson St., Suite 2700, Tampa, FL 33602
Hans Christian Beyer, Esq., 201 E. Kennedy Blvd., Suite 600, Tampa, FL 33602
Charles A. Postler, Esq., 110 E. Madison St., Suite 200, Tampa, FL 33602
Andrew M. Brumby, Esq., P. O. Box 4956, Orlando, FL 32802-4956
Benjamin E. Lambers, Esq., 501 E. Polk St., Suite 1200, Tampa, FL 33602
All parties listed on the Local Rule 1007-2 parties in interest list

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

THIS AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of the ~~3rd~~ 24th day of August, 2009, by and among **ERNIE HAIRE FORD, INC.**, a Florida corporation ("Seller"), as debtor and debtor in possession in Case No. 08-18672-MGW, pending in the United States Bankruptcy Court for the Middle District of Florida (Tampa) (the "Court"), and **ELDER AUTOMOTIVE GROUP OF TAMPA BAY, INC.**, a Florida corporation ("Buyer"). Buyer and Seller are sometimes referred to individually as a "Party" and together as the "Parties".

## RECITALS

A.    Seller is the owner of certain assets used in connection with the operation of an automobile dealership (the "Business") which sells products of the Ford Division of Ford Motor Company ("Ford Motor Company" or "Ford") located at 9545 North Florida Avenue, Tampa, Florida 33612 (the "Dealership Facility"). For purposes of this Agreement, the Dealership Facility shall be comprised of the New Vehicle Sales Parcel, the Used Vehicle Sales Parcel and the Vacant Lot, as such terms are defined in Section 11(A)(13) of this Agreement.

B.    Seller desires to sell and Buyer desires to buy certain assets of Seller related to the Business as described herein (the "Asset Transaction").

C.    Seller and Buyer are parties that certain Asset Purchase Agreement dated June 29, 2009 (the "Original Purchase Agreement").

D.    Seller and Buyer desire to enter into this Amended and Restated Asset Purchase Agreement concerning the Asset Transaction, which shall supersede the Original Purchase Agreement in all respects.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, it is agreed by and between the Parties as follows:

1.    <u>TRANSFER AND PRICING OF ASSETS TO BE SOLD</u>. Seller shall sell and Buyer shall purchase certain of the assets of Seller on the terms and conditions all as set forth on <u>Schedule 1</u> attached hereto and made a part hereof (collectively, the "Assets").

2.    <u>EXCLUDED ASSETS</u>. The Assets to be purchased hereunder do not include those Assets listed on <u>Schedule 2</u> attached hereto. Any assets or goods on consignment shall not be included in the definition of Assets under this Agreement.

3.    <u>LIABILITIES NOT ASSUMED</u>. Except for the Assumed Business Contracts and Leases (as defined in Section 8(C) below), Buyer will not assume, and Seller, or its affiliates, are solely responsible for, any and all debts, obligations or liabilities of Seller, or its affiliates, contingent or otherwise, presently existing or arising after the Date of this Agreement (as defined in Section 21(L) below), including but not limited to: (a) any liability for taxes; (b) contingent liabilities, including any contingent warranty liability, except as provided in this

Section 3 below; (c) 401(k) employee elective deferrals, matching contributions and any discretionary employee elective contributions payable; (d) accrued healthcare expense; (e) accrued property or other tax; (f) any liability to any of Seller' employees as more fully described in Section 14 below, and (g) any liability related to any employee leasing company or credit life company operating in connection with the Business.

Seller has informed Buyer and Buyer acknowledges that Seller, in its operation of the Business, grants a purchaser of a Used Vehicle (as defined in Schedule 1 attached hereto) a thirty (30) day warranty (the "Used Vehicle Warranty"). At the Closing the sum of One Thousand and No/100 Dollars ($1,000) multiplied by the number of Used Vehicles sold by Seller within thirty (30) days prior to Closing shall be withheld by Buyer from the purchase price otherwise due to Seller under this Agreement (the "Warranty Escrow Funds"), and shall be deposited with Dawda, Mann, Mulcahy & Sadler, PLC ("Dawda Mann"), to be held or disbursed by Dawda Mann in accordance with the terms hereof. If at any time during the thirty (30) day period following the Closing Date (the "Warranty Escrow Period"), Buyer incurs any expenses or costs with respect to any Used Vehicle Warranty, Buyer shall provide written notice to Dawda Mann, with a copy to Seller setting forth the amount of such expenses or costs and Dawda Mann shall, following receipt, pay to Buyer from the Warranty Escrow Funds the amount of such expenses or costs incurred by Buyer. To the extent that any Warranty Escrow Funds remain following the expiration of the Warranty Escrow Period, such remaining Warranty Escrow Funds shall be delivered by Dawda Mann to Seller. Any costs and expenses related to any Used Vehicle Warranty incurred by Buyer during the Warranty Escrow Period in excess of the Warranty Escrow Funds shall be the responsibility of Buyer.

4.    REPRESENTATIONS AND WARRANTIES OF SELLER. Seller represents and warrants to Buyer as follows:

(A)    (1)    Seller is a corporation duly incorporated, existing and in good standing under the laws of the State of Florida, and is duly authorized to carry on the Business and to own and lease its properties as and in the places where such properties are now owned, leased or operated, subject to the United States Bankruptcy Code, 11 U.S.C. §§101, et. seq.

(2)    Pursuant to the Court Order, as defined in Section 11(A)(10) below, Seller has all requisite power and authority to own and operate the Assets, to carry on the Business, to enter into this Agreement and the other documents and instruments to be executed and delivered by Seller pursuant hereto and to carry out the transactions contemplated hereby and thereby, and the person signing on behalf of Seller has all requisite power and authority to bind Seller to this Agreement and to execute all documents necessary to consummate the Asset Transaction.

(3)    Seller does not own any interest in any corporation, partnership or other entity, except for its interest in Brandon Used Car AutoMall, LLC, a Florida limited liability company, and E Z Car Sales, Inc., a Florida corporation.

(B)    At the time the Court Order is entered, Seller will be awarded and will have good and marketable title to all of the Assets subject to no mortgage, conditional sales agreement, charges, liens, claims, debts, taxes or encumbrances.

2

(C) Seller has filed, or will file, all federal, state and local governmental tax returns required by it to be filed in accordance with the provisions of law pertaining thereto and has paid all taxes and assessments (including, without limitation of the foregoing, income, excise, unemployment, social security, occupation, franchise, property, and import taxes, duties or charges and all penalties and interest in respect thereto) required by Seller to have been paid to date. Buyer acknowledges that Seller has not yet filed its federal, state and local tax returns for the 2008 tax year, and that the Internal Revenue Service has filed a claim against Seller with respect to its 2008 tax year. The Court Order shall provide that Buyer assumes no responsibility for any federal, state and local taxes of Seller, and that the Assets shall be free and clear of any claim for taxes by any taxing authority.

(D) (1) The execution and delivery of this Agreement and the other documents and instruments to be executed and delivered by Seller pursuant hereto and the consummation of the transactions contemplated hereby and thereby have been duly authorized by Seller. Other than the Court Order, no other or further corporate act or proceeding on the part of Seller or its shareholders is necessary to authorize this Agreement or the other documents and instruments to be executed and delivered pursuant hereto or the consummation of the transactions contemplated hereby and thereby. This Agreement constitutes, and when executed and delivered, the other documents and instruments to be executed and delivered by Seller pursuant hereto will constitute, valid and binding agreements of Seller, enforceable in accordance with their respective terms.

(2) Except as set forth on **Exhibit E** attached hereto, and except for Case No. 08-18672-MGW pending in the United States Bankruptcy Court for the Middle District of Florida (Tampa) ("Seller's Bankruptcy"), there are no legal, quasi-judicial or administrative actions, suits or proceedings of any kind or nature now pending or threatened before any court or administrative body in any manner involving Seller, its shareholders, or any of the Assets or shares of capital stock of Seller, or which may adversely affect the power or authority of Seller to carry out the transactions contemplated by this Agreement.

(3) The execution and delivery of this Agreement by Seller and the consummation of the transactions contemplated hereby, as authorized and approved by the Court Order, does not: (i) conflict with or result in a material breach of any provision of or constitute a material default (or an event which with the giving of notice or the lapse of time or both would constitute a material default) or result in the creation of any lien, security interest, charge or encumbrance upon any part of the Assets under any of the terms, conditions or provisions of the Articles of Incorporation or Bylaws of Seller, or any note, bond, mortgage, indenture, license, permit or material agreement or contract (including those set forth on the Exhibits attached hereto) to which Seller is a party or by which any of the Assets may be bound; or (ii) violate any material law or order, writ, injunction, decree, statute, rule or regulation of any court or other governmental authority applicable to or bearing upon Seller or the Assets.

(E) All of Seller's vehicles (other than vehicles held as inventory), machinery, tools (including such special tools as are necessary to the normal operations of the Business), supplies, furniture, fixtures, buildings, improvements and equipment are in good operating condition and repair as of the Date of this Agreement and shall be as of the Closing Date. Buyer

shall have the right at any time prior to the Closing Date to inspect such equipment and ascertain its condition.

(F) **Exhibit F** attached hereto is a list of any and all material agreements, leases or contracts of Seller with respect to the operation of the Business at the Dealership Facility (the "Business Contracts and Leases").

(G) Subject to the Court Order, Seller will have, and, pursuant to the Court Order, Seller will transfer to Buyer good and marketable title to the Assets used in the Business and sold hereunder, subject to no mortgage, pledge, lien, conditional sales agreement, claim, encumbrance or charge except for those shown on **Exhibit G**, which, shall be discharged as of the Closing Date, and Buyer shall take title to the Assets free and clear of such liens or mortgages. With respect to the Dealership Facility: (i) there are no pending or threatened condemnation proceedings, suits or administrative actions relating to the Dealership Facility or other matters affecting the current use or occupancy thereof; (ii) all buildings located upon the Dealership Facility have received all approvals of governmental authorities (including licenses and permits) required in connection with the operation thereof and have been operated and maintained in accordance with applicable laws, ordinances, rules and regulations; (iii) there are no contracts granting to any party or parties the right of use or occupancy of all or any portion of the Dealership Facility, and there are no parties (other than Seller) in possession of all or any portion of the Dealership Facility; (iv) all buildings located on the Dealership Facility are supplied with utilities and other services necessary for their operation as currently operated, all of which services are adequate in accordance with all applicable laws, ordinances, rules and regulations, and are provided via public roads or via permanent, irrevocable, appurtenant easements benefitting the Dealership Facility; (v) the Dealership Facility abuts on and has adequate direct vehicular access to a public road and there is no pending or threatened termination of such access; and (vi) all improvements, buildings and systems on the Dealership Facility are suitable for their current use.

(H) Environmental Matters.

(1) Except as set forth in that certain "Limited Asbestos Screen Report" prepared by Ace Environmental Consulting, LLC, dated July 9, 2009 (the "Asbestos Report"), copies of which have been provided to Buyer and Seller, to the best of Seller's knowledge there are no asbestos-containing materials contained in any improvements located upon the Dealership Facility.

(2) Except as set forth in that certain Phase I Environmental Site Assessment prepared by Enercon Services, Inc., dated July 17, 2009 (the "Phase I Report"), and that certain Limited Phase II Environmental Site Assessment prepared by Enercon Services, Inc., dated July 24, 2009 (the "Limited Phase II Report") (the Asbestos Report, the Phase I Report and the Limited Phase II Report are collectively referred to herein as the "Environmental Reports"), or as otherwise disclosed on **Exhibit H** attached hereto, Seller has not received any request for information, notice of claim, demand or other notification that it is or may be potentially responsible with respect to any investigation or clean-up of hazardous, toxic or polluting substances. Except as necessary to comply with applicable regulations, Seller has not treated, stored for more than ninety (90) days, recycled or disposed of any hazardous, toxic or polluting

4

substances on the Dealership Facility, and except as set forth in the Environmental Reports, no other person has treated or stored for more than ninety (90) days, substances on the Dealership Facility. To the best of Seller's knowledge, and except as set forth in the Environmental Reports, no PCB's, asbestos or urea formaldehyde insulation is present on the Dealership Facility, and there are no underground storage tanks, active or abandoned, on the Dealership Facility.

(3) Except as disclosed on **Exhibit H** attached hereto: (i) Seller has complied with and is not in violation of any federal, state or local law, regulation, permit, provision or ordinance relating to the generation, storage, transportation, treatment or disposal of hazardous, toxic or polluting substances; (ii) Seller has obtained and adhered to all necessary permits and other approvals necessary to store, dispose, and otherwise handle hazardous, toxic and polluting substances; (iii) except as set forth in the Environmental Reports, Seller has reported, to the extent required by federal, state and local law, all past and present sites upon the Dealership Facility where hazardous, toxic or polluting substances have been treated, stored or disposed. To the best of Seller's knowledge, Seller has not transported any hazardous, toxic or polluting substances or arranged for the transportation of such substances to any location which is listed or proposed for listing under the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended ("CERCLA"), the Resource Conservation and Recovery Act, as amended ("RCRA"), or the Clean Water Act, as amended ("CWA"), or which is the subject of federal, state or local enforcement actions or other investigations which may lead to claims against Seller for clean-up costs, remedial work, damages to natural resources or for personal injury claims, including, but not limited to, claims under CERCLA, RCRA or the CWA which could lead to a claim being made against Buyer or Seller.

(I) Seller has informed Buyer, and Buyer acknowledges, that pursuant to Seller's Bankruptcy, Seller is in default under certain of the Business Contracts and Leases. The Court Order shall provide that Buyer assumes no responsibility for any obligations under the Business Contracts and Leases prior to or after the Closing Date, except for any obligations accruing after the Closing Date, and only after the Closing Date, related to any Assumed Business Contracts and Leases.

(J) Seller is not a party to or bound by any collective bargaining agreement or any other agreement with a labor union, and there has been no labor union prior to the Date of this Agreement organizing any employees of Seller into one or more collective bargaining units. There is not now, and there has not been prior to the Date of this Agreement, any actual or threatened labor dispute, strike or work stoppage which affects or which may affect the Business or which may interfere with its continued operations. Neither Seller, nor any employee, agent or representative thereof, have since the date of incorporation of Seller committed any unfair labor practice as defined in the National Labor Relations Act, as amended, and there is no pending or threatened charge or complaint against Seller by or with the National Labor Relations Board or any representative thereof. There has been no strike, walkout or work stoppage involving any of the employees of Seller prior to the Date of this Agreement. Buyer is not obligated, and nothing herein shall be deemed to be a promise, to hire any employees of Seller. Seller has complied with applicable laws, rules and regulations relating to employment, civil rights and equal employment opportunities, including but not limited to, the Civil Rights Act of 1964, the FLSA and Title I of the Americans with Disabilities Act, all as amended.

(K) (i) Except as may be required by applicable law, Seller is not obligated under any employee welfare benefit plan as described in Section 3(1) of ERISA ("Welfare Plan") to provide medical or death benefits with respect to any employee or former employee of Seller or its predecessors after termination of employment; (ii) Seller has complied with the notice and continuation coverage requirements of Section 4980B of the Internal Revenue Code of 1986, as amended (the "Code") and the regulations thereunder with respect to each Welfare Plan that is, or was during any taxable year for which the statute of limitations on the assessment of federal income taxes remains open, by consent or otherwise, a group health plan within the meaning of Section 5000(b)(1) of the Code; and (iii) there are no reserves, assets, surplus or prepaid premiums under any Welfare Plan which is an Employee Benefit Plan. The consummation of the transactions contemplated by this Agreement will not entitle any individual to severance pay, and, will not accelerate the time of payment or vesting, or increase the amount of compensation, due to any individual.

(L) Seller shall retain the responsibility for providing its employees notice as required by the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101, et seq. (the "WARN Act"). Seller shall be solely responsible for any and all liabilities, losses, claims, damages, causes of action, lawsuits, administrative proceedings (including informal proceedings), judgments, settlement payments, costs and expenses (including without limitation reasonable attorneys' fees and disbursements of every kind, nature and description) with respect to any obligations under the WARN Act, including but not limited to, any and all such liabilities, losses, claims, damages, causes of action, lawsuits, administrative proceedings (including informal proceedings), judgments, settlement payments, costs and expenses (including without limitation reasonable attorneys' fees and disbursements of every kind, nature and description) arising out of a failure to give the required notice under the WARN Act and/or giving the required notice in less than the time required by the WARN Act. Buyer shall have no responsibility to Seller or any employees of Seller under the WARN Act, and Seller expressly acknowledges and agrees that this remains Seller's obligation following the Closing. The Court Order shall provide that Seller is solely responsible for, and Buyer shall have no responsibility for, any obligations to the employees of Seller under the WARN Act, including but not limited to, any obligations to the employees of Seller arising out of any reduction in the notification period required by the WARN Act.

5. COVENANTS OF SELLER. Seller represents and covenants to Buyer that during and pending completion of the sale of the Assets contemplated hereby and as of Closing that:

(A) Each and every covenant, representation and warranty set forth in Section 4 above, shall be true and correct.

(B) Seller will maintain itself at all times up to and including the Closing Date as a duly licensed corporation in good standing under the laws of the State of Florida, and duly authorized to carry on the Business and to own and lease its properties as and in the places where such properties are now owned, leased or operated..

(C)     Seller will: (i) keep the Business open during and for not less than the hours customary in the trade in the Dealer's Locality (as such term has been defined pursuant to Seller's Ford Motor Company Sales and Service Agreement); (ii) cause the Business to function in the ordinary course of business and in a good and efficient manner in keeping with the practices customary in the trade in the Dealer's Locality; and (iii) operate the Business in such a way as not to affect adversely the operation of the Business or the good name, goodwill or reputation of Ford Motor Company.

(D)     Seller will afford Buyer, its representatives, agents and employees, at all reasonable times, access to all of the Assets, Seller's books, files, records, insurance policies and shareholders' list for the purpose of audit, inspection and examination thereof, and will do everything reasonably necessary to enable Buyer to make a complete examination of the Assets and the condition thereof. All information so obtained by Buyer and its representatives, agents, and employees shall be kept confidential.

(E)     Seller will not mortgage, pledge or subject to lien or other encumbrance any of the Assets, except for the floor planning of new and used vehicles and any liens approved by the Court that will not attach to the Assets or the Dealership Facility pursuant to the Court Order, and will be discharged by the Court Order so that such liens do not affect the Assets at or after the Closing.

(F)     Seller will not acquire or dispose of any of the Assets subject to the terms of this Agreement or in any way obligate itself to do so, except as may be expressly provided by the terms of this Agreement or except in the ordinary course of business.

(G)     Seller will keep all of the Assets that are insurable insured in accordance with its present practice, and it will maintain, preserve and keep all improvements located upon the Dealership Facility and all equipment, machinery and other personal property constituting a part of the Assets in a good condition and state of repair, reasonable wear and tear or damage or loss by fire, storm or other casualty loss excepted.

(H)     Seller agrees not to enter into employment contracts with employees, grant employees additional benefits, or give employees raises, except in the normal course of business pursuant to a prior written agreement between Seller and such employee(s), or as consistent with the prior operations of the Business.

6.     REPRESENTATIONS AND WARRANTIES OF BUYER. Buyer represents and warrants to Seller as follows:

(A)     (1)     Buyer is a corporation incorporated, existing and in good standing under the laws of the State of Florida.

(2)     Buyer has all requisite power and authority to enter into this Agreement and the other documents and instruments to be executed and delivered by Buyer pursuant hereto and to carry out the transactions contemplated hereby and thereby.

7

(B)    (1)    The execution and delivery of this Agreement and the other documents and instruments to be executed and delivered by Buyer pursuant hereto and the consummation of the transactions contemplated hereby and thereby have been duly authorized by Buyer. No other or further corporate act or proceeding on the part of Buyer is necessary to authorize this Agreement or the other documents and instruments to be executed and delivered by Buyer or the consummation of the transactions contemplated hereby and thereby. This Agreement constitutes, and when executed and delivered, the other documents and instruments to be executed and delivered by Buyer pursuant hereto will constitute, valid and binding agreements of Buyer, enforceable in accordance with their respective terms.

(2)    There are no legal, quasi judicial or administrative actions, suits or proceedings of any kind or nature now pending or, to the knowledge of Buyer, threatened before any court or administrative body in any manner involving Buyer which may adversely affect the power or authority of Buyer to carry out the transactions to be performed by Buyer hereunder.

## 7.    REPRESENTATIONS, WARRANTIES & COVENANTS TRUE AS OF THE CLOSING DATE/NATURE AND SURVIVAL.

All of the representations, warranties and covenants herein contained in Sections 4, 5 and 6 above, shall be true and correct and shall not have been breached on and as of the Closing Date as though made on and as of the Closing Date. All representations and warranties, indemnities, covenants, and agreements made by all Parties shall survive the Closing Date. Each Party shall have the right to fully rely on the representations, warranties, covenants and agreements of the Parties contained in this Agreement or in any other documents or papers delivered in connection herewith, and each representation, warranty, covenant and agreement of the Parties contained in this Agreement is independent of each other's representation, warranty, covenant and agreement.

## 8.    DEPOSIT/DUE DILIGENCE.

(A)    Pursuant to that certain Order Granting Debtor's Emergency Motion to Approve Bid Procedures for Auction and Sale of Assets entered in the Court on July 17, 2009 (the "Bidding Procedures Order"), Buyer has deposited with Donica Law Firm, P.A., as escrow agent ("Escrow Agent"), the sum of Twenty Five Thousand and No/100 Dollars ($25,000) as a deposit toward the purchase price to be paid by Buyer to Seller on the Closing Date (the "Deposit"). In the event that the transactions hereunder shall proceed to Closing, the Deposit shall be paid to Seller at Closing and shall be deemed a credit to the total purchase price due by Buyer to Seller under the terms of this Agreement. Subject to the terms of the Bidding Procedures Order, in the event that any of the conditions to Closing set forth herein shall not be satisfied on or prior to the Closing Date, and either Party provides the other with written notice of termination of this Agreement in accordance with the terms of Section 9(A) of this Agreement, the Escrow Agent shall return the Deposit to Buyer and this Agreement shall be deemed null and void and neither Party shall have any further liability to the other, other than due to a default by either Party under this Agreement.

(B)    Buyer has had an opportunity to review and inspect Seller's sales history and fixed operations history (the "Records") of the Business and conduct a physical examination of the Assets as well as any other inspections of the Dealership Facility deemed necessary by

Buyer, including but not limited to, a Phase I Environmental Assessment and, if deemed necessary by the environmental consultant selected by Buyer, a Phase II Environmental Assessment (the "Due Diligence Period"). The cost of the Phase I Environmental Assessment shall be the sole responsibility of Buyer. In the event a Phase II Environmental Assessment is recommended by the environmental consultant who performs the Phase I Environmental Assessment, the cost of the Phase II Environmental Assessment shall be split equally between Buyer and Seller. Buyer is satisfied with the results of its due diligence review of the Records and its physical examination of the Assets and the Dealership Facility. Seller agrees to provide Buyer access to the Records, the Assets and the Dealership Facility from after the Date of this Agreement and through the Closing Date. Seller agrees that upon request by Buyer, Seller shall furnish to Buyer a list of all employees, their hire dates, leaves of absence, most recent vacation, rates of pay including, separately, base pay, and any incentive or commission plans. Buyer agrees not to disclose such information to any third parties, other than authorized representatives of Buyer, and to treat such information as confidential. Seller will cause its accountants and attorneys to reasonably cooperate with Buyer in the completion of Buyer's due diligence.

(C)     Within five (5) Business Days (as defined in Section 21(H) below) following the execution of this Agreement, Seller shall provide to Buyer true and complete copies of all of the Business Contracts and Leases. Within fifteen (15) Business Days (as defined in Section 21(H) below) following receipt of all such Business Contracts and Leases, Buyer shall provide to Seller written notice of those Business Contracts and Leases that Buyer desires to assume from and after the Closing Date (the Business Contracts and Leases which Buyer elects to assume are referred to individually as an "Assumed Business Contract and Lease" and collectively as the "Assumed Business Contracts and Leases"). In the event that Buyer fails to provide any notice of an election to assume any Business Contracts and Leases than it shall be deemed that Buyer has not elected to assume any of the Business Contracts and Leases. With respect to any Assumed Business Contract and Lease, Seller shall obtain from the other party to such Assumed Business Contract and Lease a consent to the assignment of such Assumed Business Contract and Lease from Seller to Buyer, together with a statement from such party that Seller is not in default under such Assumed Business Contract and Lease and that such party has no knowledge of any default by Seller under such Assumed Business Contract and Lease (each such consent of a third party to an Assumed Business Contract and Lease is referred to as a "Third Party Consent Agreement"). On the Closing Date, with respect to the Assumed Business Contracts and Leases, Seller shall execute and deliver to Buyer a certificate stating the following: (i) that Seller is not in default under the Assumed Business Contracts and Leases; (ii) that no third party has given Seller notice of a default under the Assumed Business Contracts and Leases; (iii) the date of the last payment by Seller under the Assumed Business Contracts and Leases; (iv) that the copies of the Assumed Business Contracts and Leases provided by Seller to Buyer are true and complete copies of the Assumed Business Contracts and Leases and that such Assumed Business Contracts and Leases are in full force and effect (such certificate referred to as the "Seller Assumed Business Contracts and Leases Certificate"). Seller is solely responsible for, and Seller shall indemnify, defend and hold Buyer harmless from, any and all liability related to the Assumed Business Contracts and Leases that arose prior to the Closing Date. Buyer indemnifies, defends and holds Seller harmless from any liability with respect to the Assumed Business Contracts and Leases from and after the Closing Date. These indemnities shall survive the Closing Date. Buyer shall have no liability with respect to any Business Contracts and Leases that are not assumed by Buyer pursuant to the terms of this Agreement.

9

Notwithstanding anything to the contrary contained in this Agreement, Seller will contact Ford Motor Company and use its best good faith efforts to restructure the Rotunda Contract between Seller and Ford Motor Company prior to the Closing to separate the items purchased under the Rotunda Contract by Seller for use in the Business from those items purchased under the Rotunda Contract by Seller for use in a separate used car sales business owned by Brandon Used Car AutoMall, LLC, a Florida limited liability company, a subsidiary of Seller.

(D) In the event that during the Due Diligence Period, Buyer (or any of its designees) shall cause any damage to the Assets or the Dealership Facility, Buyer shall cause such damage to be repaired at the cost of Buyer.

9. CLOSING DATE.

(A) Subject to the terms and conditions of this Agreement, the closing of the transactions (the "Closing") contemplated by this Agreement and any other agreement or instrument to be executed by any Party pursuant to this Agreement, will occur at the Dealership Facility, fifteen (15) Business Days (as defined in Section 21(H) below) following the satisfaction of each of the conditions to closing set forth in this Agreement (the "Closing Date"), or at such other place, date and time as may be mutually established by the Parties, but not later than September 15, 2009, unless the Closing Date is extended for the sole purpose of obtaining Ford's approval of Buyer as set forth in the Bidding Procedures Order and the Court Order; provided however, the sixty (60) day period to obtain Ford's approval of Buyer shall commence to run on August 25, 2009. Buyer and Seller acknowledge and agree that if the conditions to Closing have not been satisfied on or before September 15, 2009, or as such date may be extended for sole purpose of obtaining Ford's approval of Buyer as set forth in the Bidding Procedures Order and the Court Order, that either party may terminate this Agreement by written notice to the other and, subject to the terms of the Bidding Procedures Order the Deposit shall be returned to Buyer, and neither Party shall have any further liability to the other, subject to a default by either Party under this Agreement. Buyer and Seller acknowledge and agree that all profits, or losses, relating to the Business on the Closing Date shall be the property and responsibility of Buyer. The Closing shall be deemed to be completed as of 12:01 am EST on the Closing Date. Notwithstanding the foregoing to the contrary, the Closing Date shall not be earlier than the date Seller's plan of arrangement is confirmed by the Court, such confirmation hearing being scheduled, as of the Date of this Agreement, for October 14, 2009.

(B) Buyer and Seller acknowledge that preparation of the Bill of Sale (as defined herein) and the exhibits and schedules thereto is a joint responsibility, the completion of which in a continuing business is a time-consuming and complicated process and Buyer shall assist Seller in the completion of the inventories required in connection with the preparation of the Bill of Sale.

10. CONDITIONS PRECEDENT TO PAYMENT OF PURCHASE PRICES.

(A) Buyer's obligation to pay the various purchase prices stated in this Agreement shall be conditioned upon their calculation under the formula set forth in this Agreement and upon accomplishment of the following conditions precedent, it being understood that Seller shall do everything within its power to cause such conditions to be accomplished.

(1) Intentionally omitted.

(2) <u>Sales Agreement and Ford Approval</u>. Buyer shall have received a Sales and Service Agreement from the Ford Division of Ford Motor Company, or approval of same, in form and substance satisfactory to Buyer in Buyer's sole and absolute discretion, covering Seller's Dealer Locality.

(3) Intentionally omitted.

(4) <u>Representations and Warranties</u>. Each of the representations and warranties of Seller are true and correct as of the Closing Date, and Seller shall have performed or complied with all covenants, made all of the closing deliveries and performed all other obligations required to be performed by Seller under this Agreement on or prior to the Closing Date.

(5) Intentionally omitted.

(6) Intentionally omitted.

(7) Intentionally omitted.

(8) Intentionally omitted.

(9) Intentionally omitted.

(10) Intentionally omitted.

Buyer may at its election waive any of the conditions precedent set forth above and proceed with the Closing of the transaction contemplated by this Agreement.

(B) Seller's obligations under this Agreement are subject to the accomplishment of the following conditions precedent:

(1) <u>Representations and Warranties</u>. Each of the representations and warranties of Buyer are true and correct as of the Closing Date and Buyer has performed or complied with all covenants, made all of the closing deliveries and performed all other obligations required to be performed by Buyer under this Agreement on or prior to the Closing Date.

(2) Intentionally omitted.

Seller may at its election waive any of the conditions precedent set forth above and proceed with the Closing of the transaction contemplated by this Agreement.

11. <u>CLOSING DELIVERIES</u>.

    (A)    Seller shall deliver the following at Closing:

    (1)    <u>Seller's Resignation</u>. Seller shall have terminated its Sales and Service Agreement with the Ford Division of Ford Motor Company by delivering to Ford Motor Company a letter of resignation in a form satisfactory to Ford Motor Company and shall have executed any and all documents required by Ford Motor Company for the purpose of relinquishing its franchise rights with Ford Motor Company.

    (2)    <u>Seller's Records</u>. Seller shall have transferred to Buyer, in electronic format, all of its customer lists, customer service history files, registration lists (new and used cars, and trucks), owner follow-up lists, service files, as well as used "hard" copies of shop repair orders and lists of new car orders on hand at the Closing Date.

    (3)    <u>Telephone Numbers/Payment of Telephone Charges</u>. Seller shall have transferred to Buyer, insofar as it can, Seller's right in telephone numbers, facsimile numbers, domain addresses and web sites used by Seller in the Business at the Dealership Facility. Seller shall have obtained from the telephone company a statement that all sums billed before the Closing Date have been paid.

    (4)    <u>List of Employees/Termination of Employees.</u> Seller shall have furnished to Buyer a list of all employees, their rates of pay, including separately, base pay, and any incentive or commission plans. Seller shall provide written evidence satisfactory to Buyer in its sole and absolute discretion, of the termination by Seller of each of its employees as of the Closing Date.

    (5)    <u>Bill of Sale</u>. Seller shall have delivered to Buyer a bill of sale with warranty of title for all Assets to be transferred by Seller hereunder, an IRS allocation of purchase price, (IRS Form 8594), other documents of transfer of title, and any other documents necessary or desirable in the opinion of Buyer's counsel in connection with the transfer, which documents shall warrant title to Buyer and shall in all respects be in such form as may be reasonably required by Buyer or its counsel. The Form 8594 shall be initialed by each of Buyer and Seller on the Closing Date.

    (6)    <u>Approval of Sale and Ownership of Assets</u>. Seller shall have furnished to Buyer at closing the Court Order authorizing the sale of the Assets to Buyer, along with a resolution of Seller authorizing the sale of the Assets to Buyer.

    (7)    <u>Tax Clearance</u>. Seller shall have furnished to Buyer certificates from all appropriate state, county and local authorities that all taxes and contributions payable by Seller have been paid in full, or in lieu thereof, the Court Order (as defined in Section 11(A)(10) below) shall provide that all of Seller's taxes due to all appropriate state, county and local authorities have been discharged and Buyer assumes no responsibility for any state, county and local taxes of Seller, and that the Assets shall be free and clear of any claim for taxes by any such taxing authority.

(8)     Representations and Warranties. The President or Vice President and the Secretary or the Assistant Secretary of Seller shall have executed and delivered to Buyer a certificate confirming the truth and correctness of all representations and warranties set forth in Sections 4 and 5 above, from the Date of this Agreement to, and as of the Closing Date.

(9)     Assumed Business Contracts. A Third Party Consent Agreement with respect to each Assumed Business Contract and Lease and the Seller Assumed Business Contracts and Leases Certificate.

(10)     Court Order. Seller shall have obtained all necessary approvals and orders required from the United States Bankruptcy Court for the Middle District of Florida (Tampa) and under federal bankruptcy law which shall, in all respects, authorize (a) the sale and transfer of all the Assets to Buyer and Leases (as defined in Section 11(A)(13) below) of the Dealership Facility to Buyer and (b) entry into and completion of the transaction contemplated by this Agreement, after notice to creditors and solicitation of higher and better bids through the auction process and (c) the transfer of clear, lien free and marketable title to the Assets to Buyer pursuant to Section 363 of the Bankruptcy Code subject to no mortgage, conditional sales agreement, charges, liens, claims, debts, taxes or encumbrances (the "Court Order"). The Court Order shall be acceptable to Buyer in its reasonable discretion, and Buyer shall have the right to review and comment upon the Court Order prior to its entry by the Court. The Court Order shall provide that all appropriate proceedings and procedures under the Bankruptcy Code and the Bankruptcy Rules have been followed by Seller and that the Court Order is final, irrevocable, non-appealable, and not subject to challenge or contest by any party following the Closing, and that Buyer and any of its lenders may rely upon the Court Order for all purposes.

(11)     UCC Termination Statements. Seller shall have filed with the Secretary of State of Florida or presented to Buyer for filing, UCC-3 termination statements, authorized by the secured party, releasing any and all liens filed on any of the Assets to be purchased hereunder.

(12)     Interim Use Letter. In the event Buyer is unable to obtain its own dealer license to operate an automobile dealership business at the Dealership Facility by the Closing Date, Seller shall permit Buyer to use Seller's State of Florida, Division of Motor Vehicles dealer license, dealer license number, dealer license plates, dealership name ("Ernie Haire Ford") and bank accounts for an interim period of sixty (60) days following the Closing (the "License Use Period") so as to permit Buyer time to obtain its own dealer license, dealer license number and dealer license plates with respect to the Assets for the operation of the Business. In connection therewith, Buyer and Seller shall enter into an Interim Use Letter in the form attached hereto as **Exhibit I**. The Interim Use Letter specifically provides that Seller agrees to remit funds received by Seller from indirect lenders on contracts for vehicles sold by Buyer under this Agreement, as well as other related funds such as dealer reserves, no later than the day following the day such funds are deposited into Seller's account. Buyer shall return all dealer license plates to the State of Florida Division of Motor Vehicles simultaneous with Seller's termination of its dealer license and immediately prior to the issuance to Buyer of its dealer license, dealer license number and dealer license plates.

hereto as **Exhibit I**. The Interim Use Letter specifically provides that Seller agrees to remit funds received by Seller from indirect lenders on contracts for vehicles sold by Buyer under this Agreement, as well as other related funds such as dealer reserves, no later than the day following the day such funds are deposited into Seller's account. Buyer shall return all dealer license plates to the State of Florida Division of Motor Vehicles simultaneous with Seller's termination of its dealer license and immediately prior to the issuance to Buyer of its dealer license, dealer license number and dealer license plates.

(13) Lease of Dealership Facility. Buyer shall have entered into three (3) separate leases for the three (3) separate parcels that comprise the Dealership Facility. Specifically, (i) Buyer shall enter into a lease, as tenant, with Seller, as landlord (the "Used Vehicle Sales Parcel Lease"), for that portion of the Dealership Facility where the used vehicle sales business is conducted as of the Date of this Agreement (the "Used Vehicle Sales Parcel") in the form attached hereto as **Exhibit J**; (ii) Buyer shall enter into a lease, as tenant, with Mary K. Haire, Trustee of the Mary K. Haire Revocable Trust Agreement dated November 14, 1989, as landlord (the "New Vehicle Sales Parcel Lease"), for that portion of the Dealership Facility where the new vehicle sales business is conducted as of the Date of this Agreement (the "New Vehicle Sales Parcel") in the form attached hereto as **Exhibit K**; and (iii) Buyer shall enter into a lease, as tenant, with Maerdama Properties, a Florida partnership, as landlord (the "Vacant Lot Lease"), for the vacant lot located upon the Dealership Facility (the "Vacant Lot") in the form attached hereto as **Exhibit L** (the Used Vehicle Sales Parcel Lease, the New Vehicle Sales Parcel Lease and the Vacant Lot Lease are collectively referred to as the "Leases"). The Used Vehicle Sales Parcel Lease shall be for a term of thirty six (36) months. The New Vehicles Sales Parcel Lease and Vacant Lot Lease shall be for a term of forty eight (48) months. The monthly rent under the Leases will be as follows: (a) Twenty Thousand and No/100 Dollars ($20,000) monthly rent under the Used Vehicle Sales Parcel Lease; (b) Thirty Six Thousand and No/100 Dollars ($36,000) monthly rent under the New Vehicle Sales Parcel Lease for the first twenty-four (24) months of the lease term, and Forty Five Thousand and No/100 Dollars ($45,000) monthly rent for the balance of the lease term; and (c) Five Thousand and No/100 Dollars ($5,000) monthly rent under the Vacant Lot Lease. The rent payments for the Used Vehicle Sales Parcel Lease shall be made by Buyer, as tenant, directly to Seller's lender, Wachovia Bank ("Wachovia").

The New Vehicle Sales Parcel Lease and the Vacant Lot Lease shall provide Buyer, as the tenant, with the option to purchase any one or both of the New Vehicle Sales Parcel (other than the unused driveway strip at the rear of the New Vehicle Sales Parcel) and the Vacant Lot at any time after the commencement of the respective Leases for a purchase price equal to the average of (x) the appraised value of the applicable parcel as set forth in that certain appraisal conducted by Integra Realty Resources dated July 27, 2009, a copy of which is in the possession of both Buyer and Seller, and (y) the appraised value of the applicable parcel on the date Buyer, as tenant, exercises its option to purchase the applicable parcel. The Used Vehicle Sales Parcel Lease shall provide Buyer, as the tenant, with an option to purchase the Used Vehicle Sales Parcel at any time after the commencement of the Used Vehicle Sales Parcel Lease; provided however, Buyer, as tenant, shall be obligated and committed to exercise the option to purchase the Used Vehicle Sales Parcel, and shall close upon and complete the acquisition of the Used Vehicle Sales Parcel, no later than the expiration of the Used Vehicle Sales Parcel Lease. The purchase price payable at closing upon the exercise of the option to purchase the Used Vehicle Sales Parcel shall be fixed at

14

or (bb) the undrawn balance of Wachovia's letter of credit in favor of Florida Fruit and Vegetable Association (Seller's workers' compensation carrier).

Seller is solely responsible for obtaining (i) the signed Leases for each parcel from each landlord entity, and (ii) the consent of any existing lender(s) of the landlords under the Leases, as well as obtaining a Subordination, Non-Disturbance and Attornment Agreement from such lender(s), including but not limited to, Wachovia which holds a mortgage on the Used Vehicle Sales Parcel and the New Vehicle Sales Parcel, in favor of Buyer, the terms of which shall be satisfactory to Buyer in its reasonable discretion. The Vacant Lot Lease shall not include the southern sixty (60) feet of the Vacant Lot, as Seller will continue to occupy such southern sixty (60) feet of the Vacant Lot for the sale of motorcycles and motorcycle part and accessories manufactured by Big Dog Motorcycles, LLC. Simultaneous with the Closing, Seller and the owners of the Dealership Facility shall deliver to Buyer a termination of any and all existing leases for any of the parcels that comprise the Dealership Facility.

        (B)     Buyer shall deliver the following at Closing:

        (1)     <u>Purchase Price</u>. The purchase price due and payable to Seller under the terms of this Agreement, subject to any adjustments as set forth herein. The purchase price will be payable at Closing by an official bank check or wire transfer in immediately available funds to an account of Seller designated by Seller for such purpose.

        (2)     <u>Corporate Approval of Purchase</u>. Buyer shall have furnished to Seller at closing a resolution of Buyer authorizing the purchase of the Assets by Buyer.

        (3)     <u>Representations and Warranties</u>. The President or Vice President and the Secretary or the Assistant Secretary of Buyer shall have executed and delivered to Seller a certificate confirming the truth and correctness of all representations and warranties set forth in Sections 6 above, from the Date of this Agreement to, and as of the Closing Date.

12.     ACCOUNTS RECEIVABLE. Buyer, as an accommodation to Seller and on Seller's behalf, shall accept payment of Seller's accounts receivable arising out of the operation of the Business prior to the Closing Date at no charge to Seller, for a period of ninety (90) days after the Closing Date, and Buyer shall turn over to Seller from time to time during said period all of the moneys so accepted on said accounts receivable. At the end of said ninety (90) day period, Buyer shall turn over to Seller all documents in Buyer's possession which pertain to any such accounts receivable which remain uncollected. It is understood that Buyer's responsibility, so far as such collection is concerned, is only to accept moneys paid on such accounts receivable and shall not include any obligation to attempt to enforce payment thereof, or to send out bills or statements therefor. No adjustments shall be made in any of such accounts receivable without the written permission of Seller or its nominee.

13.     TAXES. Seller and Buyer agree that all state, city and county personal property taxes, if any, which are directly applicable to the Assets to be transferred hereunder, shall be prorated to the Closing Date. Buyer shall pay only the pro rata share of such taxes applicable to the period subsequent to the Closing Date. Buyer shall pay all sales and use taxes arising as a result of this transaction.

14. <u>EMPLOYEES</u>. Buyer will assume no past or future obligations of Seller to any employees hired by Buyer, including, but not limited to, any obligations to pay severance pay, incentive pay, bonuses, sick pay, pensions, vacation pay or other benefits to such employees, and such obligations will be and remain obligations of Seller, as will any similar obligations to any employees of Seller who are not hired by Buyer. Seller will transfer to Buyer on the Closing Date all applicable unemployment compensation rates, to the extent permitted by law and requested by Buyer. Seller will pay any and all employee obligations arising, accrued or owing prior to the Closing Date, including but not limited to, severance pay, incentive pay, bonuses, vacation pay or other benefits. Without limiting the foregoing, Seller agrees to assume responsibility for all vacation claims accruing to its employees prior to the Closing Date, it being agreed that Buyer shall not, under any circumstances, become obligated for payment of any such vacation pay accruing prior to the Closing Date. If on the Closing Date, any accrued vacation pay liability of Seller remains, it shall be paid by Seller based on the vacation policy of the Business prior to Closing Date and Seller shall furnish satisfactory evidence thereof to Buyer. Buyer shall have no obligation to hire any employees of Seller. To the extent that Buyer hires any employees of Seller, all such employees shall be considered "new hires" of Buyer. The Court Order shall provide that Buyer assumes no responsibility for any of the matters described in this Section 14.

15. <u>SELLER'S OBLIGATION UNDER COBRA</u>. Seller shall retain the responsibility for providing its employees and their dependents, as "Qualified Beneficiaries," under COBRA, who experience "qualifying events" prior to and on and including the Closing Date, with the opportunity for continuation of group health care coverage as required by COBRA. For purposes of this provision, references to COBRA (as set forth in the Code, and the Employee Retirement Income Security Act of 1974, as amended) shall include references to any provision of such statutes as they may be amended from time to time. Buyer shall have no responsibility under any applicable law, rule or regulation to offer or to provide COBRA benefits for Seller's employees, and Seller expressly acknowledges and agrees that this remains Seller's obligation following Closing. Seller acknowledges that to meet these COBRA obligations it is responsible for maintaining, and will maintain, in force and effect, its health insurance plan after the Closing Date.

16. <u>BREAK UP FEE</u>. If, at the auction of the Assets to be held pursuant to the Court Order and/or other order of the Bankruptcy Court, Seller receives an offer from a qualified third party that is greater than (a) the purchase price offered in this Agreement for the Assets, or (b) such other offer(s) as Buyer shall submit at any auction of the Assets to be held pursuant to the Court Order and/or other order of the Bankruptcy Court, and that is approved by the Court (the "Bona Fide Offer"), then the Seller may accept such Bona Fide Offer subject to the terms set forth herein. If the Seller desires to accept such Bona Fide Offer, Seller must provide to Buyer the following upon Seller's receipt of said Bona Fide Offer: (i) a copy of such Bona Fide Offer and (ii) at closing of the transaction contemplated by such Bona Fide Offer, a bank check payable to Buyer in the amount of One Hundred Fifty Thousand and No/100 Dollars ($150,000). Upon receipt of the foregoing payment, this Agreement shall be deemed null and void and of no further force and effect and neither party shall have any further liability to the other. Except as otherwise provided in this Agreement, Seller may not accept any offers to acquire the Assets. At any auction of the Assets to be held during a hearing before the Court having jurisdiction over

the Assets, Buyer and Seller agree that any initial bid offered by a third party at the auction for the Assets must include a purchase price that is at least Two Hundred Thousand and No/100 Dollars ($200,000) more than the purchase price for the Assets as set forth in this Agreement. After any initial bid offered by a third party at the auction for the Assets that complies with the monetary increase in purchase price as set forth in the preceding sentence, all future bids must increase at minimum incremental amounts of Twenty Five Thousand and No/100 Dollars ($25,000).

17. <u>EXPENSES OF TRANSACTION</u>. Each party shall pay its own expenses incident to the preparation for carrying this Agreement into effect and consummating the transactions hereby contemplated.

18. <u>DEFAULT/REMEDIES</u>. In the event the transaction contemplated by this Agreement shall fail to close solely because of a default by Buyer, Seller shall be entitled, as its sole and exclusive remedy to the Deposit, and said sum shall constitute liquidated damages to Seller and neither Party shall have any further liability to the other.

If Seller is in default hereunder, Buyer shall be entitled to exercise any and all rights or remedies, at law and/or in equity, including without limitation, specific performance.

19. <u>INDEMNIFICATION</u>.

(A) Seller hereby covenants and agrees to indemnify, defend, protect and hold harmless, Buyer and its respective officers, directors, employees, members, assigns, successors and affiliates (individually a "Buyer Indemnified Party" and collectively the "Buyer Indemnified Parties") from, against and in respect of all liabilities, losses, claims, damages, punitive damages, causes of action, lawsuits, administrative proceedings (including informal proceedings), investigations, audits, demands, assessments, adjustments, judgments, settlement payments, deficiencies, penalties, fines, interest (including interest from the date of such damages), costs and expenses (including without limitation reasonable attorneys' fees and disbursements of every kind, nature and description) but net of any insurance and tax benefits and excluding any consequential or incidental damages (collectively, "Damages") suffered, sustained or incurred or paid by the Buyer Indemnified Parties in connection with, resulting from or arising out of, directly or indirectly: (i) any breach of any representation or warranty of Seller as set forth in this Agreement or any schedule or certificate, delivered by or on behalf of Seller in connection therewith; or (ii) any material nonfulfillment of any covenant or agreement by Seller under this Agreement; (iii) the assertion against any Buyer Indemnified Party of any Damages relating to the Assets or the Dealership Facility prior to the Closing Date, or the actions or omissions of the shareholders, directors, officers, employees or agents of Seller prior to the Closing Date, other than Damages arising from or relating to acts or omissions of Buyer with respect to its investigations of the Dealership Facility; and (iv) any unpaid taxes of Seller to any local, state or federal governmental authority.

(B) Buyer hereby covenants and agrees to indemnify, defend, protect and hold harmless, Seller and its respective officers, directors, employees, shareholders, assigns, successors and affiliates (individually a "Seller Indemnified Party" and collectively the "Seller Indemnified Parties") from, against and in respect of all Damages (as defined in Section 19(A)

above) suffered, sustained or incurred or paid by the Seller Indemnified Parties in connection with, resulting from or arising out of, directly or indirectly: (i) any breach of any representation or warranty of Buyer as set forth in this Agreement or any schedule or certificate, delivered by or on behalf of Buyer in connection therewith; or (ii) any material nonfulfillment of any covenant or agreement by Buyer under this Agreement; or (iii) the assertion against any Seller Indemnified Party of any Damages relating to the Assets or the Dealership Facility after the Closing Date, or the actions or omissions of the shareholders, directors, officers, employees or agents of Buyer after the Closing Date.

(C)    At the Closing the sum of Fifty Thousand and No/100 Dollars ($50,000) of the purchase price (the "Indemnity Escrow Funds") otherwise due to Seller shall be withheld by Buyer, and shall be deposited with Dawda Mann to be held or disbursed by Dawda Mann in accordance with the terms hereof. If at any time during the ninety (90) day period following the Closing Date (the "Indemnity Escrow Period"), Buyer should suffer any loss, damage or liability as a result of any matter subject to the indemnification provisions of this Agreement, Buyer shall provide written notice to Dawda Mann, with a copy to Seller, setting forth the amount of such loss, damage or liability and Dawda Mann shall, if objection is not raised by Seller within five (5) Business Days following receipt, pay to Buyer from the Indemnity Escrow Funds the amount of such loss, damage or liability incurred by Buyer. In the event an objection claim is asserted by Seller, Dawda Mann shall not pay any disputed amounts from the Indemnity Escrow Funds until Dawda Mann receives either (i) joint written instructions signed by both Seller and Buyer, or (ii) a final nonappealable order from the Court. To the extent that any Indemnity Escrow Funds remain following the expiration of the Indemnity Escrow Period, such remaining Indemnity Escrow Funds shall be delivered by Dawda Mann to Seller. Buyer shall not submit any claims to Dawda Mann with respect to the Indemnity Escrow Funds until they exceed, in the aggregate, Five Thousand and No/100 Dollars ($5,000).

The covenants and obligations under this Section 19 shall survive the Closing Date.

20.    NOTICES.   Any notice, communication, request, reply or advice (hereinafter severally and collectively, for convenience, called "Notice") in this Agreement provided or permitted to be given, made or accepted by either Party to the other, must be in writing and may, unless otherwise in this Agreement expressly provided, be given or be served by depositing the same in the United States mail, postage paid, and registered or certified and addressed to the Party to be notified, with return receipt requested, or by delivering the same in person to an officer of such Party, or by nationally recognized overnight courier for next business day delivery, when appropriate, addressed to the Party to be notified. Notice deposited in the mail or via overnight courier in the manner here in above described shall be effective, unless otherwise stated in this Agreement, from and after the date it is so deposited. Notice given in any other manner shall be effective only if and when received by the Party to be notified. For purposes of Notice, the addresses of the Parties shall be as follows:

If to Seller:                    Ernie Haire Ford, Inc.
                                 9545 North Florida Avenue
                                 Tampa, Florida 33612
                                 Attention: Ernest B. Haire, III

18

| with a copy to: | Todd Hodges, Esq. |
| | 905 Shaded Water Way |
| | Lutz, Florida 33549 |

| If to Buyer: | Elder Automotive Group of Tampa Bay, Inc. |
| | 320 East Fletcher Avenue |
| | Tampa, Florida 33612 |
| | Attention: Robert R. Elder |

| with a copy to: | Dawda, Mann, Mulcahy & Sadler, PLC |
| | 39533 Woodward Avenue, Suite 200 |
| | Bloomfield Hills, Michigan 48304 |
| | Attention: Edward C. Dawda |

### 21. MISCELLANEOUS.

(A) <u>Section and Other Headings</u>. Section or other headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(B) <u>Attorney's Fees and Costs</u>. In the event it becomes necessary for either Party to enforce the terms of this Agreement, the prevailing Party shall be entitled, in addition to such damages or other relief as may be granted, to recover reasonable attorneys' fees and costs, such attorneys' fees to include those incurred on any appeal.

(C) <u>No other Discussions</u>. Except as otherwise required by law or court order, from and after the execution of this Agreement and prior to any valid termination of this Agreement, Seller, its shareholders and their employees, agents and representatives will not: (i) initiate, encourage the initiation by others of discussions or negotiations with third parties, or respond to solicitations by third persons relating to any merger, sale or other disposition of any part of the Assets, capital stock, business or properties of Seller (whether by merger, consolidation, sale of stock, sale of assets, or otherwise); or (ii) enter into any agreement or commitment (whether or not binding) with respect to any of the foregoing transactions.

(D) <u>Arm's Length Negotiations</u>. Each Party herein expressly represents and warrants to all other Parties hereto that: (i) before executing this Agreement, said Party has fully informed itself of the terms, contents, conditions, and effects of this Agreement; (ii) said Party has relied solely and completely upon its own judgment in executing this Agreement; (iii) said Party has had the opportunity to seek and has obtained the advice of counsel before executing this Agreement; (iv) said Party has acted voluntarily and of its own free will in executing this Agreement; (v) said Party is not acting under duress, whether economic or physical, in executing this Agreement; and (vi) this Agreement is the result of arm's length negotiations conducted by and among the Parties and their respective counsel.

(E) <u>Choice of Law</u>. It is the intention of the Parties that the laws of the State of Florida should govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the Parties.

(F)     Parties in Interest/Assignment.  All of the terms and provisions of this Agreement shall be binding upon, inure to the benefit of and be enforceable by the Parties and their successors, heirs and permitted assigns.  Buyer may assign this Agreement to an entity to be formed or to an assignee of Buyer at any time prior to Closing by written notice to Seller.

(G)     Documentation/Further Assurances.  From time to time, after the Closing Date, at the request of Buyer, Seller will execute and deliver to Buyer such other instruments of conveyance and transfer and take such other actions as Buyer may reasonably require to more effectively convey, transfer to, and vest in Buyer, and to put Buyer in possession of, any of the Assets to be conveyed, transferred, and delivered to Buyer hereunder.  In addition, after the Closing Date, Seller and Buyer agree to cooperate with each other in every reasonable way to make any necessary adjustments to the closing documents and the prorations contained on the Bill of Sale.

(H)     Time.  In computing any period of time prescribed by the terms of this Agreement, the day from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included unless it is a Saturday, Sunday, or legal holiday (i.e., not a "Business Day"), in which event the period shall run until the end of the next day which is a Business Day.  In the event any day on which any act is to be performed by Seller or Buyer under the terms of this Agreement is not a Business Day, the time for the performance by Seller or Buyer of any such act shall be extended to the next day which is a Business Day.

(I)     Exhibits.  Information set forth in any Exhibit specifically refers to the Section of this Agreement to which such information is responsive and such information shall not be deemed to have been disclosed with respect to any other Section of this Agreement or for any other purpose.   The Exhibits shall not vary, change or alter the language of the representations and warranties contained in this Agreement and, to the extent the language in the Exhibits does not conform in every respect to the language of such representations and warranties, such language shall be disregarded and be of no force or effect.  Any Exhibits stated to be attached hereto and not specifically listed as being attached as of the Closing Date, must be provided by Seller to Buyer, or mutually agreed upon between Seller and Buyer, within ten (10) Days following the Date of this Agreement.  Certain Exhibits (related to the Assets to be purchased) shall be attached hereto and shall be updated prior to the Closing Date.

(J)     Counterpart; Facsimile; Electronic Signature.  This Agreement may be executed by the Parties in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument.   This Agreement may be executed and delivered by facsimile transmission or electronic signature with the same effect as if a manually signed original were personally delivered, so long as the manually signed original is, in fact, delivered to the receiving Party on the next Business Day.

(K)     Brokers.  Buyer and Seller each represent and warrant to the other that such Party has not dealt with any brokers or finders in connection with this Agreement and, insofar as each Party knows, no broker or person is entitled to any commission or finder's fee in connection with this transaction.  Buyer and Seller hereby agree to indemnify, defend, and hold the other harmless from any and all actions, claims, demands, debts, liabilities, losses, damages,

costs and expenses (including without limitation attorneys' fees and court costs), which any broker agent or finder, licensed or otherwise, may have or claim to have by reason of the conduct or contracts of the indemnifying party. This provision shall survive the Closing or any termination of this Agreement.

(L)    Date of Agreement.  For the purposes of the transaction contemplated by this Agreement, the "Date of this Agreement" is the date of the signature of the last party to sign this Agreement.

(M)    Entire Agreement.  This Agreement constitutes the entire agreement between the Parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations and understandings of the Parties, including but not limited to, the Original Purchase Agreement.  This Agreement was prepared jointly with input from Buyer and Seller and none of its provisions shall be construed against one Party as being the Party that prepared this Agreement.  No supplement, modification, or amendment of this Agreement will be binding unless executed in writing by all Parties.  No waiver of any of the provisions of this Agreement will be considered, or will constitute, a waiver of any other provision, and no waiver will constitute a continuing waiver.  No waiver will be binding unless executed in writing by the Party making the waiver.

(N)    Confidentiality.  Seller and Buyer will, prior to the Closing, keep all non-public information regarding this transaction or the other Parties strictly confidential, except as may be required by law or in connection with any enforcement proceedings, including, without limitation, any lawsuit between the Parties.  No press release or other public announcement related to this Agreement or the transactions contemplated hereby will be issued by any Party hereto without the prior approval of the other Parties, except that either Party may make such public disclosure which it believes in good faith to be required by law or regulation. Nothing in this Paragraph shall prohibit either party from disclosing any such information to its attorneys, accountants, consultants, lenders, or Ford Motor Company.  Notwithstanding the foregoing, the Parties consent and agree that a copy of this Agreement may be filed with the Court.

(O)    Dispute Resolution.  Any disputes under this Agreement between Buyer and Seller shall be resolved amicably between the Parties, and failing same, shall be submitted to the Court.  The decision of the Court shall be final between the Parties unless it may be appealed in accordance with bankruptcy rules and procedures.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

The Parties have executed this Agreement as of the day and year set forth directly below the signatures of the respective Parties.

SELLER:

ERNIE HAIRE FORD, INC.,
a Florida corporation

By: _Ernest B. Haire, III_ (signature)

Ernest B. Haire, III, President

Date: _8/24/09_

BUYER:

ELDER AUTOMOTIVE GROUP OF TAMPA BAY, INC.,
a Florida corporation

By: _Robert R. Elder_ (signature)

Robert R. Elder, President

Date: _8/21/09_

_Mary K. Haire_ (signature)

Mary K. Haire, as Trustee of the Mary K. Haire Revocable Trust Agreement dated November 14, 1989
[For the sole purpose of agreeing and consenting to the terms of New Vehicle Sales Parcel Lease as defined in Section 11(A)(13) of this Agreement and attached hereto as **Exhibit K**]

Date: _8/24/09_

MAERDAMA PROPERTIES,
a Florida partnership

By: _Mary K. Haire_ (signature)

Mary K. Haire, Partner

[For the sole purpose of agreeing and consenting to the terms of Vacant Lot Lease as defined in Section 11(A)(13) of this Agreement and attached hereto as **Exhibit L**]

Date: _8/24/09_

## SCHEDULE 1
## ASSETS TO BE PURCHASED

(A)  <u>Parts and Accessories</u>.  Buyer shall purchase from Seller certain Ford parts and accessories of Seller that are currently marketed by Ford and listed in Ford's most recent Parts and Accessories Net Price List for Ford dealers with supplements in effect on the date of the counting of the Inventory (as defined below) of such parts and accessories (the "Price List"), provided such parts and accessories are: (i) undamaged, (ii) located on the Dealership Facility as of the date of counting the Inventory (as defined below), (iii) appear on the Inventory of parts and accessories to be counted by Dressel Inventory Service, or such other inventory service firm as mutually agreed upon by Buyer and Seller (the "Inventory Service") on or prior to the Closing Date (as defined in Section 9 of this Agreement) (the "Inventory"), (iv) in original resalable merchandising packages and in unbroken lots, (v) returnable to Ford Motor Company under its parts return program, and (vi) have not been in Seller's parts inventory for more than twelve (12) months (by part number) (the parts and accessories to be purchased hereunder are referred to as the "Parts and Accessories").  The cost of the Inventory Service shall be split equally between Buyer and Seller.

The purchase price to be paid by Buyer to Seller for the Parts and Accessories shall be the "Dealer Net Price" for such Parts and Accessories.  The "Dealer Net Price" shall mean the price to a Ford dealer of those Parts & Accessories as set forth on the Price List as of the date of the Inventory, reduced by the amount of any discounts for such Parts & Accessories for which Ford dealers are eligible. It is the intent of the Parties that such discounts be treated equitably.  If Seller has received or will receive such discount then the "Dealer Net Price" will be reduced by such discount.  If Buyer will receive such discount, then the "Dealer Net Price" shall not include a reduction for such discount.

The Inventory shall be reconciled and adjusted to the Closing Date (as defined in Section 9 of this Agreement) in accordance with industry practice to reflect additions and deductions in stock of such Parts and Accessories.  Seller agrees that no such additions and deductions shall be made in its stocks except in the normal course of business consistent with past practices and, further, to keep its usual and adequate books and records of such additions and deductions, which records shall be made available to Buyer for review.

Seller hereby assigns (to the extent assignable) to Buyer any parts return privilege that may have been or will be granted to Seller by Ford. Seller hereby authorizes Buyer to make, as part of its payment to Seller for the Assets under the terms of this Agreement, a check payable jointly to Seller and Ford in such amount as shall be the balance owed on its parts statement and the warranty credit advance.

With respect to parts and accessories that do not meet the definition of Parts and Accessories as set forth herein, Buyer shall have no obligation to purchase such parts or accessories, but they may be purchased if Buyer and Seller agree on a price for such parts and accessories.

(B)  <u>New Vehicles</u>.  Buyer acknowledges that Seller owns certain new and undamaged vehicles of model year 2009 and 2010 which shall not have a title issued as of the

Closing Date (as defined in Section 9 of this Agreement) and with less than 500 miles (individually a "New Vehicle" and collectively, the "New Vehicles"). Buyer agrees to purchase such New Vehicles from Seller on the terms and conditions and for the purchase price set forth below:

Seller shall sell and Buyer shall buy Seller's New Vehicles as are owned and in the actual possession of Seller at the Dealership Facility on the Closing Date, and not reported to Ford as sold, at the dealer cost thereof to Seller as evidenced by Ford invoices (collectively, "Dealer Invoice Price") plus the sum of the following relating to such vehicles:

(1)     The cost to Seller of accessories and options locally installed prior to the Closing Date (labor costs shall be at Seller's internal labor rates), provided further, that Seller agrees that all such additions shall be the types of additions made to such New Vehicles in the ordinary course of business, further, that it will keep its usual and adequate records of such additions which, together with detailed pricing information related to such additions, shall be made available to Buyer for review and verification, and Buyer shall have the right to refuse any accessories or options locally installed which Buyer does not consider to be normal and customary additions;

and minus the sum of the following items relating to such New Vehicles:

(2)     All model changeover or closeout allowances, miscellaneous allowances or factory-to-dealer rebates, and other credits or allowances (including but not limited to, dealer operations expense assistance, dealer reserve, floor plan assistance, driver's training allowance, approximate finance cost allowance, full gas tank allowance, rebatable advertising charges, service (P&C) allowance on vehicles which have not been serviced prior to the Closing Date and any other holdbacks for such New Vehicles that accrue prior to the Closing Date. It is the intention of the parties that "holdbacks" and other credits or allowances (individually an "Allowance" and collectively, the "Allowances") be treated equitably. If Seller has been paid or will be paid the Allowance for a particular New Vehicle, then the Allowance shall be deducted from the purchase price of such New Vehicle. If Buyer will be paid the Allowance upon retail sale of the New Vehicle or otherwise, then the Allowance shall not be deducted from the price paid to Seller for such New Vehicle; and

(3)     The cost to replace any factory-installed accessories or options which are missing from a New Vehicle, such as keys, DVDs or similar accessories. Seller will keep its usual and adequate records of such items which, together with detailed pricing information related to such items, shall be made available to Buyer for review and verification.

Buyer shall have no obligation to purchase any vehicle upon which additional installed accessories or equipment has invalidated the new vehicle warranty. As set forth this Section B Buyer will only purchase "undamaged" New Vehicles and will not purchase any Damaged (as defined in Section C below) New Vehicles.

At least two (2) Business Days prior to Closing (subject to adjustment at Closing for additions or deletions in the ordinary course of business), Seller shall provide Buyer with a list of all New Vehicles in the possession of Seller with the cost to Seller of each, together with the adjustments set forth in paragraphs B(1), (2), and (3) above, and the amount for which each of these units listed is "floor planned" on the date designated thereon, which shall be attached hereto as **Exhibit A**. Prior to Closing, Seller shall make available to Buyer copies of factory invoices and detailed pricing information related to any locally installed additions or deletions. The originals of factory invoices and any manufacturers' certificates of origin for the New Vehicles shall be delivered by Seller to Buyer at Closing.

All 2007 and 2008 model year New Vehicles shall be considered used vehicles for purposes of this Agreement.

(C)     Demonstrators.     Buyer agrees to purchase 2009 and 2010 Ford model year Demonstrator Vehicles (as hereinafter defined) from Seller upon the same terms and conditions as in Section B above, less an amount of $0.35 per mile for each mile on such Demonstrator Vehicle. Demonstrator Vehicle is defined as a new vehicle meeting the criteria in Section B above, except said vehicle has more than 500 miles but less than 5,000 miles on its odometer.     All model year 2007 and 2008 Demonstrator Vehicles and any Demonstrator Vehicles of any model year with more than 5,000 miles shall be considered used vehicles for purposes of this Agreement.

Adjustments shall be made to such prices at Dealer's cost to reflect any additions to or removals from such vehicles of equipment and/or accessories. Buyer shall have no obligation to purchase any vehicle upon which additional installed accessories or equipment has invalidated the new vehicle warranty. Seller represents that **Exhibit B** attached hereto is a list of all Demonstrator Vehicles in Seller's possession on the date designated thereon with the cost to Seller of each. Seller agrees that hereafter no additions shall be made to such Demonstrator Vehicles except in the ordinary course of business and, further, that it will keep its usual and adequate records of such additions which shall be made available to Buyer for review and verification.

As set forth in this Section C Buyer will only purchase "undamaged" Demonstrator Vehicles and shall have no obligation to purchase any Damaged (as defined below) Demonstrator Vehicles.

For the purposes of Section B and this Section C, a New Vehicle or Demonstrator Vehicle shall be considered "Damaged" if: (i) the cost to repair such damage would be in excess of Seven Hundred Fifty Dollars ($750), or (ii) the repairs made to any New Vehicle or Demonstrator Vehicle exceeds Seven Hundred Fifty Dollars ($750). Seller shall disclose all the repairs made to any New Vehicle or Demonstrator Vehicle.

(D)     Used Vehicles. Buyer shall purchase all of Seller's used vehicle inventory (the "Used Vehicles") owned by Seller on the Closing Date at the wholesale value of each Used Vehicle as determined by negotiation between a representative of Buyer and a representative of Seller, or in lieu thereof, as published in the National Auto Research Black Book Official Used Car Market Guide, Weekly Regional Edition; provided however, Buyer shall receive a reduction of One Hundred Fifty and No/100 Dollars ($150) from the purchase price of any Used Vehicle

that Buyer intends, in Buyer's sole discretion, to sell at auction following the Closing Date. Prior to, or on the Closing Date, Buyer will provide Seller with a list of the Used Vehicles Buyer intends to sell at auction following the Closing Date.

(E)     Furniture, Fixtures and Equipment. Seller shall sell and Buyer shall buy all of Seller's machinery and shop equipment, furniture, signs and office equipment (the "Equipment") as set forth on **Exhibit C** attached hereto and for the purchase price as set forth in the appraisal report of the Equipment (the "Appraisal Report") performed by an appraisal service to be mutually agreed upon by Buyer and Seller (the "Equipment Appraiser"). After the completion of the Appraisal Report, and within ten (10) Days following the Date of this Agreement, Buyer and Seller shall mutually agree upon the Equipment set forth in the Appraisal Report that will be purchased by Buyer from Seller, and only such Equipment shall be included on **Exhibit C** attached hereto. The Equipment Appraiser shall appraise the Equipment at its "in use"/"in place" value. The cost of the Equipment Appraisal shall be split equally between Buyer and Seller. Prior to the Closing, Buyer shall confirm the Equipment as set forth on **Exhibit C** attached hereto is all located at the Dealership Facility and in substantially the same condition as of the date of the Appraisal Report, and to the extent that any such Equipment does not satisfy these requirements the purchase price for the Equipment shall be reduced accordingly (the "Equipment Purchase Price"). As set forth on **Exhibit C** attached hereto, the Equipment Purchase Price shall be Six Hundred Fourteen Thousand Five Hundred Twenty Five and No/100 Dollars ($614,525).

Buyer and Seller agree that if any of the Equipment as described on **Exhibit C** hereto is financed on conditional contracts or otherwise, Buyer, at its election, may assume indebtedness of Seller. If Buyer shall assume the obligations of Seller, then said amount shall be deducted from the Equipment Purchase Price to be paid by Buyer hereunder. Seller shall coordinate and obtain with the assistance of Buyer all documentation from third parties necessary in connection with such assignment and assumption of the obligations of Seller as provided above.

(F)     Miscellaneous Inventories. Seller shall sell and Buyer shall buy all usable oil, grease, undercoat and rustproof materials, and body and paint materials as are on Seller's Dealership Facility on the Closing Date. Prices shall be determined as follows:

(1)     Oil and grease: 100% of replacement cost as determined by most recent vendor's invoices to Seller.

(2)     Miscellaneous. Undercoat, rustproof and body materials, paint in unopened cans, paint in a mixing system, and such other miscellaneous, usable and salable articles in unbroken lots: 100% of replacement cost as determined by most recent vendor's invoices to Seller. Seller will disclose to Buyer if any paint is on consignment.

Buyer shall have no obligation to purchase other miscellaneous items not set forth above. Seller agrees that if such items not listed above are not removed from the Dealership Facility within fifteen (15) days after the Closing Date, they shall become the property of Buyer without charge in addition to the other consideration named in this Agreement.

(G)     Miscellaneous Supplies. For other considerations named in this Schedule 1, Seller shall transfer to Buyer without additional charge hereunder all of the Seller's right, title and interest in Seller's product sales training material, video tapes and discs and reference books as are on hand on the Closing Date.

(H)     Vehicle Orders. Seller, without additional charge therefor, shall have turned over or assigned by appropriate documents to Buyer all unfilled retail orders and deposits (each a "Vehicle Order") made thereon and names and addresses of the service customers and prospective purchasers. Attached hereto as **Exhibit D** is a list, prepared by Seller, of all its unfilled retail orders and deposits as of the Date of this Agreement. Buyer and Seller acknowledge and agree that these retail orders may be filled by Seller before the Closing Date and new unfilled retailed orders may be procured by Seller prior to the Closing Date and therefore **Exhibit D** shall be updated as of the Closing Date. Buyer: (i) has the right to approve all proposed trade-in allowances on used vehicles to be taken in trade for new vehicles which will not be delivered by Seller prior to Closing; and (ii) has the right to accept or reject each such Vehicle Order, in its sole and absolute discretion.

(I)     Work in Process. Buyer shall reimburse Seller on the Closing Date for Seller's cost of the completed labor, and completed sublet labor on any incomplete customer service repair orders for vehicles physically in the service department on the Closing Date. Buyer shall complete such repair work and shall be entitled to collect the entire proceeds covering such repairs from the customers of Seller. Any Work in Process to be purchased by Buyer must be valid work in process for which the vehicle is presently in service with documentation supporting all work performed and parts installed on such vehicle.

(J)     Goodwill. For other consideration named in this Schedule 1, and for the sum of Two Million Six Hundred Five Thousand and No/100 Dollars ($2,605,000) payable in readily available funds to Seller at the Closing, Seller shall transfer to Buyer Seller's goodwill, including the ownership of the name Ernie Haire Ford, and the use of Seller's website, domain address, telephone numbers, facsimile numbers, customer lists and customer service history files, deal jackets, parts records, lease records, personnel records, technical data, internal memoranda, supplier's lists, all vehicle registration lists, owner follow-up lists, service files, used "hard" copies of shop repair orders, and lists of new car orders. For avoidance of doubt, the Court, after rounding, calculated the net value to Seller's bankruptcy estate of Buyer's original bid (that is, the Purchase Price) for the Assets and real estate described in Section 11(A)(13) above, as the same was adjusted during the August 17, 2009 Sale Hearing, at Eight Hundred Ninety Five Thousand and No/100 Dollars ($895,000). The difference between Buyer's winning bid of Three Million Five Hundred Thousand and No/100 ($3,500,000), and the Court's Eight Hundred Ninety Five Thousand and No/100 Dollars ($895,000) valuation of Buyer's bid, or Two Million Six Hundred Five Thousand and No/100 Dollars ($2,605,000), represents goodwill to be paid to Seller at the Closing.

## SCHEDULE 2
## LIST OF EXCLUDED ASSETS

Notwithstanding anything to the contrary contained herein, Seller shall retain and shall not sell to Buyer, all assets not expressly included in the enumeration of Assets set forth in Schedule 1, including, without limitation, the following specific items (collectively, the "Excluded Assets"):

    A. Cash and cash equivalents on hand and in banks, certificates of deposit, commercial paper, stock, bonds, corporate books and records, contracts in transit, claims against third parties, insurance commissions, life insurance cash values, notes receivables from officers, tax refunds, and other liquid investments;

    B. All income, credits or any and all types of receivables in connection with the operation of the Business to and through the Closing Date (All income, credits or other receivable in connection with the operation of the Business at Buyer's location after the Closing Date shall be paid to the Buyer);

    C. Seller's prepaid assets or any other asset not specifically covered for purchase under any section of this Agreement, contracts or policies of insurance and any refunds of taxes or tax loss carryforwards relating to any period or portion thereof ending prior to the Closing Date;

    D. Seller's interest in Brandon Used Car AutoMall, LLC, a Florida limited liability company, and E Z Car Sales, Inc., a Florida corporation;

    E. Any motorcycles located upon the Dealership Facility on the Closing Date manufactured by Big Dog Motorcycles, LLC and equipment specifically related thereto; and

    F. Any other assets of Seller not specifically set forth in Schedule 1 of this Agreement.

## LIST OF EXHIBITS

A.   New Vehicles

B.   Demonstrators

C.   Furniture, Fixtures and Equipment

D.   Vehicle Orders

E.   List of Legal Actions

F.   Business Contracts and Leases

G.   List of Liens and Encumbrances

H.   Environmental Matters

I.   Interim Use Letter

J.   Dealership Facility Lease (Used Vehicle Sales Parcel)

K.   Dealership Facility Lease (New Vehicle Sales Parcel)

L.   Dealership Facility Lease (Vacant Lot)

## EXHIBIT A

### NEW VEHICLES

(to be attached)

## EXHIBIT B

## DEMONSTRATORS

(to be attached)

## EXHIBIT C

## FURNITURE, FIXTURES AND EQUIPMENT

Service Department equipment

| | |
|---|---|
| Photos #1<br>Set Hunter R811 - DSP400 Alignment System Console<br>c/w Hunter 14,000# 4-Post Lift-Rack<br>Condition: Good | $ 19,000.00 |
| Photos #2<br>Set Hunter R811 - DSP400 Alignment System Console<br>c/w Rotary 10,000# 4-Post Lift-Rack (2003)<br>Condition: Good | 16,000.00 |
| Photos #3<br>2 Rotary 12,000# 4-Post Lift-Racks (2002-1997)<br>Condition: Good | 8,800.00 |
| Photos #4<br>23 Rotary 12,000# 2-Post Lifts (2007-1998)<br>Condition: Good | 87,000.00 |
| 1 Rotary 10,000# 2-Post Lift (2007)<br>Condition: Good | 2,400.00 |
| 4 Globe 7,000# 2-Post Lifts (Assorted)<br>Condition: Good | 7000.00 |
| 1 Rotary 9,000# 2-Post Lift (1998)<br>Condition: Good | 1,800.00 |
| 1 Forward 25000# 4-Post Runway Lift-Rack (Outside)<br>Condition: Fair $    5,000.00<br>1 Hunter BL-505 Combo (Disc-Drum) Brake Lathe<br>Condition: Good | 4,600.00 |
| 1 Ammco 4100 Combo (Disc-Drum) Brake Lathe<br>Condition: Good | 3,250.00 |
| 1 Robinair CoolTech Dual 2K (R-134a) Station<br>Condition: Good | 2,100.00 |
| 1 Robinair CoolTech 34700Z (R-134a) Station<br>Condition: Good | 2,400.00 |
| 1 Robinair CoolTech 700 (R-134a) Station<br>Condition: Good | 1,400.00 |
| 1 Midtronics GR-1 190 D/C (Battery) Charger<br>Condition: Good | 250.00 |

SERVICE DEPARTMENT EQUIPMENT (Cont'd)

Photo #5
1 Hunter GSP9700 RF Wheel Balancer - Integrated Lift                          9,750.00
Condition: Good

1 Hunter TC3500 Euro-Style Wheel Balancer                                    5,800.00
Condition: Good

Set MTS 2010-HP Rim-Clamp Tire Changer                                       3,500.00
Condition: Good

1 Nu-Star Power Pusher                                                       1,250.00
Condition: Good

2 Pro-Cut PFM 9.0 On-Car Brake Lathes (Assorted)                             5,500.00
Condition: Good

1 Vac-U-Tec (Smoke Machine) Station                                           875.00
Condition: Good

1 Rotunda-OTC 1250# Powertrain Lift-Table                                  $ 1,050.00
Condition: Good
Photos #7

3 Ford-IDS Systems (3 Toughbooks, 4 VCMs, 3 VMM Kits)
c/w (3) Dell PCs & (3) Traction-Control Cabinets                            13,500.00
Condition: Very Good

1 Snap-On Solus Scanner                                                        900.00
Condition: Good

Lot (50+) Essential Tools & Kits (in Parts & thru-out)
(Past 5 Years + Remaining Prior Years)                                      12,500.00
Condition: Very Good

Photos #8
Set New Oil-ATF Dispensing System including
(10) Hose-Reels (+ 4 Air Hose-Reels),
(2) Oil-ATF Tanks-Pumps-Reels (Inside) &
(4) Oil Bulk Tanks (3 Pumps) (Outside)
(1) Graco Oil-ATF Fluid Commander (in Parts Dept)                            6,500.00
Condition: Good

Set Used Oil Disposal System including
(2) Diaphragm Used Oil Pumps (Inside) &
(2) Bulk Storage Tanks (Outside)                                             1,750.00
Condition: Good

Photo #9
3 Sullivan-Palatek 20D (20 HP Diesel) Air Compressors
Mounted on Horizontal Tank (outside)
c/w Arrow Air Dryer (Outside)                                               10,500.00
Condition: Good

SERVICE DEPARTMENT EQUIPMENT (Cont'd)

Lot Support and Minor Equipment including (but not limited to)
and in the order identified...

(1) Rotunda-Hunter P611 Alignment Console
(1) OTC 17 1/2 Ton Hyd. Shop Press
(1) Norco 25 Ton Hyd. Shop Press
(2) Dbl-End Grinders on Pedestal
(2) Red-Blue Hyd. Engine Cranes
(2) Red Engine Repair Stands
(2) Oxy-Acet. Welding Carts (Not Tanks - Assorted)
(3) Red 2-4 Ton Hyd. Floor Jacks
(3) Round (Drum) Fans
(7) Pedestal Floor Fans
(1) Water Hose-Reel (on Wall)
(26) Steel Workbenches-(10) Vises (Assorted)
(8) Tech PCs-(5) Blue Cabinets-Bench-Desks
(24) Black 25 Gal Used Oil Drains
(5) Black Evac Used Oil Drains
(8) Red-Yellow Rag Cans
(1) Metal (Wall) Tool Cabinet
(Lot) D/C Fire Extinguishers (thru-out Bldgs)
(Lot) Wringer Buckets-Supplies
(Lot) Hand Barrel Pumps
(1) Hyd. Dual-Wheel Lift (under Stairway)
(1) Bench-Mtd Strut Spring Compressor
(1) Rubbermaid Dbl-Door Cabinet
(1) Ridgid Shop Vac
(Lot) Eye Wash-Zee Protector-First Aid Kits-Blanket
(3) Tripod Underhoist Stands
(4) Red Screw-Top Underhoist Stands
(Lot) Wheel Weights Cabinets
(1) Yellow Bead Setting Tool (Tank)
(1) 30 Gal Gas Tanker
(5) High-Lift Hyd. Transmission Jacks
(4) Jack Stands
(1) Branick Strut Spring Compressor on Stand
(2) Blue-System One Parts Washers
(1) Red-Blue Parts Washer on Drum
(2) Rotunda-SBTS PC Stations
(1) Christie Battery-Starter
(Lot) Air Hoses, etc.
(2) Blue Windshield Washer Fluid Tanks (Outside)
22,500.00
_____

SERVICE DEPARTMENT EQUIPMENT, TOTAL...                    $256,875.00

BODY SHOP EQUIPMENT

(Paint Room - Back)

| | |
|---|---|
| Photos #10<br>Set (2) Rotunda-DeVilbiss Concept Downdraft Spray Booths<br>Drive-Thru Models + Paint Mixing Booth (Center)<br>c/w Air-Make-Up Systems<br>Condition: Good | $55,000.00 |
| 1 Rotunda-DeVilbiss Downdraft Spray (Paint) Booth<br>Drive-In Model c/w Air-Make-Up System<br>Condition: Good | 22,500.00 |

(Paint Room - Middle)

| | |
|---|---|
| Photos #11<br>1 Chief EZ Liner 5-Tower Platform Frame (Repair) Rack<br>c/w Related Gauges & Tools<br>Condition: Good | 21,000.00 |
| 1 Chief Genesis 2 Electronic Measuring (PC) System<br>Condition: Good | 6,500.00 |
| 3 Post-Trak 2-Tower Platform Frame (Repair) Racks<br>c/w Related Gauges & Tools<br>Condition: Good | 28,500.00 |

Lot Support and Minor Equipment including (but not limited to)
and as identified (both Rooms)…

| | |
|---|---|
| (1) Snap-On YA225 A MIG Welder (not Tank)<br>(1) Auto Arc XLT 182-220V MIG Welder (not Tank)<br>(1) Millermatic 130 MIG Welder (not Tank)<br>(1) Oxy-Acetylene Welding Cart (not Tanks)<br>(1) Plasma Cutter<br>(1) Dent Remover<br>(2) Orange-Red 2-4 Ton Hyd. Floor Jacks<br>(2) Power Pulling (Frame) Posts + Repair Bench<br>(Lot) Green-Red Steel Pallet Racking (10 Sections)<br>(5+) Circulator (Wall) Fans (1 on Pedestal)<br>(6) Steel Workbenches<br>(Lot) Dbl-Door Cabinets, File Cabinets, etc<br>(1) 1-Gal. Paint Can Shaker<br>(1) RTI A/C Station + MAC (Battery) Charger | 7,500.00 |

BODY SHOP EQUIPMENT, TOTAL…                    $ 141,000.00

PARTS DEPARTMENT SHELVING & EQUIPMENT

| | |
|---|---|
| Photos #12<br>5 Blue-Borroughs 8-Drawer HD Parts Bins (48" W x 24" D)<br>Condition: Very Good | $ 4,750.00 |
| Lot Other Shelving including (but not limited to)…<br>    (Lot) White Clip-Rail-Wood Shelving (11 Sections)<br>    (122) Metal Parts Bins (36"x 12"x 84" - Assorted)<br>    (Lot) Green-Red Steel Pallet Racking (3 Sections)<br>    (1) Wood Mult-Slot Moulding Shelving Rack | 10,500.00 |
| Photo #13<br>1 Barnes PC+Flash Key Code Cutting Machine<br>Condition: Very Good | 2,750.00 |
| Lot Nut-Bolt-Screw Storage including (but not limited to)…<br>    (3) Metal 40-Hole Bins<br>    (2) Metal 72-Hole Bins<br>    (8) Metal 4-Drawer Cabinets<br>    (Lot) Terminal Cabinet, etc. | 3,500.00 |
| Lot Support and Minor Equipment including (but not limited to)<br>as identified (thru-out Dept)… | |
| (1) White Plastic Water Cooler (2 Filters)<br>(Lot) Dbl-Door Cabinets, Bookcase, etc.<br>(1) Aluminum 2-Wheel Hand Truck<br>(2) Green-Alum. 6' Stepladders<br>(2) Gray Metal Open Racks<br>(2) Gray Steel Workbenches<br>(2) Design Plotters | 1,750.00 |
| Photo #14<br>1 Nissan 4000# LP Forklift Truck w/ Rops Cage<br>Condition: Fair | 2,750.00 |
| PARTS DEPARTMENT SHELVING & EQUIPMENT, TOTAL… | $ 26,000.00 |

FURNISHINGS & OFFICE EQUIPMENT (See Note 1 at the conclusion of the Furnishings & Office Equipment Section)
(Showroom)

Lot Including (but not limited to)…

(4) Dell P4 PCs w/ (2) Monitors
(2) Canon Calculators
(4) Mesh-Fabric High-Back Swivel Arm-Chairs
(1) Black Metal 2-Dr File Cabinet
(1) HP 1320n Printer
(1) White Marker Board
(1) 100-Slot Mail Organizer
(1) Dell Optiplex GX240 PC
(2) Laminate Magazine-Literature Displays
(2) American Flags (Hanging)
(1) Chrome Truck Accessories Display
(2) Toshiba TVs and VCRs on Wall Brackets
(1) Sand Metal Dbl-Dr Cabinet
(3) Dell P4 PCs w/ Monitor
(1) HP 1320n Printer
(9) Round Laminate Tables
(30) Fabric Stack-Arm Chairs
(1) The Truth About Trucks Display
(1) Saleen Display Board
(1) Popcorn Maker Wagon
(3) White Plastic Waste Receptacles
(2) American Flags (hanging from Ceiling)                                    $8000.00

FURNISHINGS & OFFICE EQUIPMENT (Cont'd)
(Executive Suite - Starting in Reception Office)

Photo #15
1 300-Gal Fish Aquarium Tank (Wall Divider)                    $ 1,650.00
Condition: Fair

Lot Including (but not limited to)...

(1) Gray Metal 5-Dr Lateral File Cabinet
(2) Gray Metal 2-Dr File Cabinets (1 Roller)
(1) Gray Metal 4-Dr Lateral File Cabinet
(1) Sand Metal 4-Dr Lateral File Cabinet
(1) Wood-Laminate 3/4-Surround Desk
(1) Mesh-Fabric High-Back Swivel Arm-Chair
(1) Fabric Customer Stack-Arm Chair
(1) Dell P4 PC w/ Monitor
(1) Brother Laser IntelliFAX 4100 Machine
(1) Sharp EL Calculator
(1) Aluminum 4-Step Ladder                                      2,500.00

(following segment in Dealer Principal Office)

(Set) Hardwood Dbl-Ped Desk and Hutch-Credenza
(1) Leather Swivel Armchair
(2) Leather Guest Wood-Arm Chairs (Matching)
(1) Wood Oval Glass-Top Table
(1) Sand Metal 2-Dr File Cabinets
(1) Leather 3-Cushion Sofa
(1) Wood Oval (Remington) Table                                 4,500.00

FURNISHINGS & OFFICE EQUIPMENT (Cont'd)

(Conference-Training Room)

Lot Including (but not limited to)…

(3) Light Sand Metal 4-Dr File Cabinets
(1) Steel Dbl-Door Records Safe (Large)
(1) Sand Metal 3-Dr Lateral File Cabinet
(5) Gray Metal 2-Dr Lateral File Cabinets
(1) Letter-Forms Organizer (on File Cabinets)                                        $750.00

(2 Hall Offices - leading to Lobby Reception)

Lot Including (but not limited to)…

(1) Bleached Dbl-Ped Desk (Older) + Bookcase
(1) Gray Fabric Swivel Arm-Chair
(1) Gray Fabric Stack-Arm Chair
(1) Gray Metal 4-Dr File Cabinet
(2) Sand Metal 2-Dr File Cabinets (Stacked)
(1) Dell GX240 PC (no Monitor)
(1) Gray Fabric High-Back Swivel Arm-Chair
(1) Sand Metal 2-Dr Lateral File Cabinet
(2) Gray Laminate 2-Dr Lateral File Cabinets
(1) Dot-Matrix Printer on Stand
(1) Bleached Dbl-Ped L-Desk (Older) + Credenza
(1) Black Leather High-Back Swivel Armchair
(2) Blue Fabric Stack-Arm Chairs
(1) Dell P4 PC (no Monitor)
(1) HP Color LaserJet 2840 All-in-One Machine                                     2,500.00

(2 Hall Offices - leading to Telemarketing)

Lot Including (but not limited to)…

(1) Light Wood Dbl-Ped Desk
(1) Gray Fabric Swivel Arm-Chair
(1) Dell P4 PC w/ Monitor
(3) Fabric Stack-Arm Chairs
(1) Gray-Black Laminate 3/4-Surround Desk-Hutch
(1) Black Mesh-Back Swivel Arm-Chair
(1) Dell P4 PC w/ (2) Monitors
(1) Brother MFC 4800 Laser Machine
(1) Brother HL-1435 Laser Printer
(1) Sharp Calculator
(1) Fellowes Paper Shredder
(3) Sand-Black Metal 2-Dr File Cabinets
(2) Gray-Black Stack Chairs (Assorted)
(1) Laminate-Top Metal Table (Corner)                                              2,250.00

FURNISHINGS & OFFICE EQUIPMENT (Cont'd)

(Accounting Office - Upstairs)

Lot Including (but not limited to)...

(following segment in Enclosed Office)

(1) Wood 3/4-Surround Desk-Hutch-Credenza
(1) Black Mesh-Back Swivel Arm-Chair
(2) Black Fabric Sculptured Chairs
(1) Black Metal 5-Dr Lateral File Cabinet
(1) Black Metal 4-Dr Lateral File Cabinet
(1) Dell P4 PC w/ Monitor
(1) HP LaserJet 1000 Printer
(1) Casio Calculator
(1) Metal 2-Dr File Cabinet (under Desk)                                    $ 1,500.00

(following segment in Enclosed Office)

(1) Wood Laminate L-Return Desk
(1) Blue Fabric High-Back Swivel Arm-Chair
(2) Black Fabric Sculptured Chairs
(2) Sand Metal 4-Dr Lateral File Cabinets
(1) Wood 4-Shelf Bookcase
(1) Dell P4 PC w/ (2) Monitors
(1) HP 1018 Laser Printer                                                   1,200.00

(following segment in Open Offices)

(2) White-Gray Laminate 3/4-Surround Desks
(2) Fabric Swivel Chairs (1 Arm)
(2) Dell P4-GX280 PCs w/ Monitor
(2) Canon/Sharp Calculators
(2) Black Metal 2-Dr File Cabinets
(1) Putty Metal 3-Dr Lateral File Cabinet

(4) Sand Metal 4-Dr Lateral File Cabinets
(1) Light Sand Metal 4-Dr File Cabinet
(Set) White Oval Table + (7) Sculptured Chairs
(1) Fellowes Paper Shredder + Waste Basket
(2) Blue Fabric Arm-Chairs
(1) Black Metal 2-Dr Lateral File Cabinet

(2) Light Sand Metal 4-Dr File Cabinets
(8) Sand Metal 2-Dr Lateral File Cabinets (Stacked)
(9) Sand Metal 4-Dr Lateral File Cabinets

(2) White-Gray Laminate 3/4-Surround Desks
(2) Fabric Swivel Arm-Chairs
(1) Dell GX280 PC w/ Monitor + Extra Monitor
(1) HP LaserJet 1320 Printer
(2) Sharp Calculators
(2) Black Metal 2-Dr File Cabinets
(1) Gray Metal 2-Dr File Cabinet (Roller)
(1) Sand Metal 4-Dr Lateral File Cabinet

FURNISHINGS & OFFICE EQUIPMENT (Cont'd)

(Accounting Offices - Upstairs - Open - Cont'd)

(3) Sand Metal 4-Dr Lateral File Cabinets

(2) White-Gray Laminate 3/4-Surround Desks
(2) Fabric Swivel Arm-Chairs (Assorted)
(1) Blue Fabric Arm-Chair
(1) Dell P4 PCs w/ Monitor
(1) HP LaserJet Printer
(1) Sharp Calculators
(2) Black Metal 2-Dr File Cabinets
(1) Sand Metal 4-Dr Lateral File Cabinet

(1) Sand Metal 4-Dr Lateral File Cabinet
(1) Light Sand Metal 4-Dr File Cabinet

(2) White-Gray Laminate L-Surround Desks
(2) Fabric-Leather Swivel Arm-Chairs (Assorted)
(1) Dell P4 PCs w/ Monitor
(1) HP LaserJet Printer
(1) Brother MFC-7220 All-in-One Machine
(1) Black (Sharp) Calculator
(3) Metal 2-Dr File Cabinets (Assorted)
(2) Sand Metal 2-Dr Lateral File Cabinets (Stacked)

(1) Refrigerator w/ Top Freezer
(1) Magic Chef Compact Refrigerator
(1) Black-Door Undercounter Refrigerator
(Set) Round Table + (6) Folding Chairs
(Lot) Microwave + Toaster Oven

(4) Gray Metal-Wood 5-Shelf Racks
(13) Metal 4-Dr File Cabinets (Assorted)
(1) Wood (Postage) Work Table
(1) Metal Roller-Cage Cart
(1) Tan Metal Dbl-Door Cabinet
(1) Black Metal 4-Dr Lateral File Cabinet

(2) White-Gray Laminate 3/4-Surround Desks
(1) Red Fabric Swivel Arm-Chair
(1) Gray Fabric Swivel Chair
(2) Dell P4 PCs w/ Monitor
(1) HP LaserJet 1018 Printer
(2) Calculators (Assorted)
(1) Sand Metal 4-Dr Lateral File Cabinet
(2) Black-Gray 2-Dr File Cabinets
(3) Sand Metal 4-Dr Lateral File Cabinets

(2) White-Gray Laminate L-Surround Desks
(2) Fabric-Leather Swivel Arm-Chairs (Assorted)
(1) Dell P4 PCs w/ Monitor
(1) HP LaserJet Printer
(1) Dell 1700 Laser Printer
(1) Black (Sharp) Calculator

FURNISHINGS & OFFICE EQUIPMENT (Cont'd)

(Accounting Offices - Upstairs - Open - Cont'd)

(3) Metal 2-Dr File Cabinets (Assorted)
(1) Sand Metal 2-Dr Lateral File Cabinets

(6) Sand Metal 4-Dr Lateral File Cabinets
(4) Gray-Black 2-Dr Lateral File Cabinets

(1) Gray Metal 2-Door Closet over 2-Dr Lateral File
(1) Gray Metal 2-Dr Lateral File Cabinet
(1) Gray Metal 3-Dr Lateral File Cabinet
(1) Brown Fabric Swivel Chair
(1) Sanitaire Upright Sweeper
(Lot) Wall Clock, Pictures & Misc-Small Desk Items                    $ 20,000.00

FURNISHINGS & OFFICE EQUIPMENT (Cont'd)

(Fleet Center Offices - Starting near Finance Dept)

(1) Dark Wood L-Desk
(1) Black Leather High-Back Swivel Armchair
(1) Dell P4 PC w/ Monitor
(1) Canon Calculator
(1) HP LaserJet 1022 Printer
(3) Blue Fabric Stack-Arm Chairs
(1) Sand Metal 4-Dr File Cabinet

(2) Dark Wood Dbl-Ped Desks
(1) Blue Fabric High-Back Swivel Arm-Chair
(1) Blue Fabric Swivel Arm-Chair
(1) Black Fabric Swivel Arm-Chair
(1) Dell P4 PC w/ Monitor
(1) Black Metal 2-Dr File Cabinet
(2) Light-Dark Wood Bookcase
(1) Fireking 4-Dr Fire File Cabinet
(1) Sand Metal 4-Dr File Cabinet

(1) White Plastic Water Cooler + Waste Receptacle

(1) Woodgrain Dbl-Door Cabinet
(3) Black Metal 2-Dr File Cabinets
(1) Bleached Wood Bookcase + White Marker Board
(2) Fabric Swivel Arm-Chairs (Assorted)

(1) Dark Wood-Gray Laminate L-Desk
(1) Blue Fabric Swivel Chair
(1) Victor Calculator

(1) Dark Wood-Gray Laminate L-Desk-Hutch
(1) Dark Wood-Gray Laminate 2-Dr Lat File Cabinet
(1) Blue Fabric Swivel Chair
(1) Blue Fabric Stack-Arm Chair
(1) Sand Metal 2-Dr File Cabinet
(1)Dot-MatrixPrinteronStand                                    $6000.00

(Customer Lounge)

(1) Panasonic 50" Plasma Flat-Panel TV
(2) Black Leather 2-Cushion Sofas
(4) Black Leather Armchairs
(2) Dark Wood Square-Top Tables
(Lot) Children's Toys                                          $ 2,000.00

(Customer Service Vehicles)

Photo #17
1 2002 Ford Think Neighbor Electric Car (Green)                7,500.00
Condition: Good (Clean)
1 2002 Ford Think Neighbor Electric Car (Gray)                 5,250.00
Condition: Good (Average)

FURNISHINGS & OFFICE EQUIPMENT (Cont'd)

(Parts Department)

Lot Including (but not limited to)...

(8) Dell-DCS PCs w/ Monitor + HP Laser Printer
(1) HP LaserJet 4030I Printer
(1) 1-Dr Cash Register
(4) Padded Chrome Counterstools
(1) Graco Oil-ATF Fluid Commander
(2) Woodgrain L-Desks + Hutch
(1) Brown Leather Swivel Armchair
(1) Gray Fabric Swivel Arm-Chair
(1) Dell GX260 PC w/ Monitor
(2) Sharp Calculators
(1) Bleached Wood Bookcase
(1) Gray Metal File-Storage Cabinet
(1) Black Metal 2-Dr File Cabinet
(1) Sand Metal 4-Dr Lateral File Cabinet
(1) Dot-Matrix Forms Printer on Stand

(1) Wood Dbl-Ped Desk
(1) Gray Fabric Swivel Arm-Chair
(1) Dell GX240 PC w/ CRT Monitor

(4) Plastic Folding Chairs
(2) Gray Steel Workbench Tables
(2) Design Plotters (Printers)                                    $ 5,500.00

FURNISHINGS & OFFICE EQUIPMENT (Cont'd)

(Service Department - Starting in Drive-Thru)

Lot Including (but not limited to)…

(5) Dell P4 PCs w/ Monitor
(2) HP 1320n LaserJet Printers (on Stand)
(1) HP 4050n LaserJet Printer
(4) Calculators
(4) Padded Chrome Counterstools (Assorted)
(2) Metal Order Racks
(1) Service Advisor Desk + Padded Counterstool

(3) 2-Section Metal Tire Display Racks
(2) White Plastic Waste Receptacles
(4) Wall-Mounted Air-Circulator Fans
(5) Tree-Planters
(1) 2-Chair-Table Set                                                              $ 3,200.00

(following segment in Customer Lounge)

(1) Vizio 42" LCD Flat-Panel TV
(Set) 13-Chair / 4-Table Lounge Seating
(3) Roller Chairs + 3-Section Work Desk
(1) Counter Microwave Oven                                                    2,500.00

(following segment in Service Offices)

(1) Wood L-Desk
(1) Gray Fabric HIgh-Back Swivel Arm-Chair
(2) Gray Fabric Stack-Arm Chairs
(1) Dell P4 PC w/ Monitor
(1) HP LaserJet 1018 Printer
(1) Sharp Calculator

(1) Gray-Black Laminate Desk-Hutch
(1) Gray Fabric High-Back Swivel Arm-Chair
(1) Dell GX240 PC w/ Monitor
(1) Sand Metal File Cabinet
(Lot) Round Table + (2) Metal Folding Chairs

(1) Gray Laminate L-Desk-Hutch + Table
(1) Gray Fabric Swivel Chair
(1) Blue Fabric Stack-Arm Chair
(1) Dell GX280 PC w/ Monitor
(1) HP 4050 LaserJet Printer
(1) Sand Metal 2-Dr File Cabinet

(1) Brown-Black Laminate 3/4-Surround Desk-Hutch
(1) Black Mesh-Back Swivel Arm-Chair
(4) Black Mesh-Back Customer Arm-Chairs
(1) Dell Flat-Panel Monitor
(1) HP OfficeJet 7210 All-in-One
(1) GBC Shredder on Waste Basket
(1) Wood Laminate Round-Top Table

FURNISHINGS & OFFICE EQUIPMENT (Cont'd)

(Service Department - Cont'd)

(2) Gray Metal Supply Racks
(1) Woodgrain-Gray L-Desk-Hutch
(1) Black Leather High-Back Swivel Arm-Chair
(1) Blue Fabric Swivel Chair
(1) Black Metal 4-Dr File Cabinet
(2) Black Metal 2-Dr File Cabinets

(3) Black Leather Chrome Foot-Ring Counterstools
(1) Dell GX240 PC w/ Monitor
(2) Dell P4 PCs w/ Monitor
(1) HP LaserJet 4050n Printer
(1) Calculator
(2) Dell P4 PCs w/ Monitor
(1) Dot-Matrix Forms Printer (Newer)
(1) HP LaserJet 4050T Printer                                            $ 7,500.00


(following segment Upstairs)

(1) Large Screen TV
(Set) Brown Leather Sofa and (2) Loveseats
(3) Round Tables + (6) Fabric Chairs
(Lot) White Refrigerator + (2) Microwave Ovens

(1) Sanyo TV on Table
(Lot) Woodgrain Folding Table + (2) Fabric Chairs
(1) Bookcase (Tall)

(Lot) 30-Section Gray Metal (Records) Shelving
(9) Metal 4-5 Dr File Cabinets (Assorted)
(7) Blue Fabric Stack-Arm Chairs
(3) Laminate Work Tables
(1) Wood Laminate Conference Table
(1) Sony TV-VCR-Laminate Cabinet                                          3,200.00

FURNISHINGS & OFFICE EQUIPMENT (Cont'd)

(Body Shop)

Lot Including (but not limited to)…
(1) Bleached Wood Dbl-Ped Desk
(1) Gray Fabric High-Back Swivel Arm-Chair
(5) Gray Fabric Stack-Arm Chairs
(1) Dell P4 PC w/ Monitor
(1) Sharp Calculator
(1) GBC Paper Shredder
(1) Yellow Jump-Starter
(1) Bleached Wood Table-Desk
(1) Red Fabric Swivel Arm-Chair
(1) Black Metal 2-Dr File Cabinet
(1) Dell GX240 PC w/ Monitor
(2) Brown Vinyl Armchairs + Table

(1) Sony TV
(2) Black-White Microwave Ovens
(4) Red Fabric Swivel Arm-Chairs
(1) Sand Refrigerator
(Lot) Bookcase + Round Table

(1) Dell P4 PC w/ Monitor
(1) Sharp Calculator
(Lot) Fabric Swivel Chair + 2-Dr File Cabinet

(1) Dell GX270 PC w/ Monitor
(1) Dell P4 PC w/ Monitor
(1) Dell DCS PC w/ Monitor
(1) HP LaserJet 2100 Printer
(3) Bleached Wood Desks + Cabinet
(3) Fabric Swivel Arm-Chairs
(1) Dell Monitor
(2) Victor-Sharp Calculators
(1) HP 4050T Printer on 2-Dr File Cabinet
(3) White Marker Wall Boards
(1) Gray Metal 7-Shelf Rack
(4) Metal 4-Dr File Cabinets
(1) Metal Bin + Dbl-Door Cabinet
(5) Blue 40-Hole Bins + 72-Hole Bin (Contents)

(10+) Sand Metal Shelving (Upstairs)
(1) Red Metal Mobile Stairway                                    $ 6,000.00

FURNISHINGS & OFFICE EQUIPMENT (Cont'd)

(Pre-Owned Center - Starting in Reception Area)

Photo #19
1 KeyTrak Inventory PC w/ 2-Dr Cabinet                                                    $ 2,500.00
Condition: Good

Lot Including (but not limited to)...

(1) Cherry-Gray L-Reception Desk + Back Credenza
(1) Dell P4 PC w/ Monitor
(1) HP LaserJet 4050 Printer
(1) Dell Celeron PC w/ Monitor
(1) Red Popcorn Maker Wagon
(7) Round Woodgrain-Top Tables
(27) Blue Fabric Side-Arm Chairs
(2) Sylvania TVs on Ceiling Bracket
(8) Planters

(1) Cherry-Gray Laminate-Top on (2) 2-Dr. File Cabs
(2) Dell GX260 PCs w/ Monitor
(1) HP LaserJet 1320 Printer
(1) Pad-Easel
(1) White Plastic Waste Receptacle

(3) Dell P4 PCs w/ (2) Monitors
(1) Dell P4 PC w/ Monitor
(1) HP LaserJet 1320n Printer
(1) Dot-Matrix Forms Printer
(4) Calculators
(4) Blue Fabric High-Back Swivel Arm-Chairs
(1) Black Metal Oxford File Cabinet
(1) Sand Metal 2-Dr File Cabinet
(1) Blue Jump-Starter                                                                     12,250.00

(following segment in Enclosed Hall Office - Front)

(1) Cherry-Gray L-Desk
(1) Blue Fabric Swivel Arm-Chair
(2) Blue Fabric Side-Arm Chairs
(1) Dell P4 PC w/ (2) Monitors
(1) HP DeskJet 6540 Printer
(1) Victor Calculator
(2) Black Vinyl Stack Chairs                                                              1,300.00

(following segment in Enclosed Hall Office - 2nd)

(1) Cherry-Gray L-Desk-Hutch
(1) Cherry-Gray Dbl-Ped Desk
(1) Cherry-Gray 2-Dr Lateral File Cabinet
(1) Blue Fabric Swivel Arm-Chair
(1) Blue Fabric Side-Arm Chair
(5) Black Vinyl Stack Chairs
(1) Dell P4 PC w/ (2) Monitors                                                            1,200.00

FURNISHINGS & OFFICE EQUIPMENT (Cont'd)

(Pre-Owned Center - Cont'd)

(following segment in Kitchen)

(1) SS Dbl-Door Refrigerator
(1) SS Microwave Oven
(Lot) Dbl-Coffee Maker + Toaster-Oven
(3) Round Gray Laminate-Top Tables
(9) Black Vinyl Stack Chairs     1,800.00

(following segment in Training Center Room)

(Set) Sony TV & VCR on Wood Cabinet
(2) White Marker Wall Boards
(14) Gray-Black Laminate Tables
(27) Black Vinyl Stack Chairs
(4) Fabric Swivel Arm-Chairs
(1) Blue Fabric Side-Arm Chair
(1) Gray Fabric Stack-Arm Chair
(1) White Plastic Waste Receptacle     4,650.00

(following segment in Business Offices)

(1) Cherry-Gray L-Desk-Hutch
(2) Cherry-Gray L-Desks
(3) Blue Fabric High-Back Swivel Arm-Chairs
(6) Blue Fabric Side-Arm Chairs
(2) Dell P4 PCs w/ Monitor
(1) HP OfficeJet 7210 All-in-One
(1) Calculator     1,800.00

(following segment in Sales F&I Manager Office)

(1) Cherry-Gray L-Desk-Hutch + 2-Dr Lat File Cab
(1) Blue Fabric High-Back Swivel Arm-Chair
(4) Blue Fabric Side-Arm Chairs
(1) Dell P4 PC w/ Monitor
(1) HP LaserJet 1320 Printer
(1) Dot-Matrix Forms Printer
(1) Calculator
(1) Planter     1,750.00

(following segment in Open Sales & Mgr Offices)

(25) Cherry-Gray Laminate Dbl-Ped Desks
(1) Woodgrain Laminate Dbl-Ped Desk
(4) Cherry-Gray Laminate L-Desks
(21) Blue Fabric High-Back Swivel Arm-Chairs
(36) Blue Fabric Side-Arm Chairs
(3) Black Metal 2-Dr File Cabinets
(1) Black Leather Swivel Armchair
(1) Dell GX270 PC w/ Monitor
(6) Dell P4 PCs w/ Monitor
(6) Dell P4 PC w/ (2) Monitors

FURNISHINGS & OFFICE EQUIPMENT (Cont'd)

(Pre-Owned Center - Cont'd)

| | |
|---|---:|
| (2) Dell Monitors (Only)<br>(1) HP LaserJet 1320 Printer<br>(1) HP LaserJet 1320in Printer<br>(1) HP OfficeJet 7210 All-in-One<br>(2) Calculators<br>(9) Planters | $24,000.00 |

(following segment in IT Manager Office)

| | |
|---|---:|
| (1) Cherry-Gray 3/4-Surround Desk-Hutch<br>(1) Blue Fabric High-Back Swivel Arm-Chair<br>(2) Blue Fabric Side-Arm Chairs<br>(1) Dell P4 PC w/ (2) Monitors<br>(1) HP LaserJet 1320 Printer<br>(2) Black Metal 2-Dr File Cabinets | 1,250.00 |

(following segment in Customer TV-Lounge Room)

(1) Toshiba TheaterWide Projection TV
(4) 3-Seat-Table Settees $ 1,850.00
(Surveillance-Security System)

| | |
|---|---:|
| Photo #20<br>1 Surveillance-Security System including (3) DVRs<br>(2 in Mainframe Room - 1 in Parts Dept)<br>and (14+) Remote Cameras<br>Condition: Good | 4,400.00 |

| | |
|---|---:|
| FURNISHINGS & OFFICE EQUIPMENT, TOTAL... | $ 150,400.00 |

**Note 1**

**The purchase price paid to Seller at Closing for any furnishings and office equipment that are subject to any capital lease shall be reduced by the remaining amount due under any such capital lease.**

SIGNAGE

| | |
|---|---|
| Photo #21<br>1 Ford Blue Oval Brand Sign on (1) Column...approx 28' H<br>Condition: Good | $ 11,000.00 |
| Photo #22<br>1 Electronic Menu Board Sign (Retangular)<br>on Pre-Existing 2 Columns...approx 30' High<br>Condition: Good | 10,000.00 |
| Photo #23<br>1 Ford Pre-Owned Vehicles Sign (Rectangular)<br>on (1) Column...approx 16' High<br>Condition: Good | 4,000.00 |
| Photo #24<br>1 Ford Trucks Sign (Rectangular)<br>on (1) Column...approx 20' High<br>Condition: Good | 5,000.00 |

Lot Remaining Signage including (but not limited to)
and in the order identified...

(1) Ford Blue Oval Sign (on Bldg)
(1) Fleet Center (Lettering on Bldg)
(1) Ford Blue Oval (Lettering on Bldg)
(4) Parts-Service (Lettering on Bldg)
(1) Collision Center (Lettering on Bldg)
(13) Blue Dbl-Sided Info/Directional Signs (Assorted)
(1) Ford Blue Oval Fleet Center (Rect Illuminated)
(2) Pre-Owned Center (Lettering on Bldg)                    10,250.00

SIGNAGE, TOTAL...                                          $ 40,250.00

RECAP

| | |
|---|---|
| SERVICE DEPARTMENT EQUIPMENT, TOTAL… | $ 256,875.00 |
| BODY SHOP EQUIPMENT, TOTAL… | 141,000.00 |
| PARTS DEPT SHELVING & EQUIPMENT, TOTAL… | 26,000.00 |
| FURNISHINGS & OFFICE EQUIPMENT, TOTAL | 150,400.00 |
| SIGNAGE, TOTAL… | 40,250.00 |
| DEALERSHIP FIXED ASSETS, GRAND TOTAL… | $ 614,525.00 |

## EXHIBIT D

### VEHICLE ORDERS

| DATE | DEAL # | CUSTOMER NAME | CONTRACT AMOUNT | DOWN PAYMENT |
|------|--------|---------------|-----------------|--------------|
| **OUTSTANDING CONTRACTS AS OF 8/10/2009** | | | | |
| 7/27/2009 | 299691 | RAMIREZ, OSCAR | $18,919.07 | $0.00 |
| 7/31/2009 | 299993 | BARTHOLOMEW, ERIC | $23,709.42 | $0.00 |
| 7/31/2009 | 300000 | SMITH, CHRIS LEON | $16,690.96 | $0.00 |
| 7/31/2009 | 300004 | RAYMOND JR, BERNARD | $0.00 | $28,300.63 |
| 8/04/2009 | 300009 | GUETHER, DAVID | $11,936.94 | $0.00 |
| 8/10/2009 | 300011 | RUTTER, WILLIAM | $30,772.68 | $0.00 |
| 8/06/2009 | 300013 | AUGUSTO, ALESSIO | $0.00 | $20,800.00 |
| 8/05/2009 | 300026 | OCONNOR, SHERRI | $20,555.79 | $0.00 |
| 8/05/2009 | 300037 | WITANACHCHI, SARATH | $16,374.85 | $0.00 |
| | | TOTAL | $138,959.71 | $49,100.63 |

# EXHIBIT E

## LIST OF LEGAL ACTIONS

| Caption, Case No. | Nature | Court | Status |
|---|---|---|---|
| Nova Casualty Company v. Clouden Thomas, Case No. 08-8621 | Interpleader | Hillsborough County Circuit Court | pending |
| Bancroft v. Ernie Haire Ford Case No. 08-24666 | class action | Hillsborough County Circuit Court | recently filed |
| Hilliard v. Ernie Haire Ford Case No. 08-16268 | employment | Hillsborough County Circuit Court | pending |
| Ernie Haire Ford v. Karam Case No. 08-16100 | noncompete | Hillsborough County Circuit Court | pending |
| Ernie Haire Ford v. Bumpers Case No. 08-19959 | breach of title warranty | Hillsborough County Court | pending |
| Ernie Haire Ford v. Smith Case No. 08-8708 | bad check | Hillsborough County Circuit Court | pending |
| Ernie Haire Ford v. Clark Case No. 2D08-1317 | slander | Second District Court of Appeal | plaintiff appealed dismissal |
| Ernie Haire Ford v. City of Tampa, Case No. 07-1370 | declaratory action | Hillsborough County Circuit Court | pending |
| Alvarez v. Ernie Haire Ford Case No. 07-1346 | products liability | Hillsborough County Circuit Court | pending |
| Atkinson v. Ernie Haire Ford Case No. 06-6350 | employment | Hillsborough County Circuit Court | appeal of verdict |
| Beasley v. Ernie Haire Ford Case No. 06-5104 | breach of contract | Hillsborough County Circuit Court | pending |
| Lopez v. Ernie Haire Ford Case No. 04-10561 | breach of contract | Hillsborough County Circuit Court | pending |

| | | | |
|---|---|---|---|
| Ernest Hertz & Torinto Marasco v. Ernie Haire Ford, Inc. Case No. 2007-6165 | breach of contract | Circuit Court of Orange County | pending |
| Ernie Haire Ford v. Balasco Case No. 09-15273 | noncompete | Hillsborough County Circuit Court | pending |
| Elmquist v. Ernie Haire Ford Case No. 09-6439 | products liability | Hillsborough County Circuit Court | pending |
| Ernie Haire Ford v. Universal Underwriters Case No. 09-17139 | bad faith claim | Hillsborough County Circuit Court | pending |
| Ernest Haire v. Shields Case No. 04-5590 | securities claim | Hillsborough County Circuit Court | pending |
| Gilley v. Ernie Haire Ford, Inc. Case No. 02-8101 | class action | Hillsborough County Circuit Court | judgment |
| Deschamps v.Ernie Haire Ford, Inc. Case No. 07-7336 | warranty claim | Hillsborough County Circuit Court | judgment |

# EXHIBIT F

## BUSINESS CONTRACTS AND LEASES

| **Contracting Party** | **Nature of Contract** | **Termination Conditions** |
|---|---|---|
| Ford Motor Company | Franchise Agreement | 30 days by dealer; 15 days by Ford for certain events; 90 days for other events; all subject to Chapter 320, *Fla. Stat.* |
| Big Dog Motorcycles | Franchise Agreement | 60 days by dealer; 10 days by Big Dog for certain events; 60 days for other events; all subject to Chapter 320, *Fla. Stat.* |
| Aimbridge Indirect Lending | Dealer Agreement | 30 days' notice |
| Bank of America | Dealer Agreement | at will |
| Capital One Auto Finance | Dealer Agreement | 30 days' notice |
| Harris, N.A. | Dealer Agreement | 30 days' notice |
| J.P. Morgan Chase Bank | Dealer Agreement | at will |
| American General Finance | Dealer Agreement | 30 days' notice |
| Drive Financial (Santander) | Dealer Agreement | at will |
| Ford Motor Credit | Dealer Agreement | ? |
| Nicholas Financial | Dealer Agreement | at will |
| Regional Acceptance Corp. | Dealer Agreement | 10 days' notice |
| Americredit Financial | Dealer Agreement | 30 days' notice |
| Flagship Credit Corp. | Dealer Agreement | at will |
| Fidelity Bank | Dealer Agreement | at will |
| National Auto Finance | Dealer Agreement | at will |
| Southern Auto Finance | Dealer Agreement | 10 days' notice |
| Citi Financial | Dealer Agreement | at will |
| City of Tampa | Replacement Parts | at will |
| City of Tampa | Body Shop Work | at will (resolution pending) |
| Great American Ins. Co. | GAP coverage | 30 days' notice |

| | | |
|---|---|---|
| Dealer Computer Services | Computer system | motion to reject |
| Nation Warranty Corp. | Finance Products | 30 days' notice |
| Fidelity Warranty Services | Finance Products | 30 days' notice |
| Mitel Leasing | Telephone Equipment | 30 days' notice |
| Mitel NetSolutions | Telephone Service | 60 days' notice |
| Autobase | Data Services | motion to reject |
| Key Trak | Key Security Services | motion to reject |
| AXSA/US Bank | Copiers | motion to reject |
| Dealer Track | Software | motion to reject |
| G & K Services | Uniform Rentals | 30 days' notice |
| DeLage Landen Financial, f/k/a Wachovia Business Leasing, f/k/a First Union Commercial | Equipment Lease | capital lease for equipment at used car facility |
| Seaboard Distribution | Oil Supplier | undetermined |

# EXHIBIT G

## LIST OF LIENS AND ENCUMBRANCES

| Lienholder | Nature of Lien | Approx. Balance |
|---|---|---|
| Wachovia Bank | Mortgage on 9545 North Florida | $2,500,000 |
| Wachovia Bank | Credit Line Mortgage on 9545 | $2,650,000 |
| Wachovia Bank | Mortgage on 9560 North Florida | $1,600,000 |
| Wachovia Bank | Mortgage on 801 East Bearss | $1,190,000 |
| Wachovia Bank | Cross-Collateralization of Other Obligations, Secured by 9545 And 9560 North Florida Avenue | |
| | Swap Termination Fee | $ 90,000 |
| | Brandon Automall R.E. Mortgage | $4,800,000 |
| | Brandon Automall Floorplan Debt | $1,700,000 |
| | Letter of Credit/Surety Bond | $ 125,000 |
| | Total | $6,715,000 |
| Comerica Bank | Blanket Lien Securing Floorplan | $2,000,000 |
| DeLage Landen Financial | Capital Lease of Equipment at 9560 | $ 45,000 |
| Ford Motor Company | Rotunda Equipment Financing at 9545 | $ 11,000 |
| | Rotunda Equipment Financing at Brandon Automall | $ 167,000 |
| | Total | 178,000 |
| Hillsborough County Tax Collector | 2008 Real Estate Taxes at 9560 | $ 58,000 |
| | 2008 Personal Property Taxes | $ 22,100 |
| Consignment Cars, LLC | Used Car Financing Lien | $ 750,000 |
| Clark & Martino, P.A. | Judgment | $ 36,000 |
| Mary K. Haire et al. | Mortgage on 9560 N. Florida and 801 E. Bearss | $5,500,000 |
| Mary K. Haire et al. | Lien on Motorcycle Inventory | $ 500,000 |
| Ford Motor Credit | Lien on Ford F-550 | $ 45,000 |
| HLC Capital /HLC Financial | Lien on Autobase Equipment and software | (lease) |

In addition to the foregoing, the following constitute liens against the Debtor's business premises, arising out of the Debtor's use of the premises:

| City of Tampa | Non-conforming signs at 9545 | $ | ? |
|---|---|---|---|
| | Non-conforming signs at 9530 | $ | ? |

## EXHIBIT H

## ENVIRONMENTAL MATERS

## NONE

EXHIBIT I

INTERIM USE LETTER

_____, 2009

Elder Automotive Group of Tampa Bay, Inc.          **VIA HAND DELIVERY**
320 East Fletcher Avenue
Tampa, Florida 33612

**Re:     SALE OF ASSETS OF ERNIE HAIRE FORD, INC. TO
           ELDER AUTOMOTIVE GROUP OF TAMPA BAY, INC.**

Effective as of the date hereof, Ernie Haire Ford, Inc., a Florida corporation ("Seller") has sold to Elder Automotive Group of Tampa Bay, Inc., a Florida corporation ("Buyer"), certain assets of Seller's automobile sales and service business (the "Business") located at 9545 North Florida Avenue, Tampa, Florida 33612 (the "Dealership Facility").

As of the date hereof, Buyer has not obtained all necessary automobile sales and service dealership licenses (the "Buyer Dealer Licenses") from the State of Florida in order for Buyer to conduct the Business at the Dealership Facility, however, following the date hereof, Buyer will make application for the Buyer Dealer Licenses.

Seller and Buyer acknowledge that for a period of sixty (60) days after the date hereof, Buyer shall be permitted to continue to operate the Business under Seller's automobile sales and service dealership licenses (the "Seller Dealer Licenses"), as set forth on Exhibit A attached hereto, until Buyer has been issued the Buyer Dealer Licenses from the State of Florida.

Seller hereby agrees to allow Buyer to continue to operate the Business at the Dealership Facility under the Seller Dealer Licenses until such time as Buyer obtains the necessary Buyer Dealer Licenses from the State of Florida to operate the Business at the Dealership Facility. Seller hereby agrees that Buyer may use Seller's dealer and temporary plates and bank accounts until such time as Buyer obtains the Buyer Dealer Licenses from the State of Florida. Seller agrees to remit funds received by Seller from indirect lenders on contracts for vehicles sold by Buyer under this Agreement as well as other related funds such as dealer reserves no later than the day following the day such funds are deposited into Seller's account.

Buyer certifies to Seller that Buyer is prepared to apply for all of the Buyer Dealer Licenses, and will use its good faith efforts to obtain the Buyer Dealer Licenses as soon as possible. Buyer and Seller understand that the process to obtain the Buyer Dealer Licenses and to have actual physical possession of the Buyer Dealer Licenses could take up to sixty (60) days. Buyer agrees to return all dealer license plates to the State of Florida Division of Motor Vehicles simultaneous with Seller's termination of the Seller Dealer Licenses and immediately prior to the issuance to Buyer of the Buyer Dealer Licenses. Buyer certifies they are aware of no circumstances in the respective applications that would prohibit the State of Florida from issuing

the Buyer Dealer Licenses.

Buyer acknowledges that Seller does not have legal authority to grant the use of the Seller Dealer Licenses to Buyer as this is vested with the State of Florida. Buyer understands that upon an objection by the State of Florida of this transitional arrangement, it may be required to cease operations until the Buyer Dealer Licenses have been issued.

Buyer agrees to indemnify, defend, protect and hold Seller harmless from any and all loss, liabilities, damages, demands, claims, suits, actions, judgments or causes of action, assessments, costs and expenses, including, without limitation, interest, penalties, reasonable attorneys' fees and reasonable costs, incurred by Seller due to the use of the Seller Dealer Licenses by Buyer.

Buyer agrees to notify Seller within forty eight (48) hours after obtaining all of the Buyer Dealer Licenses and at such time to immediately cease using the Seller Dealer Licenses.

<div style="margin-left:40%">

Sincerely,

Ernie Haire Ford, Inc.

By:_____
      Ernest B. Haire III
      President

</div>

Acknowledged this ____ day of _____, 2009

Elder Automotive Group of Tampa Bay, Inc.

By:_____
      Robert R. Elder
      President

# EXHIBIT A

## SELLER DEALER LICENSES

<u>EXHIBIT J</u>

## DEALERSHIP FACILITY LEASE
### (USED VEHICLE SALES PARCEL)

**THIS LEASE** is made this _____ day of _____, 2009, by and between **ERNIE HAIRE FORD, INC.**, a Florida corporation, whose address is _____ (hereinafter referred to as "Landlord"), and **ELDER AUTOMOTIVE GROUP OF TAMPA BAY, INC.**, a Florida corporation, whose address is 320 East Fletcher Avenue, Tampa, Florida 33612 (hereinafter referred to as "Tenant").

### W I T N E S S E T H:

**WHEREAS**, Landlord and Tenant are parties to that certain Asset Purchase Agreement dated as of June 29, 2009, as amended (the "Purchase Agreement"), whereby Tenant, as Buyer, has the right to purchase from Landlord, as Seller, certain assets used in connection with the operation of an automobile dealership which sells products of the Ford Division of Ford Motor Company located at 9545 North Florida Avenue, Tampa, Florida 33612 (all capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement); and

**WHEREAS**, it is a condition precedent to the obligations of Tenant under the Purchase Agreement that Landlord and Tenant enter into this Lease for the Premises (as defined herein).

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant covenant and agree as follows:

1.     <u>Description and Improvements</u>.  Landlord, in consideration of the rents to be paid and the covenants and agreements to be performed by Tenant, does hereby lease unto Tenant the land and buildings (which land and buildings are hereinafter together referred to as the "Premises") located in the City of Tampa, County of Hillsborough, State of Florida, commonly known as 9650 North Florida Avenue, together with all the tenements, hereditaments, improvements, appurtenances, rights, easements, and rights-of-way incident thereto.  The legal description of the Premises is set forth on <u>Exhibit A</u> attached hereto.

2.     <u>Term</u>.  The term of this Lease shall be for a period of three (3) years [or thirty six (36) months] from the date of this Lease (the "Term").  The taking possession of the Premises by Tenant shall not constitute a waiver by Tenant of (i) any defects in the Premises, which Landlord is required to cure pursuant to this Lease, or (ii) any failure by Landlord to perform any of Landlord's other covenants or obligations contained in this Lease.

3.     <u>Rent</u>.  Tenant shall pay, as rent for the Premises, the sum of Twenty Thousand and No/100 Dollars ($20,000) for each calendar month of the Term, payable on the first (1st) day of each calendar month for the current calendar month; provided, however, that if the Term shall commence on a day other than the first day of a calendar month, or shall end on a day other than

the last day of a calendar month, the rental for such first or last fractional month shall be such proportion of the monthly fixed rental as the number of days in such fractional month for which rent is payable bears to the total number of days in such calendar month. In the event this Lease is terminated, canceled, annulled, or voided, then all unearned rent and other charges paid in advance by Tenant shall be promptly refunded by Landlord to Tenant. The monthly rental amount to be paid by Tenant under this Lease shall not be increased for any reason whatsoever, including but not limited to, a sale of the Premises by Landlord during the Term. Notwithstanding anything to the contrary contained in this Lease, Landlord hereby directs Tenant to pay the monthly rent payments directly to Landlord's lender, Wachovia Bank ("Wachovia") at an address to be provided to Tenant by Landlord or Wachovia, and Landlord will provide Tenant with monthly invoices from Wachovia in order to insure proper crediting.

4.     Option to Purchase. Tenant shall have an irrevocable right to purchase the Premises so long as Tenant is leasing the Premises described in this Lease (the "Option"), which Option may be exercised by Tenant at any time during the Term by providing written notice to Landlord of Tenant's intent to exercise the Option (the "Option Notice"); provided however, Tenant shall be obligated and committed to exercise the Option, and shall close upon and complete the acquisition of the Premises, no later than the expiration of the Term. Upon Landlord's receipt of the Option Notice, Landlord agrees to transfer, sell and convey by general warranty deed, fee simple title to the Premises to Tenant (or its designee), subject only to easements and other matters of record which have been reviewed by and are acceptable to Tenant in Tenant's sole and absolute discretion and matters which are disclosed by an accurate survey of the Premises (the "Survey") and are acceptable to Tenant in Tenant's sole and absolute discretion (the "Permitted Exceptions"). The terms of Tenant's purchase of the Premises under the Option are as follows:

(a)     The purchase price payable at closing upon the exercise of the Option to purchase the Premises shall be fixed at Two Million Two Hundred Ten Thousand Three Hundred and No/100 Dollars ($2,210,300). Tenant shall receive a credit towards the purchase price for the Premises in an amount equal to Five Thousand and No/100 Dollars ($5,000) multiplied by the number of monthly rental payments made by Tenant under this Lease from the commencement of this Lease through the closing of Tenant's acquisition of the Premises. In addition, Tenant shall receive a credit towards the purchase price for the Premises in the amount of the lesser of (i) One Hundred Twenty Five Thousand and No/100 Dollars ($125,000), or (ii) the undrawn balance of Wachovia's letter of credit in favor of Florida Fruit and Vegetable Association (Seller's workers' compensation carrier).

(b)     Landlord shall, within fifteen (15) days after receipt of the Option Notice, furnish to Tenant, at Landlord's cost and expense, a commitment for an owner's extended policy of title insurance (the "Title Commitment") for the Premises issued by a title insurance company acceptable to Tenant (the "Title Company"), dated later than the date of the Option Notice and in the amount of the purchase price, along with copies of all of the underlying documents referenced in the Title Commitment. The Title Company shall agree to insure title to the Premises subject only to the Permitted Exceptions (as defined above). Landlord, at its sole expense, will cause the Title Company to deliver to Tenant promptly after the closing a final policy of title insurance covering the Premises with such endorsements that Tenant may reasonably require following its review of the Title Commitment and the Survey (the "Title

Policy").

(c)     Landlord shall pay all costs for the Title Commitment, the premium to issue to Tenant the Title Policy, and all transfer taxes. Tenant shall be responsible for the payment of its own attorney's fees, the fee required to record the general warranty deed, and the cost of the Survey.

(d)     At closing on the purchase of the Premises, Landlord shall convey good and marketable fee simple title to the Premises to Tenant pursuant to a recordable general warranty deed acceptable to Tenant. Landlord shall deliver any affidavits, statements, gap undertakings, and other documents reasonably required by Tenant or the Title Company to consummate Tenant's purchase of the Premises. Tenant shall have the right to examine the Survey and the Title Commitment and to notify Landlord of any objectionable matter or defect, as determined by Tenant in Tenant's sole and absolute discretion. If Landlord is notified of any objectionable matter(s), Landlord agrees to promptly employ good faith efforts to procure a cure for same at no cost to Tenant. In the event, however, that Landlord is unable to cure to Tenant's satisfaction, any objectionable matter within thirty (30) days after notice of objection is given to Landlord, then at Tenant's option Tenant may (i) take title to the Premises despite the existence of the objectionable matters, (ii) withdraw its Option Notice, in which event the Lease shall continue in full force and effect as if the Option Notice had never been sent by Tenant to Landlord, (iii) enter into negotiations with a third party (or third parties) to cure any such objectionable matters, provided that any agreement to cure such objectionable matters must be satisfactory to Landlord in its reasonable discretion, or (iv) in the event that such objectionable matter relates to a monetary lien of a known amount, to reduce the purchase price by the amount necessary to satisfy the obligation related to such lien.

5.     Landlord's Representations, Warranties and Covenants.     Landlord hereby represents, warrants and covenants to Tenant as follows:

(a)     Landlord has furnished Tenant with all reports, evaluations, notices, surveys and/or assessments prepared for, or in the possession of, or under the control of, Landlord pertaining to the Premises which are reasonably related to the environmental condition of the Premises (the "Environmental Reports").

(b)     Landlord has no other information concerning the environmental condition of the Premises other than the Environmental Reports furnished to Tenant.

(c)     The Premises has been properly maintained and operated in the ordinary course, with no damage or casualty having occurred upon the Premises.

(d)     The Premises shall at the commencement of the Term, and during the entire Term, conform to the laws, ordinances, rules, regulations, requirements and orders of all duly constituted governmental units, authorities, and agencies and shall be in a condition suitable for the operation of an automobile sales and service business.

(e)     The Premises complies with all applicable zoning and other laws, ordinances, regulations and building codes and Landlord has not received any notice of any

violation thereof which has not been remedied.

(f) That, except as disclosed in the Environmental Reports, (i) no Hazardous Substances, as defined below, including without limitation, asbestos-containing materials and electrical transformers or ballasts containing PCBs, are present or were installed, exposed, released or discharged in, or under the Premises, (ii) no underground storage tanks containing Hazardous Substances, any hydraulic lifts containing Hazardous Substances or any other Hazardous Substances are or were located on or in the Premises, and (iii) the Premises has been used and operated by Landlord, or any lessee of the Premises, in compliance with all applicable local, state and Federal laws, ordinances, rules, regulations and orders regarding Hazardous Substances, and Landlord has all permits and authorizations required for the use and operation of the Premises. "Hazardous Substance(s)" as used herein means any hazardous or toxic substances, materials, or wastes, including, but not limited to, those substances, materials or wastes, listed in the United States Department of Transportation Hazardous Materials Table (49 CFR 172.101) or by the Environmental Protection Agency as hazardous substances (40 CFR Part 302) and amendments thereto, or such substances, materials and wastes which are regulated under any applicable local, state or federal law, including, without limitation, any material, waste or substance which is (1) petroleum and gasoline, (2) asbestos, (3) polychlorinated biphenyls, (4) designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act (33 U.S.C. §1251, et seq. (33 U.S.C. §1321) or listed pursuant to Section 307 of the Clean Water Act (33 U.S.C. §1317), (5) defined as a "hazardous waste" pursuant to Section 1004 of the Solid Waste Disposal Act, including the Resource Conversation and Recovery Act, 42 U.S.C. §6901, et seq. (42 U.S.C. §6903(5)), or (6) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response Compensation, and Liability Act, 42 U.S.C. §9601, et seq. (42 U.S.C. §9601).

(g) Landlord has the full power and authority to execute and deliver this Lease and to perform its obligations under this Lease.

6. _Holdover._ In the event Tenant remains in possession of the Premises after it cancels or terminates this Lease, or remains in possession of the Premises after the expiration of the Term, the tenancy shall thereafter be from month to month at the same monthly rental as set forth in Section 3 above and on the same conditions except as to the Term, as herein provided.

7. _Alterations._ Tenant shall have the right and privilege at all times during the Term to make, at its own expense, such alterations, changes, improvements and additions to the Premises as Tenant may desire provided such work when completed will not impair the structural integrity or soundness of the building; and provided that all such improvements are made in accordance with applicable local, state and federal rules, regulations and ordinances.

8. _Repairs._ Tenant shall maintain, repair and replace the structural and non-structural components of the Premises. Tenant shall enter into a service agreement with a qualified maintenance provider for such provider to maintain the plumbing, electrical, heating, ventilation and air conditioning systems, as well as, to maintain the paving located within and upon the Premises, and shall make all necessary repairs and replacements thereto as recommended by such provider.

9.    Utilities.  Tenant shall pay for all gas, electricity, heat and water and all other utilities consumed by it at the Premises from and after the delivery of exclusive physical possession of the Premises to Tenant.  Tap charges, sewer charges and sewer taxes, regardless of the manner billed or assessed, shall be paid by Tenant.  Landlord shall not do anything which will interrupt or interfere with availability of any utilities to Tenant at the Premises throughout the Term.

10.    Defaults by Tenant.

(a)    If the monthly rent set forth in Section 3 above, or any part thereof, shall be unpaid on the date of payment as required by this Lease, and remain unpaid for a period of ten (10) days after Tenant shall have received from Landlord notice in writing of such nonpayment, then and in such case it shall and may be lawful for Landlord, at Landlord's option, by summary proceedings or by any other appropriate legal action or proceedings to terminate this Lease and to enter into the Premises, or any part thereof, and expel Tenant or any person or persons occupying the Premises.  Landlord agrees that in no event shall the nonpayment of rent be the basis of a forfeiture of this Lease or otherwise result in the eviction of Tenant or the termination of the Term unless said written notice shall have been served on Tenant as hereinbefore provided and Tenant shall have failed to cure such default within said ten (10) day period after the receipt of said notice.

(b)    It is mutually agreed that if Tenant shall be in default in performing any of the terms or provisions of this Lease (other than the provision requiring the payment of rent which is covered in Section 10(a) above) Landlord shall give to Tenant notice in writing of such default, and if Tenant shall fail to cure such default within thirty (30) days after receipt of such notice, or if the default is of such character as to require more than thirty (30) days to cure and Tenant shall fail to use reasonable diligence in curing such default after receipt of such notice, then and only in such event Landlord may cure such default for the account of and at the cost and expense of Tenant, and the full amount so expended by Landlord shall immediately be owing by Tenant to Landlord.  However, in the event that Tenant shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or another reason of a like nature not the fault of Tenant, then performance of such act shall be excused for the period of the delay and the period for the commencement of performance of any such act shall be extended for a period equivalent to the period of such delay.  Landlord agrees that in no event shall such default be the basis of a forfeiture of this Lease or otherwise result in the eviction of Tenant or the termination of the Term.

(c)    If Tenant shall default in any payment other than rent required to be paid by Tenant under the terms of this Lease, Landlord may (but shall not be obligated to) make such payment, in which event the amount thereof shall be payable as rental to Landlord by Tenant on the next rent day, together with interest at six (6%) percent per annum from the date of such payment by Landlord.

(d)    If, as a result of an uncured Tenant default, Landlord shall, during the Term, obtain possession of the Premises by re-entry, summary proceedings, or other lawful

means, Tenant hereby agrees to pay Landlord all reasonable costs and expenses incurred in obtaining possession of the Premises.

11.     Tenant's Right to Terminate.  Tenant shall have the right to terminate this Lease at any time during the Term upon thirty (30) days prior written notice to Landlord, without any further or other obligation to Landlord hereunder as of the effective date of said termination, upon any one or more of the following events:

(a)     Upon a breach by Landlord of any representation, warranty or covenant contained in this Lease;

(b)     In the event the presence of any Hazardous Substances and/or the implementation of any response activities incident thereto, render the Premises, in the reasonable discretion of the Tenant, not useable for Tenant's intended use thereof; or

(c)     Without regard to any notice requirement, at the Closing pursuant to Tenant's exercise of the Option pursuant to Paragraph 4 above.

12.     Trade Fixtures.  Tenant may, at any time during the Term, or within a reasonable time after the expiration or termination of the Term, remove from the Premises all fixtures and other equipment which Tenant may have purchased, leased, or installed in the Premises or otherwise acquired (the "Trade Fixtures").  Tenant agrees to repair any damage which may be done to the Premises resulting from the removal of the Trade Fixtures.  Tenant shall be required to remove the Trade Fixtures from the Premises within a reasonable time after the termination or expiration of the Term, if requested to do so by Landlord.  Any Trade Fixtures that are not removed from the Premises within a reasonable time after the termination or expiration of the Term, shall become the property of Landlord and may be disposed of by Landlord at Landlord's discretion.

13.     Insurance.  Tenant shall maintain insurance on the building and the Premises in amounts and of the type typically maintained for similar operations and reasonably acceptable to Landlord.  Tenant shall keep in full force and effect appropriate levels of public liability and property damage liability insurance.  Such insurance shall name Landlord as an additional insured and an additional loss payee, and shall provide that it is primary insurance and not excess over or contributory with any other valid, existing and applicable insurance in force for or on behalf of Landlord, and shall provide that Landlord shall receive thirty (30) days written notice from the insurer prior to any cancellation or change of coverage.  In addition, Tenant shall keep in effect fire insurance (including standard extended coverage endorsement) for the full replacement cost of the Trade Fixtures, personal property and improvements.  Tenant shall deliver policies of the insurance required or certificates to Landlord on or before the commencement of the Term.  Such insurance may be provided under blanket insurance policies covering other properties owned or leased by Tenant and its affiliates.

14.     Fire.  In the event the Premises, or any material portion thereof shall be damaged by fire or other casualty during the Term so as to render the Premises untenantable and such Premises cannot be made tenantable within one hundred twenty (120) days after such damage, this Lease may be terminated by Tenant, at its sole option, by written notice thereof sent to

Landlord. If such damage can be repaired within one hundred twenty (120) days after the date of such damage, Landlord shall enter and make whatever repairs are necessary without affecting this Lease, but the rent payment hereunder shall abate while such repairs are being made in such proportion as the part of the Premises thus destroyed or rendered untenantable bears to the total Premises. In the event the Premises is so slightly damaged by such fire or other casualty as not to be rendered untenantable, Landlord shall make the necessary repairs with reasonable promptness and the payment of rent shall not be affected thereby.

      15.    Eminent Domain. If all or any substantial part of the Premises or the building shall be taken by or conveyed to any public authority under the power of eminent domain, then the Term shall cease on the part of the Premises so taken or conveyed on the date possession of that part shall be required for public use, and any rent paid in advance of such date shall be refunded to Tenant, and Tenant shall have the right to terminate this Lease upon written notice to Landlord. In the event that less than a substantial part of the Premises or the building is so affected in the reasonable judgment of Tenant, Landlord shall make all necessary repairs and Tenant shall continue in possession of the Premises under the same terms and conditions as are herein provided, except that the rent charged herein shall be reduced in direct proportion to the amount of the Premises so affected. All damages awarded for such taking or conveyance shall belong to and be the property of that party to which they are awarded.

      16.    Quiet Enjoyment.

      (a)    Landlord covenants and warrants that it owns good fee simple unencumbered marketable title to the Premises, and that it now has the right to enter into this Lease for the Term set forth herein.

      (b)    Landlord covenants that upon payment by Tenant of the rents and other charges herein provided, and upon the substantial performance of all the covenants, terms and conditions on Tenant's part to be performed under this Lease, Tenant shall peaceably and quietly hold and enjoy the Premises during the Term, without hindrance or interruption by any of the following: (i) Landlord or any assignee of Landlord; (ii) any person or party claiming, directly or remotely, under or through Landlord; (iii) any person or party, directly or indirectly, acting under the direction or control of Landlord or under the direction or control of any person or party claiming, directly or remotely, under or through Landlord, or under the direction or control of any assignee of Landlord; or (iv) any person or party acting in concert with Landlord or in concert with any assignee of Landlord, or in concert with any person or party claiming, directly or remotely, under or through Landlord.

      17.    Right to Mortgage. Landlord reserves the right to subordinate this Lease to the lien of any first mortgage now or hereafter placed upon Landlord's interest in the Premises; provided, however, that no default by Landlord under any mortgage, or any action of whatsoever kind or nature taken by any mortgagee, including without limitation the sale of the Premises upon foreclosure of the mortgage, shall affect Tenant's rights under this Lease or, directly or indirectly, disturb Tenant's peaceful and quiet possession and enjoyment of the Premises while Tenant is not in material default under this Lease and so long as Tenant's right to possession of the Premises has not been duly terminated pursuant to and in compliance with the provisions of Section 10 of this Lease.

Landlord agrees to execute and deliver to Tenant on or before the Closing Date a Subordination, Non-Disturbance and Attornment Agreement executed by any lender of Landlord (including Wachovia), in form and substance reasonably acceptable to Tenant. Any such first mortgage, now or hereafter encumbering the Premises, shall provide that the mortgagee or any transferee agrees to recognize this Lease and all of Tenant's rights hereunder, in the event of foreclosure or any other transfer of the Premises, while Tenant is not in material default under this Lease and so long as Tenant's right to possession of the Premises has not been duly terminated pursuant to and in compliance with the provisions of Section 10 of this Lease; and that such agreement of the mortgagee shall also be binding upon: (i) any party that acquires the Premises at a mortgage foreclosure sale, and (ii) all persons and parties that, directly or remotely, claim under or through the mortgagee or any mortgage foreclosure sale buyer. Tenant agrees that any mortgagee may elect to have this Lease a prior lien to its mortgage, and in the event of such election and upon written notification by such mortgagee to Tenant to that effect, this Lease shall be prior in lien to the said mortgage, whether this Lease is dated prior to or subsequent to the date of such mortgage.

      18.    Use and Occupancy. Tenant is granted the right to occupy and use the Premises for a automobile sales and service business and Tenant will use the Premises only in accordance with local zoning ordinances and other applicable laws and private land use restrictions.

      19.    Subletting, Transfer and Assignment. Tenant shall have the unrestricted right to transfer or assign this Lease, and/or, sublet or license the use of all or any portion of the Premises upon obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed.

      20.    Real Property Taxes. During the Term, Tenant shall pay all real property taxes and assessments and similar charges (including new taxes or charges in lieu of or in addition to those now in existence) assessed or levied against the Premises. Landlord covenants and agrees to use its best good faith efforts to have such taxing authorities send such tax bills directly to Tenant. In the event that the taxing authorities will not provide such tax bills directly to Tenant, Landlord shall furnish Tenant with copies of all such tax bills promptly upon receipt thereof and in sufficient time to allow Tenant to pay such taxes by the due date for which such taxes are payable without penalty. Subject to Tenant's right to contest such tax bills as set forth below, Tenant agrees to pay all tax bills by the due date for such tax bills. In the event that Tenant does not pay any such tax bills by the due date, Landlord may make payment of such tax bills, and thereafter provide written demand to Tenant for payment. Failure of Tenant to honor and remit payment within ten (10) days after receipt of such written demand from Landlord shall be a default by Tenant and governed by Section 10(c) above. Notwithstanding anything herein to the contrary, (i) for the first year of the Term, Tenant shall pay its prorated share of the real property taxes and assessments for such first year on a per diem basis based upon the respective due dates of such taxes and assessments, and (ii) upon the expiration or early termination of the Term, if Tenant does not purchase the Premises, the real property taxes and assessments for the last year of this Lease shall be prorated on a per diem basis based upon the respective due dates of such taxes and assessments. Tenant shall not be required to pay more than Tenant's prorated portion of real property taxes and assessments as set forth above, and Landlord shall pay, or reimburse Tenant for payment of the balance thereof. Tenant shall have the right to elect to pay any

assessments in installments, if permitted by the taxing authority, and in such event Tenant shall be responsible only for its portion of such installments falling due during the Term and before the expiration or early termination of this Lease. If Tenant desires to contest an increase in any such tax bills, Tenant shall have the right to do so at its own expense and Landlord shall fully cooperate with Tenant in any such proceeding.

      21.   Signs. Landlord agrees not to use or permit to be used for advertising purposes any part of the Premises, but agrees that Tenant or its subsidiaries or any person or party duly authorized by Tenant has the right to place its signs, name or advertisements in, on, and about any portion of the Premises, except such limitations as may be imposed by law.

      22.   Consent of Landlord. Wherever the consent or approval of Landlord is required in this Lease, such consent or approval shall not be unreasonably withheld or delayed.

      23.   Miscellaneous Provisions.

      (a)   Waiver. One or more waivers of any covenant or condition by Landlord or Tenant shall not be construed as a waiver of a subsequent breach of the same covenant or condition, and the consent or approval by either party to or of any act by the other party requiring consent or approval shall not be deemed to render unnecessary consent or approval to or of any subsequent similar act. No breach of a covenant or condition of this Lease shall be deemed to have been waived by either party, unless such waiver is in writing signed by each party.

      (b)   Entire Agreement. This Lease and the Exhibits attached hereto and forming a part hereof set forth all the covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Premises, and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between them concerning the Premises other than as herein set forth. No alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by each party.

      (c)   Interpretation and Use of Pronouns. Nothing contained herein shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that no provision contained herein or any acts of the parties herein, shall be deemed to create any relationship between the parties hereto other than the relationship of Landlord and Tenant. Whenever herein the singular is used, the same shall include the plural, and the neuter gender shall include the feminine and male genders, and vice-versa.

      (d)   Notices. Any notice, communication, request, reply or advice (hereinafter severally and collectively, for convenience, called "Notice") in this Lease provided or permitted to be given, made or accepted by either party to the other must be in writing and may, unless otherwise in this Agreement expressly provided, be given or be served by depositing the same in the United States mail, postage paid, and registered or certified and addressed to the party to be notified, with return receipt requested, or by delivering the same in person to an officer of such

party, or by prepaid telegram, when appropriate, addressed to the party to be notified. Notice deposited in the mail in the manner herein above described shall be effective, unless otherwise stated in this Lease, from and after the date it is so deposited. Notice given in any other manner shall be effective only if and when received by the party to be notified. For purposes of Notice, the addresses of the parties shall be as follows:

<div style="margin-left: 2em;">

If to Landlord:   Ernie Haire Ford, Inc.
9545 North Florida Avenue
Tampa, Florida 33612
Attention: Ernest B. Haire, III

with a copy to:Todd Hodges, Esq.
905 Shaded Water Way
Lutz, Florida 33549

If to Tenant:   Elder Automotive Group of Tampa Bay, Inc.
320 East Fletcher Avenue
Tampa, Florida 33612
Attention: Robert R. Elder

with a copy to:Dawda, Mann, Mulcahy & Sadler, PLC
39533 Woodward Avenue, Suite 200
Bloomfield Hills, Michigan 48304
Attention: Edward C. Dawda

</div>

or to such other location as the parties may direct in writing.

    (e)   Captions and Section Number. The captions, Section numbers, and index appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe, or describe the scope or intent of such section or subsection of this Lease nor in any way affect this Lease.

    (f)   Recording. Upon the request of either party hereto, the other party shall join in the execution of a memorandum or so-called "short form" of this Lease for the purposes of recordation. Such memorandum or short form of this Lease shall describe the parties, the leased premises, the term of this Lease, any special provisions (including the Option to purchase the Premises held by Tenant), and shall incorporate this Lease by reference.

    (g)   Laws of the State of Florida and Severability. This Lease shall be governed by and construed in accordance with the laws of the State of Florida. If any provision of this Lease or the application thereof to any party or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease shall not be affected thereby and each provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

    (h)   Exhibits. The Exhibits referred to in this Lease and attached hereto are incorporated herein by reference.

        (i)      <u>Successors</u>. All rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind their respective successors and assigns.

        (j)      <u>Counterparts</u>. This Lease, and all amendments hereto, may be executed in several counterparts, each of which shall be deemed to be an original and all of which together shall constitute one agreement binding upon both parties hereto, notwithstanding that the parties shall not have signed the same counterpart. For the purposes of this Lease, facsimile or electronic signatures shall have the same force and effect as original signatures.

        (k)      <u>Drafting of Lease</u>. This Lease was prepared and negotiated by Landlord and Tenant, and all of the provisions contained in this Lease shall be construed without prejudice to the party that actually memorialized this Lease in final form; and this Lease shall be considered to be drafted by both Landlord and Tenant.

<div align="center">[Signatures on Following Page]</div>

Landlord and Tenant have executed this Lease as of the day and year first above written.

Signed in the Presence of:

Witnesses for Landlord:     LANDLORD:

            ERNIE HAIRE FORD, INC.,
            a Florida corporation

_____  By: _____
Name:           Ernest B. Haire, III
_____    President
Name:

Witnesses for Tenant:      TENANT:

            ELDER AUTOMOTIVE GROUP OF TAMPA
            BAY, INC.,
            a Florida corporation

_____  By: _____
Name:           Robert R. Elder
_____    President
Name:

# EXHIBIT A

## LEGAL DESCRIPTION

(to be attached)

## DEALERSHIP FACILITY LEASE
### (NEW VEHICLE SALES PARCEL)

**THIS LEASE** is made this _____ day of _____, 2009, by and between **MARY K. HAIRE, TRUSTEE OF THE MARY K. HAIRE REVOCABLE TRUST AGREEMENT DATED NOVEMBER 14, 1989**, whose address is _____ (hereinafter referred to as "Landlord"), and **ELDER AUTOMOTIVE GROUP OF TAMPA BAY, INC.**, a Florida corporation, whose address is 320 East Fletcher Avenue, Tampa, Florida  33612 (hereinafter referred to as "Tenant").

### W I T N E S S E T H:

**WHEREAS**, Ernie Haire Ford, Inc., a Florida corporation ("Seller") and Tenant are parties to that certain Asset Purchase Agreement dated as of June 29, 2009, as amended (the "Purchase Agreement"), whereby Tenant, as Buyer, has the right to purchase from Seller certain assets used in connection with the operation of an automobile dealership which sells products of the Ford Division of Ford Motor Company located at 9545 North Florida Avenue, Tampa, Florida 33612 (all capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement); and

**WHEREAS**, it is a condition precedent to the obligations of Tenant under the Purchase Agreement that Landlord and Tenant enter into this Lease for the Premises (as defined herein).

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant covenant and agree as follows:

1.      Description and Improvements.  Landlord, in consideration of the rents to be paid and the covenants and agreements to be performed by Tenant, does hereby lease unto Tenant the land and buildings (which land and buildings are hereinafter together referred to as the "Premises") located in the City of Tampa, County of Hillsborough, State of Florida, commonly known as 9545 North Florida Avenue, together with all the tenements, hereditaments, improvements, appurtenances, rights, easements, and rights-of-way incident thereto, and the right to use the driveway strip at the rear of the Premises.  The legal description of the Premises is set forth on Exhibit A attached hereto.

2.      Term.  The term of this Lease shall be for a period of four (4) years [or forty-eight months] from the date of this Lease (the "Term").  The taking possession of the Premises by Tenant shall not constitute a waiver by Tenant of (i) any defects in the Premises, which Landlord is required to cure pursuant to this Lease, or (ii) any failure by Landlord to perform any of Landlord's other covenants or obligations contained in this Lease.

3. <u>Rent</u>. Tenant shall pay to Landlord, as rent for the Premises, the sum of Thirty Six Thousand and No/100 Dollars ($36,000) for each of the first twenty-four (24) calendar months of the Term, and Forty Five Thousand and No/100 Dollars ($45,000) monthly rent for each calendar month for the balance of the Term, payable on the first (1st) day of each calendar month for the current calendar month; provided, however, that if the Term shall commence on a day other than the first day of a calendar month, or shall end on a day other than the last day of a calendar month, the rental for such first or last fractional month shall be such proportion of the monthly fixed rental as the number of days in such fractional month for which rent is payable bears to the total number of days in such calendar month. In the event this Lease is terminated, canceled, annulled, or voided, then all unearned rent and other charges paid in advance by Tenant shall be promptly refunded by Landlord to Tenant. The monthly rental amount to be paid by Tenant under this Lease shall not be increased for any reason whatsoever, including but not limited to, a sale of the Premises by Landlord during the Term.

4. <u>Option to Purchase</u>. Tenant shall have an irrevocable right to purchase the Premises so long as Tenant is leasing the Premises described in this Lease (the "Option"), which Option may be exercised by Tenant at any time during the Term by providing written notice to Landlord of Tenant's intent to exercise the Option (the "Option Notice"). Upon Landlord's receipt of the Option Notice, Landlord agrees to transfer, sell and convey by general warranty deed, fee simple title to the Premises to Tenant (or its designee), subject only to easements and other matters of record which have been reviewed by and are acceptable to Tenant in Tenant's sole and absolute discretion and matters which are disclosed by an accurate survey of the Premises (the "Survey") and are acceptable to Tenant in Tenant's sole and absolute discretion (the "Permitted Exceptions"). The terms of Tenant's purchase of the Premises under the Option would be as follows:

(a) Landlord and Tenant agree that for a period of seven (7) days after the date of the Option Notice, Landlord and Tenant shall negotiate in good faith to reach a mutually agreeable purchase price for the Premises. In the event Landlord and Tenant cannot agree upon a purchase price for the Premises during these seven (7) days, the purchase price shall be determined in the following manner. Landlord and Tenant hereby acknowledge that Integra Realty Resources has performed an appraisal of the Premises dated July 27, 2009 (the "Closing Appraisal"), a copy of which is in the possession of Landlord and Tenant. Upon Landlord's receipt of the Option Notice, Landlord and Tenant shall select a mutually acceptable certified MAI appraiser to perform another appraisal of the Premises (the "Option Appraisal"). The purchase price of the Premises shall be the average of the Closing Appraisal and the Option Appraisal. The cost of the Closing Appraisal shall be the sole responsibility of Tenant. The cost of the Option Appraisal, if necessary, shall be spilt equally between Landlord and Tenant.

(b) Landlord shall, within fifteen (15) days after receipt of the Option Notice, furnish to Tenant, at Landlord's cost and expense, a commitment for an owner's extended policy of title insurance (the "Title Commitment") for the Premises issued by a title insurance company acceptable to Tenant (the "Title Company"), dated later than the date of the Option Notice and in the amount of the purchase price, along with copies of all of the underlying documents referenced in the Title Commitment. The Title Company shall agree to insure title to the Premises subject only to the Permitted Exceptions (as defined above). Landlord, at its sole expense, will cause the Title Company to deliver to Tenant promptly after the closing a final

policy of title insurance covering the Premises with such endorsements that Tenant may reasonably require following its review of the Title Commitment and the Survey (the "Title Policy").

(c)     Landlord shall pay all costs for the Title Commitment, the premium to issue to Tenant the Title Policy, and all transfer taxes. Tenant shall be responsible for the payment of its own attorney's fees, the fee required to record the general warranty deed, and the cost of the Survey.

(d)     At closing on the purchase of the Premises, Landlord shall convey good and marketable fee simple title to the Premises to Tenant pursuant to a recordable general warranty deed acceptable to Tenant. Landlord shall deliver any affidavits, statements, gap undertakings, and other documents reasonably required by Tenant or the Title Company to consummate Tenant's purchase of the Premises. Tenant shall have the right to examine the Survey and the Title Commitment and to notify Landlord of any objectionable matter or defect, as determined by Tenant in Tenant's sole and absolute discretion. If Landlord is notified of any objectionable matter(s), Landlord agrees to promptly employ good faith efforts to procure a cure for same at no cost to Tenant. In the event, however, that Landlord is unable to cure to Tenant's satisfaction, any objectionable matter within thirty (30) days after notice of objection is given to Landlord, then at Tenant's option Tenant may (i) take title to the Premises despite the existence of the objectionable matters, (ii) withdraw its Option Notice, in which event the Lease shall continue in full force and effect as if the Option Notice had never been sent by Tenant to Landlord, (iii) enter into negotiations with a third party (or third parties) to cure any such objectionable matters, provided that any agreement to cure such objectionable matters must be satisfactory to Landlord in its reasonable discretion, or (iv) in the event that such objectionable matter relates to a monetary lien of a known amount, to reduce the purchase price by the amount necessary to satisfy the obligation related to such lien.

(e)     Closing on the purchase of the Premises pursuant to the Option shall be further contingent upon Tenant obtaining financing to enable Tenant to purchase the Premises in an amount and on terms acceptable to Tenant in its sole and absolute discretion.

5.     Landlord's Representations, Warranties and Covenants.     Landlord hereby represents, warrants and covenants to Tenant as follows:

(a)     Landlord has furnished Tenant with all reports, evaluations, notices, surveys and/or assessments prepared for, or in the possession of, or under the control of, Landlord pertaining to the Premises which are reasonably related to the environmental condition of the Premises (the "Environmental Reports").

(b)     Landlord has no other information concerning the environmental condition of the Premises other than the Environmental Reports furnished to Tenant.

(c)     The Premises has been properly maintained and operated in the ordinary course, with no damage or casualty having occurred upon the Premises.

(d)     The Premises shall at the commencement of the Term, and during the

entire Term, conform to the laws, ordinances, rules, regulations, requirements and orders of all duly constituted governmental units, authorities, and agencies and shall be in a condition suitable for the operation of an automobile sales and service business.

(e)     The Premises complies with all applicable zoning and other laws, ordinances, regulations and building codes and Landlord has not received any notice of any violation thereof which has not been remedied.

(f)     That, except as disclosed in the Environmental Reports, (i) no Hazardous Substances, as defined below, including without limitation, asbestos-containing materials and electrical transformers or ballasts containing PCBs, are present or were installed, exposed, released or discharged in, or under the Premises, (ii) no underground storage tanks containing Hazardous Substances, any hydraulic lifts containing Hazardous Substances or any other Hazardous Substances are or were located on or in the Premises, and (iii) the Premises has been used and operated by Landlord, or any lessee of the Premises, in compliance with all applicable local, state and Federal laws, ordinances, rules, regulations and orders regarding Hazardous Substances, and Landlord has all permits and authorizations required for the use and operation of the Premises.    "Hazardous Substance(s)" as used herein means any hazardous or toxic substances, materials, or wastes, including, but not limited to, those substances, materials or wastes, listed in the United States Department of Transportation Hazardous Materials Table (49 CFR 172.101) or by the Environmental Protection Agency as hazardous substances (40 CFR Part 302) and amendments thereto, or such substances, materials and wastes which are regulated under any applicable local, state or federal law, including, without limitation, any material, waste or substance which is (1) petroleum and gasoline, (2) asbestos, (3) polychlorinated biphenyls, (4) designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act (33 U.S.C. §1251, et seq. (33 U.S.C. §1321) or listed pursuant to Section 307 of the Clean Water Act (33 U.S.C. §1317), (5) defined as a "hazardous waste" pursuant to Section 1004 of the Solid Waste Disposal Act, including the Resource Conversation and Recovery Act, 42 U.S.C. §6901, et seq. (42 U.S.C. §6903(5)), or (6) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response Compensation, and Liability Act, 42 U.S.C. §9601, et seq. (42 U.S.C. §9601).

(g)     Landlord has the full power and authority to execute and deliver this Lease and to perform its obligations under this Lease.

6.     Holdover.   In the event Tenant remains in possession of the Premises after it cancels or terminates this Lease, or remains in possession of the Premises after the expiration of the Term, the tenancy shall thereafter be from month to month at the same monthly rental as set forth in Section 3 above and on the same conditions except as to the Term, as herein provided.

7.     Alterations.   Tenant shall have the right and privilege at all times during the Term to make, at its own expense, such alterations, changes, improvements and additions to the Premises as Tenant may desire provided such work when completed will not impair the structural integrity or soundness of the building; and provided that all such improvements are made in accordance with applicable local, state and federal rules, regulations and ordinances.

8.     Repairs.   Landlord agrees that, during the Term, it will, at its own cost and

expense, make all necessary repairs and replacements to: (i) the roof, foundation, outer walls, exterior and structure of any building located upon the Premises and related chimney outlets, plate glass, floor and ceiling tiles; (ii) the interior walls, ceilings, floors, and floor coverings, when repairs thereto are made necessary because of faulty construction or Landlord's failure to keep the exterior or structure in good repair; and (iii) all plumbing, electrical, ventilation systems, heating and air conditioning systems as necessary to keep the same in good repair; provided however, Tenant shall enter into a service agreement with a qualified maintenance provider for such provider to maintain the plumbing, electrical, heating, ventilation and air conditioning systems, with Landlord making all necessary repairs and replacements thereto as recommended by such provider. Such maintenance obligations of Tenant pursuant to the preceding sentence shall only apply to that portion of the plumbing, electrical, heating, ventilation and air conditioning systems that are located inside the building situated upon the Premises. Landlord shall be solely responsible for the maintenance, repair and replacement of that portion of the plumbing, electrical, heating, ventilation and air conditioning systems that are located outside of the building situated upon the Premises. Landlord shall also perform the paving, floor slab and common sewage line plumbing; provided however, Tenant shall enter into a service agreement with a qualified maintenance provider for such provider to maintain the paving located upon the Premises, with Landlord making all necessary repairs and replacements thereto as recommended by such provider. Any damage to Tenant's property occurring from failure of Landlord to make repairs that are Landlord's obligation to make shall be borne by Landlord. If Tenant deems any repairs and/or replacements necessary, and such repairs and/or replacements have not been made by Landlord, Tenant may provide written notice to Landlord of the need for such repairs and/or replacements. If Landlord does not make such repairs and/or replacements, or does not diligently commence making such repairs and/or replacements within five (5) days of such notice, Tenant may make such repairs and/or replacements and seek immediate reimbursement from Landlord. If Landlord fails to remit payment to Tenant within ten (10) days after notice from Tenant, Tenant may abate rent in the amount of such repairs and/or replacements. Tenant shall also have the right to make any repairs and/or replacements in the event of an emergency, and Tenant agrees to provide written notice to Landlord within forty eight (48) hours after making such emergency repairs and/or replacements indicating the nature of such repairs and/or replacements. Landlord agrees to reimburse Tenant within ten (10) days after Tenant provides notice to Landlord of the cost of such emergency repairs and/or replacements. If Landlord fails to remit payment to Tenant for such emergency repairs and/or replacements within such ten (10) day period, Tenant may abate rent in the amount of the cost of such emergency repairs and/or replacements. Landlord has the right to enter the Premises periodically, at any reasonable time, to inspect the condition of the Premises and to make repairs and/or replacements that it is Landlord's obligation to make.

9.      Utilities.  Tenant shall pay for all gas, electricity, heat and water and all other utilities consumed by it at the Premises from and after the delivery of exclusive physical possession of the Premises to Tenant. Tap charges, sewer charges and sewer taxes, regardless of the manner billed or assessed, shall be paid by Tenant. Landlord shall not do anything which will interrupt or interfere with availability of any utilities to Tenant at the Premises throughout the Term.

10. Defaults by Tenant.

(a) If the monthly rent set forth in Section 3 above, or any part thereof, shall be unpaid on the date of payment as required by this Lease, and remain unpaid for a period of ten (10) days after Tenant shall have received from Landlord notice in writing of such nonpayment, then and in such case it shall and may be lawful for Landlord, at Landlord's option, by summary proceedings or by any other appropriate legal action or proceedings to terminate this Lease and to enter into the Premises, or any part thereof, and expel Tenant or any person or persons occupying the Premises. Landlord agrees that in no event shall the nonpayment of rent be the basis of a forfeiture of this Lease or otherwise result in the eviction of Tenant or the termination of the Term unless said written notice shall have been served on Tenant as hereinbefore provided and Tenant shall have failed to cure such default within said ten (10) day period after the receipt of said notice.

(b) It is mutually agreed that if Tenant shall be in default in performing any of the terms or provisions of this Lease (other than the provision requiring the payment of rent which is covered in Section 10(a) above) Landlord shall give to Tenant notice in writing of such default, and if Tenant shall fail to cure such default within thirty (30) days after receipt of such notice, or if the default is of such character as to require more than thirty (30) days to cure and Tenant shall fail to use reasonable diligence in curing such default after receipt of such notice, then and only in such event Landlord may cure such default for the account of and at the cost and expense of Tenant, and the full amount so expended by Landlord shall immediately be owing by Tenant to Landlord. However, in the event that Tenant shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or another reason of a like nature not the fault of Tenant, then performance of such act shall be excused for the period of the delay and the period for the commencement of performance of any such act shall be extended for a period equivalent to the period of such delay. Landlord agrees that in no event shall such default be the basis of a forfeiture of this Lease or otherwise result in the eviction of Tenant or the termination of the Term.

(c) If Tenant shall default in any payment other than rent required to be paid by Tenant under the terms of this Lease, Landlord may (but shall not be obligated to) make such payment, in which event the amount thereof shall be payable as rental to Landlord by Tenant on the next rent day, together with interest at six (6%) percent per annum from the date of such payment by Landlord.

(d) If, as a result of an uncured Tenant default, Landlord shall, during the Term, obtain possession of the Premises by re-entry, summary proceedings, or other lawful means, Tenant hereby agrees to pay Landlord all reasonable costs and expenses incurred in obtaining possession of the Premises.

11. Tenant's Right to Terminate. Tenant shall have the right to terminate this Lease at any time during the Term upon thirty (30) days prior written notice to Landlord, without any further or other obligation to Landlord hereunder as of the effective date of said termination, upon any one or more of the following events:

(a)     Upon a breach by Landlord of any representation, warranty or covenant contained in this Lease;

(b)     In the event the presence of any Hazardous Substances and/or the implementation of any response activities incident thereto, render the Premises, in the reasonable discretion of the Tenant, not useable for Tenant's intended use thereof; or

(c)     Without regard to any notice requirement, at the Closing pursuant to Tenant's exercise of the Option pursuant to Paragraph 4 above.

12.     Trade Fixtures. Tenant may, at any time during the Term, or within a reasonable time after the expiration or termination of the Term, remove from the Premises all fixtures and other equipment which Tenant may have purchased, leased, or installed in the Premises or otherwise acquired (the "Trade Fixtures"). Tenant agrees to repair any damage which may be done to the Premises resulting from the removal of the Trade Fixtures. Tenant shall be required to remove the Trade Fixtures from the Premises within a reasonable time after the termination or expiration of the Term, if requested to do so by Landlord. Any Trade Fixtures that are not removed from the Premises within a reasonable time after the termination or expiration of the Term, shall become the property of Landlord and may be disposed of by Landlord at Landlord's discretion.

13.     Insurance. Tenant shall maintain insurance on the building and the Premises in amounts and of the type typically maintained for similar operations and reasonably acceptable to Landlord. Tenant shall keep in full force and effect appropriate levels of public liability and property damage liability insurance. Such insurance shall name Landlord as an additional insured and an additional loss payee, and shall provide that it is primary insurance and not excess over or contributory with any other valid, existing and applicable insurance in force for or on behalf of Landlord, and shall provide that Landlord shall receive thirty (30) days written notice from the insurer prior to any cancellation or change of coverage. In addition, Tenant shall keep in effect fire insurance (including standard extended coverage endorsement) for the full replacement cost of the Trade Fixtures, personal property and improvements. Tenant shall deliver policies of the insurance required or certificates to Landlord on or before the commencement of the Term. Such insurance may be provided under blanket insurance policies covering other properties owned or leased by Tenant and its affiliates.

14.     Fire. In the event the Premises, or any material portion thereof shall be damaged by fire or other casualty during the Term so as to render the Premises untenantable and such Premises cannot be made tenantable within one hundred twenty (120) days after such damage, this Lease may be terminated by Tenant, at its sole option, by written notice thereof sent to Landlord. If such damage can be repaired within one hundred twenty (120) days after the date of such damage, Landlord shall enter and make whatever repairs are necessary without affecting this Lease, but the rent payment hereunder shall abate while such repairs are being made in such proportion as the part of the Premises thus destroyed or rendered untenantable bears to the total Premises. In the event the Premises is so slightly damaged by such fire or other casualty as not to be rendered untenantable, Landlord shall make the necessary repairs with reasonable promptness and the payment of rent shall not be affected thereby.

15.　Eminent Domain.　If all or any substantial part of the Premises or the building shall be taken by or conveyed to any public authority under the power of eminent domain, then the Term shall cease on the part of the Premises so taken or conveyed on the date possession of that part shall be required for public use, and any rent paid in advance of such date shall be refunded to Tenant, and Tenant shall have the right to terminate this Lease upon written notice to Landlord.　In the event that less than a substantial part of the Premises or the building is so affected in the reasonable judgment of Tenant, Landlord shall make all necessary repairs and Tenant shall continue in possession of the Premises under the same terms and conditions as are herein provided, except that the rent charged herein shall be reduced in direct proportion to the amount of the Premises so affected.　All damages awarded for such taking or conveyance shall belong to and be the property of that party to which they are awarded.

16.　Quiet Enjoyment.

(a)　Landlord covenants and warrants that it owns good fee simple unencumbered marketable title to the Premises, and that it now has the right to enter into this Lease for the Term set forth herein.

(b)　Landlord covenants that upon payment by Tenant of the rents and other charges herein provided, and upon the substantial performance of all the covenants, terms and conditions on Tenant's part to be performed under this Lease, Tenant shall peaceably and quietly hold and enjoy the Premises during the Term, without hindrance or interruption by any of the following: (i) Landlord or any assignee of Landlord; (ii) any person or party claiming, directly or remotely, under or through Landlord; (iii) any person or party, directly or indirectly, acting under the direction or control of Landlord or under the direction or control of any person or party claiming, directly or remotely, under or through Landlord, or under the direction or control of any assignee of Landlord; or (iv) any person or party acting in concert with Landlord or in concert with any assignee of Landlord, or in concert with any person or party claiming, directly or remotely, under or through Landlord.

17.　Right to Mortgage.　Landlord reserves the right to subordinate this Lease to the lien of any first mortgage now or hereafter placed upon Landlord's interest in the Premises; provided, however, that no default by Landlord under any mortgage, or any action of whatsoever kind or nature taken by any mortgagee, including without limitation the sale of the Premises upon foreclosure of the mortgage, shall affect Tenant's rights under this Lease or, directly or indirectly, disturb Tenant's peaceful and quiet possession and enjoyment of the Premises while Tenant is not in material default under this Lease and so long as Tenant's right to possession of the Premises has not been duly terminated pursuant to and in compliance with the provisions of Section 10 of this Lease.

Landlord agrees to execute and deliver to Tenant on or before the Closing Date a Subordination, Non-Disturbance and Attornment Agreement executed by any lender of Landlord (including Wachovia), in form and substance reasonably acceptable to Tenant.　Any such first mortgage, now or hereafter encumbering the Premises, shall provide that the mortgagee or any transferee agrees to recognize this Lease and all of Tenant's rights hereunder, in the event of foreclosure or any other transfer of the Premises, while Tenant is not in material default under

this Lease and so long as Tenant's right to possession of the Premises has not been duly terminated pursuant to and in compliance with the provisions of Section 10 of this Lease; and that such agreement of the mortgagee shall also be binding upon: (i) any party that acquires the Premises at a mortgage foreclosure sale, and (ii) all persons and parties that, directly or remotely, claim under or through the mortgagee or any mortgage foreclosure sale buyer. Tenant agrees that any mortgagee may elect to have this Lease a prior lien to its mortgage, and in the event of such election and upon written notification by such mortgagee to Tenant to that effect, this Lease shall be prior in lien to the said mortgage, whether this Lease is dated prior to or subsequent to the date of such mortgage.

18. Use and Occupancy. Tenant is granted the right to occupy and use the Premises for a automobile sales and service business and Tenant will use the Premises only in accordance with local zoning ordinances and other applicable laws and private land use restrictions.

19. Subletting, Transfer and Assignment. Tenant shall have the unrestricted right to transfer or assign this Lease, and/or, sublet or license the use of all or any portion of the Premises upon obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed.

20. Real Property Taxes. During the Term, Tenant shall pay all real property taxes and assessments and similar charges (including new taxes or charges in lieu of or in addition to those now in existence) assessed or levied against the Premises. Landlord covenants and agrees to use its best good faith efforts to have such taxing authorities send such tax bills directly to Tenant. In the event that the taxing authorities will not provide such tax bills directly to Tenant, Landlord shall furnish Tenant with copies of all such tax bills promptly upon receipt thereof and in sufficient time to allow Tenant to pay such taxes by the due date for which such taxes are payable without penalty. Subject to Tenant's right to contest such tax bills as set forth below, Tenant agrees to pay all tax bills by the due date for such tax bills. In the event that Tenant does not pay any such tax bills by the due date, Landlord may make payment of such tax bills, and thereafter provide written demand to Tenant for payment. Failure of Tenant to honor and remit payment within ten (10) days after receipt of such written demand from Landlord shall be a default by Tenant and governed by Section 10(c) above. Notwithstanding anything herein to the contrary, (i) for the first year of the Term, Tenant shall pay its prorated share of the real property taxes and assessments for such first year on a per diem basis based upon the respective due dates of such taxes and assessments, and (ii) upon the expiration or early termination of the Term, if Tenant does not purchase the Premises, the real property taxes and assessments for the last year of this Lease shall be prorated on a per diem basis based upon the respective due dates of such taxes and assessments. Tenant shall not be required to pay more than Tenant's prorated portion of real property taxes and assessments as set forth above, and Landlord shall pay, or reimburse Tenant for payment of the balance thereof. Tenant shall have the right to elect to pay any assessments in installments, if permitted by the taxing authority, and in such event Tenant shall be responsible only for its portion of such installments falling due during the Term and before the expiration or early termination of this Lease. If Tenant desires to contest an increase in any such tax bills, Tenant shall have the right to do so at its own expense and Landlord shall fully cooperate with Tenant in any such proceeding.

21. Signs. Landlord agrees not to use or permit to be used for advertising purposes

any part of the Premises, but agrees that Tenant or its subsidiaries or any person or party duly authorized by Tenant has the right to place its signs, name or advertisements in, on, and about any portion of the Premises, except such limitations as may be imposed by law.

22. Consent of Landlord. Wherever the consent or approval of Landlord is required in this Lease, such consent or approval shall not be unreasonably withheld or delayed.

23. Miscellaneous Provisions.

(a) Waiver. One or more waivers of any covenant or condition by Landlord or Tenant shall not be construed as a waiver of a subsequent breach of the same covenant or condition, and the consent or approval by either party to or of any act by the other party requiring consent or approval shall not be deemed to render unnecessary consent or approval to or of any subsequent similar act. No breach of a covenant or condition of this Lease shall be deemed to have been waived by either party, unless such waiver is in writing signed by each party.

(b) Entire Agreement. This Lease and the Exhibits attached hereto and forming a part hereof set forth all the covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Premises, and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between them concerning the Premises other than as herein set forth. No alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by each party.

(c) Interpretation and Use of Pronouns. Nothing contained herein shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that no provision contained herein or any acts of the parties herein, shall be deemed to create any relationship between the parties hereto other than the relationship of Landlord and Tenant. Whenever herein the singular is used, the same shall include the plural, and the neuter gender shall include the feminine and male genders, and vice-versa.

(d) Notices. Any notice, communication, request, reply or advice (hereinafter severally and collectively, for convenience, called "Notice") in this Lease provided or permitted to be given, made or accepted by either party to the other must be in writing and may, unless otherwise in this Agreement expressly provided, be given or be served by depositing the same in the United States mail, postage paid, and registered or certified and addressed to the party to be notified, with return receipt requested, or by delivering the same in person to an officer of such party, or by prepaid telegram, when appropriate, addressed to the party to be notified. Notice deposited in the mail in the manner herein above described shall be effective, unless otherwise stated in this Lease, from and after the date it is so deposited. Notice given in any other manner shall be effective only if and when received by the party to be notified. For purposes of Notice, the addresses of the parties shall be as follows:

<table>
<tr><td>If to Landlord:</td><td>Mary K. Haire, Trustee<br>2553 Southwest 210th Avenue<br>Dunnellon, Florida 34431</td></tr>
</table>

If to Landlord:      Mary K. Haire, Trustee
2553 Southwest 210th Avenue
Dunnellon, Florida 34431

with a copy to: Todd Hodges, Esq.
905 Shaded Water Way
Lutz, Florida 33549

If to Tenant:      Elder Automotive Group of Tampa Bay, Inc.
320 East Fletcher Avenue
Tampa, Florida 33612
Attention: Robert R. Elder

with a copy to: Dawda, Mann, Mulcahy & Sadler, PLC
39533 Woodward Avenue, Suite 200
Bloomfield Hills, Michigan 48304
Attention: Edward C. Dawda

or to such other location as the parties may direct in writing.

(e) <u>Captions and Section Number</u>. The captions, Section numbers, and index appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe, or describe the scope or intent of such section or subsection of this Lease nor in any way affect this Lease.

(f) <u>Recording</u>. Upon the request of either party hereto, the other party shall join in the execution of a memorandum or so-called "short form" of this Lease for the purposes of recordation. Such memorandum or short form of this Lease shall describe the parties, the leased premises, the term of this Lease, any special provisions (including the Option to purchase the Premises held by Tenant), and shall incorporate this Lease by reference.

(g) <u>Laws of the State of Florida and Severability</u>. This Lease shall be governed by and construed in accordance with the laws of the State of Florida. If any provision of this Lease or the application thereof to any party or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease shall not be affected thereby and each provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

(h) <u>Exhibits</u>. The Exhibits referred to in this Lease and attached hereto are incorporated herein by reference.

(i) <u>Successors</u>. All rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind their respective successors and assigns.

(j) <u>Counterparts</u>. This Lease, and all amendments hereto, may be executed in several counterparts, each of which shall be deemed to be an original and all of which together shall constitute one agreement binding upon both parties hereto, notwithstanding that the parties shall not have signed the same counterpart. For the purposes of this Lease, facsimile or

electronic signatures shall have the same force and effect as original signatures.

        (k)     <u>Drafting of Lease</u>. This Lease was prepared and negotiated by Landlord and Tenant, and all of the provisions contained in this Lease shall be construed without prejudice to the party that actually memorialized this Lease in final form; and this Lease shall be considered to be drafted by both Landlord and Tenant.

<div align="center">[Signatures on Following Page]</div>

Landlord and Tenant have executed this Lease as of the day and year first above written.

Signed in the Presence of:

Witnesses for Landlord:

**LANDLORD:**

MARY K. HAIRE, TRUSTEE OF THE MARY K. HAIRE REVOCABLE TRUST AGREEMENT DATED NOVEMBER 14, 1989

By: _____

Name: _____

    Mary K. Haire
    Trustee

Name: _____


Witnesses for Tenant:

**TENANT:**

ELDER AUTOMOTIVE GROUP OF TAMPA BAY, INC.,
a Florida corporation

By: _____

Name: _____

    Robert R. Elder
    President

Name: _____

## **EXHIBIT A**

LEGAL DESCRIPTION

(to be attached)

<u>EXHIBIT L</u>

DEALERSHIP FACILITY LEASE
(VACANT LOT)

**THIS LEASE** is made this _____ day of _____, 2009, by and between **MAERDAMA PROPERTIES**, a Florida partnership, whose address is _____ (hereinafter referred to as "Landlord"), and **ELDER AUTOMOTIVE GROUP OF TAMPA BAY, INC.**, a Florida corporation, whose address is 320 East Fletcher Avenue, Tampa, Florida 33612 (hereinafter referred to as "Tenant").

**W I T N E S S E T H:**

**WHEREAS**, Ernie Haire Ford, Inc., a Florida corporation ("Seller") and Tenant are parties to that certain Asset Purchase Agreement dated as of June 29, 2009, as amended (the "Purchase Agreement"), whereby Tenant, as Buyer, has the right to purchase from Seller certain assets used in connection with the operation of an automobile dealership which sells products of the Ford Division of Ford Motor Company located at 9545 North Florida Avenue, Tampa, Florida 33612 (all capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement); and

**WHEREAS**, it is a condition precedent to the obligations of Tenant under the Purchase Agreement that Landlord and Tenant enter into this Lease for the Premises (as defined herein).

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant covenant and agree as follows:

1. <u>Description and Improvements</u>. Landlord, in consideration of the rents to be paid and the covenants and agreements to be performed by Tenant, does hereby lease unto Tenant the land and buildings (which land and buildings are hereinafter together referred to as the "Premises") located in the City of Tampa, County of Hillsborough, State of Florida, commonly known as 9530 North Florida Avenue, together with all the tenements, hereditaments, improvements, appurtenances, rights, easements, and rights-of-way incident thereto. The legal description of the Premises is set forth on <u>Exhibit A</u> attached hereto.

2. <u>Term</u>. The term of this Lease shall be for a period of four (4) years [or forty eight (48) months] from the date of this Lease (the "Term"). The taking possession of the Premises by Tenant shall not constitute a waiver by Tenant of (i) any defects in the Premises, which Landlord is required to cure pursuant to this Lease, or (ii) any failure by Landlord to perform any of Landlord's other covenants or obligations contained in this Lease.

3. <u>Rent</u>. Tenant shall pay to Landlord, as rent for the Premises, the sum of Five Thousand and No/100 Dollars ($5,000) for each calendar month of the Term, payable on the first (1st) day of each calendar month for the current calendar month; provided, however, that if the Term shall commence on a day other than the first day of a calendar month, or shall end on a

day other than the last day of a calendar month, the rental for such first or last fractional month shall be such proportion of the monthly fixed rental as the number of days in such fractional month for which rent is payable bears to the total number of days in such calendar month. In the event this Lease is terminated, canceled, annulled, or voided, then all unearned rent and other charges paid in advance by Tenant shall be promptly refunded by Landlord to Tenant. The monthly rental amount to be paid by Tenant under this Lease shall not be increased for any reason whatsoever, including but not limited to, a sale of the Premises by Landlord during the Term.

4.     Option to Purchase.  Tenant shall have an irrevocable right to purchase the Premises so long as Tenant is leasing the Premises described in this Lease (the "Option"), which Option may be exercised by Tenant at any time during the Term by providing written notice to Landlord of Tenant's intent to exercise the Option (the "Option Notice"). Upon Landlord's receipt of the Option Notice, Landlord agrees to transfer, sell and convey by general warranty deed, fee simple title to the Premises to Tenant (or its designee), subject only to easements and other matters of record which have been reviewed by and are acceptable to Tenant in Tenant's sole and absolute discretion and matters which are disclosed by an accurate survey of the Premises (the "Survey") and are acceptable to Tenant in Tenant's sole and absolute discretion (the "Permitted Exceptions"). The terms of Tenant's purchase of the Premises under the Option would be as follows:

(a)     Landlord and Tenant agree that for a period of seven (7) days after the date of the Option Notice, Landlord and Tenant shall negotiate in good faith to reach a mutually agreeable purchase price for the Premises. In the event Landlord and Tenant cannot agree upon a purchase price for the Premises during these seven (7) days, the purchase price shall be determined in the following manner. Landlord and Tenant hereby acknowledge that Integra Realty Resources has performed an appraisal of the Premises dated July 27, 2009 (the "Closing Appraisal"), a copy of which is in the possession of Landlord and Tenant. Upon Landlord's receipt of the Option Notice, Landlord and Tenant shall select a mutually acceptable certified MAI appraiser to perform another appraisal of the Premises (the "Option Appraisal"). The purchase price of the Premises shall be the average of the Closing Appraisal and the Option Appraisal. The cost of the Closing Appraisal shall be the sole responsibility of Tenant. The cost of the Option Appraisal, if necessary, shall be spilt equally between Landlord and Tenant.

(b)     Landlord shall, within fifteen (15) days after receipt of the Option Notice, furnish to Tenant, at Landlord's cost and expense, a commitment for an owner's extended policy of title insurance (the "Title Commitment") for the Premises issued by a title insurance company acceptable to Tenant (the "Title Company"), dated later than the date of the Option Notice and in the amount of the purchase price, along with copies of all of the underlying documents referenced in the Title Commitment. The Title Company shall agree to insure title to the Premises subject only to the Permitted Exceptions (as defined above). Landlord, at its sole expense, will cause the Title Company to deliver to Tenant promptly after the closing a final policy of title insurance covering the Premises with such endorsements that Tenant may reasonably require following its review of the Title Commitment and the Survey (the "Title Policy").

(c)     Landlord shall pay all costs for the Title Commitment, the premium to issue to Tenant the Title Policy, and all transfer taxes. Tenant shall be responsible for the payment of its own attorney's fees, the fee required to record the general warranty deed, and the cost of the Survey.

(d)     At closing on the purchase of the Premises, Landlord shall convey good and marketable fee simple title to the Premises to Tenant pursuant to a recordable general warranty deed acceptable to Tenant. Landlord shall deliver any affidavits, statements, gap undertakings, and other documents reasonably required by Tenant or the Title Company to consummate Tenant's purchase of the Premises. Tenant shall have the right to examine the Survey and the Title Commitment and to notify Landlord of any objectionable matter or defect, as determined by Tenant in Tenant's sole and absolute discretion. If Landlord is notified of any objectionable matter(s), Landlord agrees to promptly employ good faith efforts to procure a cure for same at no cost to Tenant. In the event, however, that Landlord is unable to cure to Tenant's satisfaction, any objectionable matter within thirty (30) days after notice of objection is given to Landlord, then at Tenant's option Tenant may (i) take title to the Premises despite the existence of the objectionable matters, (ii) withdraw its Option Notice, in which event the Lease shall continue in full force and effect as if the Option Notice had never been sent by Tenant to Landlord, (iii) enter into negotiations with a third party (or third parties) to cure any such objectionable matters, provided that any agreement to cure such objectionable matters must be satisfactory to Landlord in its reasonable discretion, or (iv) in the event that such objectionable matter relates to a monetary lien of a known amount, to reduce the purchase price by the amount necessary to satisfy the obligation related to such lien.

(e)     Closing on the purchase of the Premises pursuant to the Option shall be further contingent upon Tenant obtaining financing to enable Tenant to purchase the Premises in an amount and on terms acceptable to Tenant in its sole and absolute discretion.

5.     Landlord's Representations, Warranties and Covenants.     Landlord hereby represents, warrants and covenants to Tenant as follows:

(a)     Landlord has furnished Tenant with all reports, evaluations, notices, surveys and/or assessments prepared for, or in the possession of, or under the control of, Landlord pertaining to the Premises which are reasonably related to the environmental condition of the Premises (the "Environmental Reports").

(b)     Landlord has no other information concerning the environmental condition of the Premises other than the Environmental Reports furnished to Tenant.

(c)     The Premises has been properly maintained and operated in the ordinary course, with no damage or casualty having occurred upon the Premises.

(d)     The Premises shall at the commencement of the Term, and during the entire Term, conform to the laws, ordinances, rules, regulations, requirements and orders of all duly constituted governmental units, authorities, and agencies and shall be in a condition suitable for the operation of an automobile sales and service business.

(e)     The Premises complies with all applicable zoning and other laws, ordinances, regulations and building codes and Landlord has not received any notice of any violation thereof which has not been remedied.

(f)     That, except as disclosed in the Environmental Reports, (i) no Hazardous Substances, as defined below, including without limitation, asbestos-containing materials and electrical transformers or ballasts containing PCBs, are present or were installed, exposed, released or discharged in, or under the Premises, (ii) no underground storage tanks containing Hazardous Substances, any hydraulic lifts containing Hazardous Substances or any other Hazardous Substances are or were located on or in the Premises, and (iii) the Premises has been used and operated by Landlord, or any lessee of the Premises, in compliance with all applicable local, state and Federal laws, ordinances, rules, regulations and orders regarding Hazardous Substances, and Landlord has all permits and authorizations required for the use and operation of the Premises.     "Hazardous Substance(s)" as used herein means any hazardous or toxic substances, materials, or wastes, including, but not limited to, those substances, materials or wastes, listed in the United States Department of Transportation Hazardous Materials Table (49 CFR 172.101) or by the Environmental Protection Agency as hazardous substances (40 CFR Part 302) and amendments thereto, or such substances, materials and wastes which are regulated under any applicable local, state or federal law, including, without limitation, any material, waste or substance which is (1) petroleum and gasoline, (2) asbestos, (3) polychlorinated biphenyls, (4) designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act (33 U.S.C. §1251, et seq. (33 U.S.C. §1321) or listed pursuant to Section 307 of the Clean Water Act (33 U.S.C. §1317), (5) defined as a "hazardous waste" pursuant to Section 1004 of the Solid Waste Disposal Act, including the Resource Conversation and Recovery Act, 42 U.S.C. §6901, et seq. (42 U.S.C. §6903(5)), or (6) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response Compensation, and Liability Act, 42 U.S.C. §9601, et seq. (42 U.S.C. §9601).

(g)     Landlord has the full power and authority to execute and deliver this Lease and to perform its obligations under this Lease.

6.     Holdover.  In the event Tenant remains in possession of the Premises after it cancels or terminates this Lease, or remains in possession of the Premises after the expiration of the Term, the tenancy shall thereafter be from month to month at the same monthly rental as set forth in Section 3 above and on the same conditions except as to the Term, as herein provided.

7.     Alterations.  Tenant shall have the right and privilege at all times during the Term to make, at its own expense, such alterations, changes, improvements and additions to the Premises as Tenant may desire provided such work when completed will not impair the structural integrity or soundness of the building; and provided that all such improvements are made in accordance with applicable local, state and federal rules, regulations and ordinances.

8.     Repairs.  Landlord agrees that, during the Term, it will, at its own cost and expense, make all necessary repairs and replacements to: (i) the roof, foundation, outer walls, exterior and structure of any building located upon the Premises and related chimney outlets, plate glass, floor and ceiling tiles; (ii) the interior walls, ceilings, floors, and floor coverings, when repairs thereto are made necessary because of faulty construction or Landlord's failure to

keep the exterior or structure in good repair; and (iii) all plumbing, electrical, ventilation systems, heating and air conditioning systems as necessary to keep the same in good repair; provided however, Tenant shall enter into a service agreement with a qualified maintenance provider for such provider to maintain the plumbing, electrical, heating, ventilation and air conditioning systems, with Landlord making all necessary repairs and replacements thereto as recommended by such provider. Such maintenance obligations of Tenant pursuant to the preceding sentence shall only apply to that portion of the plumbing, electrical, heating, ventilation and air conditioning systems that are located inside the building situated upon the Premises. Landlord shall be solely responsible for the maintenance, repair and replacement of that portion of the plumbing, electrical, heating, ventilation and air conditioning systems that are located outside of the building situated upon the Premises. Landlord shall also perform the paving, floor slab and common sewage line plumbing; provided however, Tenant shall enter into a service agreement with a qualified maintenance provider for such provider to maintain the paving located upon the Premises, with Landlord making all necessary repairs and replacements thereto as recommended by such provider. Any damage to Tenant's property occurring from failure of Landlord to make repairs that are Landlord's obligation to make shall be borne by Landlord. If Tenant deems any repairs and/or replacements necessary, and such repairs and/or replacements have not been made by Landlord, Tenant may provide written notice to Landlord of the need for such repairs and/or replacements. If Landlord does not make such repairs and/or replacements, or does not diligently commence making such repairs and/or replacements within five (5) days of such notice, Tenant may make such repairs and/or replacements and seek immediate reimbursement from Landlord. If Landlord fails to remit payment to Tenant within ten (10) days after notice from Tenant, Tenant may abate rent in the amount of such repairs and/or replacements. Tenant shall also have the right to make any repairs and/or replacements in the event of an emergency, and Tenant agrees to provide written notice to Landlord within forty eight (48) hours after making such emergency repairs and/or replacements indicating the nature of such repairs and/or replacements. Landlord agrees to reimburse Tenant within ten (10) days after Tenant provides notice to Landlord of the cost of such emergency repairs and/or replacements. If Landlord fails to remit payment to Tenant for such emergency repairs and/or replacements within such ten (10) day period, Tenant may abate rent in the amount of the cost of such emergency repairs and/or replacements. Landlord has the right to enter the Premises periodically, at any reasonable time, to inspect the condition of the Premises and to make repairs and/or replacements that it is Landlord's obligation to make.

   9.   Utilities. Tenant shall pay for all gas, electricity, heat and water and all other utilities consumed by it at the Premises from and after the delivery of exclusive physical possession of the Premises to Tenant. Tap charges, sewer charges and sewer taxes, regardless of the manner billed or assessed, shall be paid by Tenant. Landlord shall not do anything which will interrupt or interfere with availability of any utilities to Tenant at the Premises throughout the Term.

   10.   Defaults by Tenant.

      (a)   If the monthly rent set forth in Section 3 above, or any part thereof, shall be unpaid on the date of payment as required by this Lease, and remain unpaid for a period of ten (10) days after Tenant shall have received from Landlord notice in writing of such nonpayment, then and in such case it shall and may be lawful for Landlord, at Landlord's option, by summary

proceedings or by any other appropriate legal action or proceedings to terminate this Lease and to enter into the Premises, or any part thereof, and expel Tenant or any person or persons occupying the Premises. Landlord agrees that in no event shall the nonpayment of rent be the basis of a forfeiture of this Lease or otherwise result in the eviction of Tenant or the termination of the Term unless said written notice shall have been served on Tenant as hereinbefore provided and Tenant shall have failed to cure such default within said ten (10) day period after the receipt of said notice.

(b)     It is mutually agreed that if Tenant shall be in default in performing any of the terms or provisions of this Lease (other than the provision requiring the payment of rent which is covered in Section 10(a) above) Landlord shall give to Tenant notice in writing of such default, and if Tenant shall fail to cure such default within thirty (30) days after receipt of such notice, or if the default is of such character as to require more than thirty (30) days to cure and Tenant shall fail to use reasonable diligence in curing such default after receipt of such notice, then and only in such event Landlord may cure such default for the account of and at the cost and expense of Tenant, and the full amount so expended by Landlord shall immediately be owing by Tenant to Landlord. However, in the event that Tenant shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or another reason of a like nature not the fault of Tenant, then performance of such act shall be excused for the period of the delay and the period for the commencement of performance of any such act shall be extended for a period equivalent to the period of such delay. Landlord agrees that in no event shall such default be the basis of a forfeiture of this Lease or otherwise result in the eviction of Tenant or the termination of the Term.

(c)     If Tenant shall default in any payment other than rent required to be paid by Tenant under the terms of this Lease, Landlord may (but shall not be obligated to) make such payment, in which event the amount thereof shall be payable as rental to Landlord by Tenant on the next rent day, together with interest at six (6%) percent per annum from the date of such payment by Landlord.

(d)     If, as a result of an uncured Tenant default, Landlord shall, during the Term, obtain possession of the Premises by re-entry, summary proceedings, or other lawful means, Tenant hereby agrees to pay Landlord all reasonable costs and expenses incurred in obtaining possession of the Premises.

11.     Tenant's Right to Terminate. Tenant shall have the right to terminate this Lease at any time during the Term upon thirty (30) days prior written notice to Landlord, without any further or other obligation to Landlord hereunder as of the effective date of said termination, upon any one or more of the following events:

(a)     Upon a breach by Landlord of any representation, warranty or covenant contained in this Lease;

(b)     In the event the presence of any Hazardous Substances and/or the implementation of any response activities incident thereto, render the Premises, in the reasonable

discretion of the Tenant, not useable for Tenant's intended use thereof; or

(c)     Without regard to any notice requirement, at the Closing pursuant to Tenant's exercise of the Option pursuant to Paragraph 4 above.

12.     Trade Fixtures.  Tenant may, at any time during the Term, or within a reasonable time after the expiration or termination of the Term, remove from the Premises all fixtures and other equipment which Tenant may have purchased, leased, or installed in the Premises or otherwise acquired (the "Trade Fixtures").  Tenant agrees to repair any damage which may be done to the Premises resulting from the removal of the Trade Fixtures.  Tenant shall be required to remove the Trade Fixtures from the Premises within a reasonable time after the termination or expiration of the Term, if requested to do so by Landlord.  Any Trade Fixtures that are not removed from the Premises within a reasonable time after the termination or expiration of the Term, shall become the property of Landlord and may be disposed of by Landlord at Landlord's discretion.

13.     Insurance.  Tenant shall maintain insurance on the building and the Premises in amounts and of the type typically maintained for similar operations and reasonably acceptable to Landlord.  Tenant shall keep in full force and effect appropriate levels of public liability and property damage liability insurance.  Such insurance shall name Landlord as an additional insured and an additional loss payee, and shall provide that it is primary insurance and not excess over or contributory with any other valid, existing and applicable insurance in force for or on behalf of Landlord, and shall provide that Landlord shall receive thirty (30) days written notice from the insurer prior to any cancellation or change of coverage.  In addition, Tenant shall keep in effect fire insurance (including standard extended coverage endorsement) for the full replacement cost of the Trade Fixtures, personal property and improvements.  Tenant shall deliver policies of the insurance required or certificates to Landlord on or before the commencement of the Term.  Such insurance may be provided under blanket insurance policies covering other properties owned or leased by Tenant and its affiliates.

14.     Fire.  In the event the Premises, or any material portion thereof shall be damaged by fire or other casualty during the Term so as to render the Premises untenantable and such Premises cannot be made tenantable within one hundred twenty (120) days after such damage, this Lease may be terminated by Tenant, at its sole option, by written notice thereof sent to Landlord.  If such damage can be repaired within one hundred twenty (120) days after the date of such damage, Landlord shall enter and make whatever repairs are necessary without affecting this Lease, but the rent payment hereunder shall abate while such repairs are being made in such proportion as the part of the Premises thus destroyed or rendered untenantable bears to the total Premises.  In the event the Premises is so slightly damaged by such fire or other casualty as not to be rendered untenantable, Landlord shall make the necessary repairs with reasonable promptness and the payment of rent shall not be affected thereby.

15.     Eminent Domain.  If all or any substantial part of the Premises or the building shall be taken by or conveyed to any public authority under the power of eminent domain, then the Term shall cease on the part of the Premises so taken or conveyed on the date possession of that part shall be required for public use, and any rent paid in advance of such date shall be refunded to Tenant, and Tenant shall have the right to terminate this Lease upon written notice to

Landlord. In the event that less than a substantial part of the Premises or the building is so affected in the reasonable judgment of Tenant, Landlord shall make all necessary repairs and Tenant shall continue in possession of the Premises under the same terms and conditions as are herein provided, except that the rent charged herein shall be reduced in direct proportion to the amount of the Premises so affected. All damages awarded for such taking or conveyance shall belong to and be the property of that party to which they are awarded.

16.    Quiet Enjoyment.

(a)    Landlord covenants and warrants that it owns good fee simple unencumbered marketable title to the Premises, and that it now has the right to enter into this Lease for the Term set forth herein.

(b)    Landlord covenants that upon payment by Tenant of the rents and other charges herein provided, and upon the substantial performance of all the covenants, terms and conditions on Tenant's part to be performed under this Lease, Tenant shall peaceably and quietly hold and enjoy the Premises during the Term, without hindrance or interruption by any of the following: (i) Landlord or any assignee of Landlord; (ii) any person or party claiming, directly or remotely, under or through Landlord; (iii) any person or party, directly or indirectly, acting under the direction or control of Landlord or under the direction or control of any person or party claiming, directly or remotely, under or through Landlord, or under the direction or control of any assignee of Landlord; or (iv) any person or party acting in concert with Landlord or in concert with any assignee of Landlord, or in concert with any person or party claiming, directly or remotely, under or through Landlord.

17.    Right to Mortgage. Landlord reserves the right to subordinate this Lease to the lien of any first mortgage now or hereafter placed upon Landlord's interest in the Premises; provided, however, that no default by Landlord under any mortgage, or any action of whatsoever kind or nature taken by any mortgagee, including without limitation the sale of the Premises upon foreclosure of the mortgage, shall affect Tenant's rights under this Lease or, directly or indirectly, disturb Tenant's peaceful and quiet possession and enjoyment of the Premises while Tenant is not in material default under this Lease and so long as Tenant's right to possession of the Premises has not been duly terminated pursuant to and in compliance with the provisions of Section 10 of this Lease.

Landlord agrees to execute and deliver to Tenant on or before the Closing Date a Subordination, Non-Disturbance and Attornment Agreement executed by any lender of Landlord (including Wachovia), in form and substance reasonably acceptable to Tenant. Any such first mortgage, now or hereafter encumbering the Premises, shall provide that the mortgagee or any transferee agrees to recognize this Lease and all of Tenant's rights hereunder, in the event of foreclosure or any other transfer of the Premises, while Tenant is not in material default under this Lease and so long as Tenant's right to possession of the Premises has not been duly terminated pursuant to and in compliance with the provisions of Section 10 of this Lease; and that such agreement of the mortgagee shall also be binding upon: (i) any party that acquires the Premises at a mortgage foreclosure sale, and (ii) all persons and parties that, directly or remotely, claim under or through the mortgagee or any mortgage foreclosure sale buyer. Tenant agrees that any mortgagee may elect to have this Lease a prior lien to its mortgage, and in the event of

such election and upon written notification by such mortgagee to Tenant to that effect, this Lease shall be prior in lien to the said mortgage, whether this Lease is dated prior to or subsequent to the date of such mortgage.

18.　Use and Occupancy. Tenant is granted the right to occupy and use the Premises for a automobile sales and service business and Tenant will use the Premises only in accordance with local zoning ordinances and other applicable laws and private land use restrictions.

19.　Subletting, Transfer and Assignment. Tenant shall have the unrestricted right to transfer or assign this Lease, and/or, sublet or license the use of all or any portion of the Premises upon obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed.

20.　Real Property Taxes. During the Term, Tenant shall pay all real property taxes and assessments and similar charges (including new taxes or charges in lieu of or in addition to those now in existence) assessed or levied against the Premises. Landlord covenants and agrees to use its best good faith efforts to have such taxing authorities send such tax bills directly to Tenant. In the event that the taxing authorities will not provide such tax bills directly to Tenant, Landlord shall furnish Tenant with copies of all such tax bills promptly upon receipt thereof and in sufficient time to allow Tenant to pay such taxes by the due date for which such taxes are payable without penalty. Subject to Tenant's right to contest such tax bills as set forth below, Tenant agrees to pay all tax bills by the due date for such tax bills. In the event that Tenant does not pay any such tax bills by the due date, Landlord may make payment of such tax bills, and thereafter provide written demand to Tenant for payment. Failure of Tenant to honor and remit payment within ten (10) days after receipt of such written demand from Landlord shall be a default by Tenant and governed by Section 10(c) above. Notwithstanding anything herein to the contrary, (i) for the first year of the Term, Tenant shall pay its prorated share of the real property taxes and assessments for such first year on a per diem basis based upon the respective due dates of such taxes and assessments, and (ii) upon the expiration or early termination of the Term, if Tenant does not purchase the Premises, the real property taxes and assessments for the last year of this Lease shall be prorated on a per diem basis based upon the respective due dates of such taxes and assessments. Tenant shall not be required to pay more than Tenant's prorated portion of real property taxes and assessments as set forth above, and Landlord shall pay, or reimburse Tenant for payment of the balance thereof. Tenant shall have the right to elect to pay any assessments in installments, if permitted by the taxing authority, and in such event Tenant shall be responsible only for its portion of such installments falling due during the Term and before the expiration or early termination of this Lease. If Tenant desires to contest an increase in any such tax bills, Tenant shall have the right to do so at its own expense and Landlord shall fully cooperate with Tenant in any such proceeding.

21.　Signs. Landlord agrees not to use or permit to be used for advertising purposes any part of the Premises, but agrees that Tenant or its subsidiaries or any person or party duly authorized by Tenant has the right to place its signs, name or advertisements in, on, and about any portion of the Premises, except such limitations as may be imposed by law.

22.　Consent of Landlord. Wherever the consent or approval of Landlord is required in this Lease, such consent or approval shall not be unreasonably withheld or delayed.

23.     Miscellaneous Provisions.

(a)     Waiver.  One or more waivers of any covenant or condition by Landlord or Tenant shall not be construed as a waiver of a subsequent breach of the same covenant or condition, and the consent or approval by either party to or of any act by the other party requiring consent or approval shall not be deemed to render unnecessary consent or approval to or of any subsequent similar act.  No breach of a covenant or condition of this Lease shall be deemed to have been waived by either party, unless such waiver is in writing signed by each party.

(b)     Entire Agreement. This Lease and the Exhibits attached hereto and forming a part hereof set forth all the covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Premises, and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between them concerning the Premises other than as herein set forth.  No alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by each party.

(c)     Interpretation and Use of Pronouns.  Nothing contained herein shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that no provision contained herein or any acts of the parties herein, shall be deemed to create any relationship between the parties hereto other than the relationship of Landlord and Tenant.  Whenever herein the singular is used, the same shall include the plural, and the neuter gender shall include the feminine and male genders, and vice-versa.

(d)     Notices. Any notice, communication, request, reply or advice (hereinafter severally and collectively, for convenience, called "Notice") in this  Lease provided or permitted to be given, made or accepted by either party to the other must be in writing and may, unless otherwise in this Agreement expressly provided, be given or be served by depositing the same in the United States mail, postage paid, and registered or certified and addressed to the party to be notified, with return receipt requested, or by delivering the same in person to an officer of such party, or by prepaid telegram, when appropriate, addressed to the party to be notified.  Notice deposited in the mail in the manner herein above described shall be effective, unless otherwise stated in this Lease, from and after the date it is so deposited.  Notice given in any other manner shall be effective only if and when received by the party to be notified.  For purposes of Notice, the addresses of the parties shall be as follows:

If to Landlord:          Maerdama Properties
                         c/o Mary Haire
                         2553 Southwest 210th Avenue
                         Dunnellon, Florida  34431

with a copy to: Todd Hodges, Esq.
                905 Shaded Water Way

Lutz, Florida 33549

If to Tenant:    Elder Automotive Group of Tampa Bay, Inc.
                 320 East Fletcher Avenue
                 Tampa, Florida 33612
                 Attention: Robert R. Elder

with a copy to:Dawda, Mann, Mulcahy & Sadler, PLC
               39533 Woodward Avenue, Suite 200
               Bloomfield Hills, Michigan 48304
               Attention: Edward C. Dawda

or to such other location as the parties may direct in writing.

(e)     Captions and Section Number. The captions, Section numbers, and index appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe, or describe the scope or intent of such section or subsection of this Lease nor in any way affect this Lease.

(f)     Recording. Upon the request of either party hereto, the other party shall join in the execution of a memorandum or so-called "short form" of this Lease for the purposes of recordation. Such memorandum or short form of this Lease shall describe the parties, the leased premises, the term of this Lease, any special provisions (including the Option to purchase the Premises held by Tenant), and shall incorporate this Lease by reference.

(g)     Laws of the State of Florida and Severability. This Lease shall be governed by and construed in accordance with the laws of the State of Florida. If any provision of this Lease or the application thereof to any party or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease shall not be affected thereby and each provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

(h)     Exhibits. The Exhibits referred to in this Lease and attached hereto are incorporated herein by reference.

(i)     Successors. All rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind their respective successors and assigns.

(j)     Counterparts. This Lease, and all amendments hereto, may be executed in several counterparts, each of which shall be deemed to be an original and all of which together shall constitute one agreement binding upon both parties hereto, notwithstanding that the parties shall not have signed the same counterpart. For the purposes of this Lease, facsimile or electronic signatures shall have the same force and effect as original signatures.

(k)     Drafting of Lease. This Lease was prepared and negotiated by Landlord and Tenant, and all of the provisions contained in this Lease shall be construed without prejudice to the party that actually memorialized this Lease in final form; and this Lease shall be considered to be drafted by both Landlord and Tenant.

[Signatures on Following Page]

Landlord and Tenant have executed this Lease as of the day and year first above written.

Signed in the Presence of:

Witnesses for Landlord:                     LANDLORD:

MAERDAMA PROPERTIES,
a Florida corporation

_____       By: _____

Name: _____

                                    Its: _____

Name: _____


Witnesses for Tenant:                      TENANT:

ELDER AUTOMOTIVE GROUP OF TAMPA
BAY, INC.,
a Florida corporation

_____       By: _____

Name: _____                    Robert R. Elder
                                        President

Name: _____

## EXHIBIT A

### LEGAL DESCRIPTION

(to be attached)